KLEVANSKY PIPER LLP
SIMON KLEVANSKY
ALIKA L. PIPER
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone:     (808) 536-0200
Facsimile:     (808) 237-5757
E-Mail: sklevansky@kplawhawaii.com
apiper@kplawhawaii.com

Counsel for Debtors
and Debtors-in-Possession

WAGNER CHOI & VERBRUGGE
JAMES A. WAGNER
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
E-Mail: jwagner@hibklaw.com
aito@hibklaw.com

Counsel for Creditor
SUN KONA FINANCE I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Bk. No. 13-00353 |
| | (Chapter 11) |
| 1250 OCEANSIDE PARTNERS, a Hawaii limited partnership, | |
| Debtor and Debtor-in-Possession. | |

In re

FRONT NINE, LLC, a Delaware
limited liability company,

    Debtor and Debtor-in-Possession.

In re

PACIFIC STAR COMPANY, LLC,
dba Pacific Star Properties, an Arizona
limited liability company,

    Debtor and Debtor-in-Possession.

Bk. No. 13-00354

Bk. No. 13-00355

DATE:    September 16, 2013
TIME:    9:30 a.m.
JUDGE:  Hon. Robert J. Faris

**DISCLOSURE STATEMENT FOR DEBTORS' AND SUN
KONA FINANCE I, LLC'S JOINT CONSOLIDATED PLAN OF
REORGANIZATION DATED AUGUST 15, 2013; EXHIBITS A - F**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 1

    A.    Purpose of Disclosure Statement ........................ 3
    B.    Holders of Claims Entitled to Vote ..................... 4
    C.    Voting Procedures and Deadline ........................ 5
    D.    The Confirmation Hearing and Deadline for
        Objection to Conformation of the Plan ................. 6
    E.    Important Notice and Cautionary Statement ......... 7

II. BACKGROUND INFORMATION ........................................ 9

    A.    History ........................................................... 9
    B.    Litigation and Settlements ............................... 12

            1.    Kelly Litigation ..................................... 12
            2.    The Coupe Family Litigation .................. 15
            3.    The AMICO Litigation ........................... 16
            4.    Lot Owner Litigation ............................. 18

    C.    Secured Financing and the Debtors' Default in Repayment ... 19

            1.    Bank of Scotland ................................... 19
            2.    Ackerman Ranch, Inc. ........................... 21
            3.    Textron ................................................ 22

III. EVENTS AND CIRCUMSTANCES LEADING TO THE FILING
     OF THESE CHAPTER 11 CASES ........................... 23

    A.    Purpose in Filing ........................................... 23
    B.    Bankruptcy Filing and Post-Petition Developments ... 24

            1.    Filing .................................................. 24
            2.    DIP Financing Motion ........................... 24
            3.    Appointment of Official Unsecured Creditors
                Committee ........................................... 25
            4.    Post-Petition Management ...................... 25

i

|  | 5. | Current Financial Condition | 27 |

| IV. | SUMMARY OF THE PLAN | | 28 |

| | A. | Classification and Treatment of Claims and Equity Interests | 28 |

| | | 1. | Administrative Expenses (Unclassified Claim) | 29 |
| | | 2. | Priority Tax Claims (Unclassified Claim) | 30 |
| | | 3. | Class 1 – Other Priority Claims | 31 |
| | | 4. | Class 2 – Allowed SKFI Secured Claim | 31 |
| | | 5. | Class 3 – Allowed Red Hill Secured Claim | 33 |
| | | 6. | Class 4 – Allowed County Secured Claim | 33 |
| | | 7. | Class 5 – Allowed Ackerman Secured Claim | 34 |
| | | 8. | Class 6 – Allowed SKFII Secured Claim | 35 |
| | | 9. | Class 7 – Allowed PCSA Oceanside Secured Claim | 36 |
| | | 10. | Class 8 – Allowed PCSA Front Nine Secured Claim | 37 |
| | | 11. | Class 9 – Allowed Oceanside General Unsecured Claims | 37 |
| | | 12. | Class 10 – Allowed Front Nine General Unsecured Claims | 39 |
| | | 13. | Class 11 – Allowed Pacific Star General Unsecured Claims | 40 |
| | | 14. | Class 12 – Allowed Convenience Class Claims | 40 |
| | | 15. | Class 13 – Allowed Oceanside Equity Interests | 41 |
| | | 16. | Class 14 – Allowed Front Nine Equity Interests | 42 |
| | | 17. | Class 15 – Allowed Pacific Star Equity Interests | 42 |

| | B. | Summary of Other Provisions of the Plan | 43 |

| | | 1. | Revesting of Assets | 43 |
| | | 2. | Time and Method of Distributions Under the Plan | 43 |
| | | 3. | Provisions for Treatment of Disputed Claims | 44 |
| | | 4. | Discharge of the Debtor and Injunction | 45 |
| | | 5. | Retention of Rights of Action | 46 |
| | | 6. | Exemption from Transfer Taxes | 46 |
| | | 7. | Executory Contracts and Unexpired Leases | 47 |

| V. | VOTING AND CONFIRMATION OF THE PLAN | | 48 |

| | A. | General | 48 |

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed  08/15/13   Page 4 of 67

|     | B.   | Voting Procedures and Requirements | 49 |
|     | C.   | Best Interests Test; Liquidation Analysis | 49 |
|     | D.   | Feasibility | 53 |
|     | E.   | Compliance with Applicable Provisions of the Bankruptcy Code | 55 |
|     | F.   | Retention of Jurisdiction | 56 |
|     | G.   | Bankruptcy Code Exemptions from Registration Requirements | 56 |
| VI. |      | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN | 57 |
|     | A.   | Consequences to Holders of Certain Claims | 58 |
|     | B.   | Consequences to the Debtors | 59 |
| VII. |     | RECOMMENDATION AND CONCLUSION | 59 |

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308  Filed  08/15/13  Page 5 of 67

# DISCLOSURE STATEMENT FOR DEBTORS' AND SUN KONA FINANCE I, LLC'S JOINT CONSOLIDATED PLAN OF REORGANIZATION DATED AUGUST 15, 2013; EXHIBITS A - F

## I.  INTRODUCTION

1250 Oceanside Partners, Front Nine, LLC, and Pacific Star Company, LLC, the debtors and debtors-in-possession herein (collectively, "Debtors") and Sun Kona Finance I, LLC ("SKFI") have filed a Joint Consolidated Plan of Reorganization ("Plan") to provide for the Debtors to emerge from bankruptcy. The Debtors and SKFI are referred to hereinafter collectively as the "Plan Proponents."    This Disclosure Statement is being sent to you by the Plan Proponents to help you make an informed judgment about the Plan, and to solicit your acceptance of the Plan.

Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.  The Plan Proponents recommend that you review the definitions section of the Plan before proceeding to review this Disclosure Statement.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A)

1

- The Debtor's Financial Projections for the fiscal years 2014 through 2021 ("Projections") (Exhibit B)

- Debtors' Organizational Chart (Exhibit C)

- Sun Kona Finance I, LLC and related entities Organizational Chart (Exhibit D)

- Liquidation Analysis (Exhibit E)

- SunChase Holdings, Inc. Profile (Exhibit F)

Also enclosed with this Disclosure Statement are copies of the following:

- One or more Ballots, if the recipient is entitled to vote on the Plan

- Notice of Confirmation Hearing

If you have not received all of the enclosures, please contact Debtors' counsel, Klevansky Piper, LLP at (808) 536-0200.

The Plan Proponents believe that the Plan provides the greatest and earliest possible recovery to holders of Allowed Claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative would result in further delay, uncertainty, expense, and, smaller or no distribution to holders of Allowed Claims. The Plan Proponents believe the acceptance, confirmation and implementation of the Plan is in the best interests of creditors of the Debtor.

2

On _____, 20013, after notice and a hearing held on _____, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan.

## A. Purpose of Disclosure Statement

The Bankruptcy Code requires that the proponent of a reorganization plan prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind, and in sufficient detail, that would enable a typical holder of claims or equity interests in a class impaired under that plan to make an informed judgment with respect to the plan. This Disclosure Statement provides such information, as well as information regarding the deadlines for casting ballots with respect to the Plan, the deadlines for objecting to confirmation of the Plan, the requirements that must be satisfied in order for the Bankruptcy Court to confirm the Plan, and other relevant information. Parties in interest should read this Disclosure Statement, the Plan, and all of the accompanying exhibits in their entirety in order to determine:

- How the Plan will affect their Claims against and Equity Interests in the Debtor;

3

- Their rights with respect to voting for or against the Plan;

- Their rights with respect to objecting to confirmation of the Plan; and

- How and when to cast a ballot with respect to the Plan.

The Disclosure Statement, however, cannot and does not provide holders of Claims and Equity Interests with legal or other advice.  You should consult with lawyers and/or financial advisors of your own choosing to obtain specific advice regarding how the Plan will affect you and regarding your best course of action with respect to the Plan.

**B.      Holders of Claims Entitled to Vote**

Holders of Claims in Classes 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12 (collectively, the "Voting Classes") are entitled to vote on the Plan because such Classes are: (i) impaired under the Plan within the meaning of Section 1124; and (ii) may receive distributions of property under the Plan and therefore are not deemed to have rejected the Plan.

Each holder of an Allowed Claim in Class 1 is deemed to have accepted the Plan because holders of Allowed Claims in Class 1 are unimpaired.  Class 3 and each holder of an Allowed Equity Interest in Classes 13, 14, and 15 is deemed to reject the Plan because the holder of an Allowed Claim in Class 3 or Allowed

4

Equity Interest in Classes 13, 14, and 15 will receive no distribution under the Plan. The individual Classes are more fully described in Article III below.

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired Claims has voted to accept the Plan (without counting the votes of any insiders whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to dissenting Classes. A Class of Claims has accepted the Plan only when at least one-half in number and at least two-thirds in amount of the Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by one or more Voting Classes, the Plan Proponents intend to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) which permits confirmation notwithstanding such rejection if the Bankruptcy Court finds that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Classes.

## C.    Voting Procedures and Deadline

The Plan Proponents have provided copies of this Disclosure Statement and ballots (which include detailed voting instructions) to all known holders of impaired Claims in the Voting Classes. Those holders of a Claim in a Voting Class who seek to vote to accept or reject the Plan must complete the enclosed

5

ballot and either delivered to the following address or transmitted to the following fax number:

> Klevansky Piper, LLP
> Attn: Alika Piper, Esq.
> 841 Bishop Street, Suite 1707
> Honolulu, Hawaii 96813
> Telephone: (808) 536-0200
> Fax: (808) 237-5758

**All ballots must be completed, signed, returned to, and actually received by Klevansky Piper, LLP no later than _____, at 4:00 p.m., Hawaiian Standard Time (the "Balloting Deadline").** Creditors are encouraged to read and review their ballots carefully. Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court, will not be counted in connection with confirmation of the Plan.

**D. The Confirmation Hearing and Deadline for Objection to Confirmation of the Plan**

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____, at _____ a.m. in the Courtroom of the Honorable Robert J. Faris, United States Bankruptcy Judge for the District of Hawaii. The Confirmation Hearing may be continued from time to time by announcement in open court without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities no later than _____:

(a) 1250 Oceanside Partners, P.O. Box 430, Kealakekua, Hawaii 96750, Attention: G. Rick Robinson

(b) Klevansky Piper, LLP, 841 Bishop Street, Suite 1707, Honolulu, Hawaii 96813, Attention: Simon Klevansky, Esq., Counsel to the Debtors

(c) Wagner Choi & Verbrugge, Topa Financial Tower, 745 Fort Street, Suite 1900, Honolulu, Hawaii 96813, Attention: James A. Wagner, Esq., Counsel to Sun Kona Finance I, LLC

(d) Office of the United States Trustee, 1132 Bishop Street, Suite 602, Honolulu, Hawaii 96813, Attention: Curtis B. Ching, Esq.

Objections that are not timely filed and served may not be considered by the Bankruptcy Court. Please refer to the accompanying Notice of Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.

## E.    Important Notice and Cautionary Statement

The historical financial data relied upon in preparing the Plan and this Disclosure Statement are based upon the Debtor's books and records. The liquidation analysis, estimates, projections, and other financial information referenced in this Disclosure Statement or attached hereto as exhibits have been developed by the Plan Proponents and their professional advisors. Although these

7

professional advisors assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Plan Proponents and third parties, most of which information has not been audited. The professional advisors have not independently verified such information and, accordingly, make no representations as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, the Plan Proponents cannot warrant or represent that the information in this Disclosure Statement, including any and all financial information, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

No Person may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the Debtor or any other Person other than in connection with Confirmation of the Plan, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of Claims or Equity Interests in the Bankruptcy Case.

## II.     BACKGROUND INFORMATION

### A.     History

The Debtors were part of Lyle Anderson's ("Anderson") development "empire," which included developments in Hawaii, Arizona, New Mexico, and Scotland.  Anderson managed the Debtors from their formation until 2008, when the Debtors' primary secured lender, Bank of Scotland declared a default and exercised its contractual right to remove and replace the management of the Debtors.  Anderson has had no involvement with the management of the Debtors or in their respective businesses since October, 2008.

Attached here as Exhibit C is an organizational chart for the Debtors and their affiliates as of the Petition Date.

The Debtors collectively own over 1,800 acres of land and other assets acquired in connection with a large-scale real estate development on the Island of Hawaii, in the North Kona and South Kona districts, between Keauhou and Kealakekua Bay.  The Debtors' property stretches for three and one-half (3-1/2) miles along the Kona coast and is of significant historic and cultural importance.

The Debtors' principal development is known as "Hokuli'a" or the "Hokuli'a Project."  Oceanside is the developer of Hokuli'a.  Oceanside's assets include most of the real estate of the Hokuli'a project not yet conveyed to third parties.  Front Nine's assets are comprised of 44 undeveloped platted lots in Phase

9

2 of the Hokuliʻa Project and associated golf memberships. Pacific Star's assets consist of a large tract of land referred to as "Keopuka" or the "Keopuka Project," which is in a preliminary planning stage and located near, but not immediately adjacent to, Hokuliʻa.

During the mid-1990s, the County granted various permits, approvals, and land use entitlements relating to the development of Hokuliʻa. In 1998, Oceanside and the County entered into a Development Agreement with respect to these entitlements. The development of Hokuliʻa was subject to certain conditions, including the obligation of Oceanside to construct and dedicate to the County a bypass highway between Keauhou and Captain Cook (the "Bypass Highway"), in order to alleviate chronic traffic problems in the Kona region.

Hokuliʻa was planned to be developed in three phases on approximately 1,550 acres of land. When complete, the project would have included approximately 730 home lots each at least one acre in size, an 80 unit members' lodge, an 18 or 27-hole golf course, golf clubhouse and related facilities, beach activities center and tennis courts and a 140 acre shoreline park.

In September, 1999, the County granted final subdivision approval for the first phase of development of Hokuliʻa ("Phase 1"). Oceanside commenced sales of lots in Phase 1. In December, 2000, the County granted final subdivision approval for the second phase, and Oceanside commenced sales of lots in Phase 2.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 15 of 67

Construction of the 18 hole golf course began in 1999. The golf course opened in June 2002, and remains in operation. The golf course was among the amenities planned to be offered to members of The Club at Hokuli'a, Inc. (the "Club"). Membership in the Club was offered with the sale of Hokuli'a lots, and all lot purchasers also became Club members. After the County granted Phase 1 subdivision approval in 1999, Oceanside entered into an agreement (the "Club Transfer Agreement") with the Club regarding the construction, operation, and eventual transfer to the Club of the golf course and other related facilities (the "Club Facilities"). The Club Transfer Agreement provided a procedure pursuant to which control over the Club and the Club Facilities would be turned over to the members of the Club, and set a date of January 1, 2010, for such turnover, unless five percent or more of the Hokuli'a homesites remained unsold at that time.

Various setbacks befell Oceanside and the completion and turnover of the Club Facilities did not occur as anticipated. In December 2011, Oceanside, Bank of Scotland plc, a committee of Club members, and the Hokuli'a Community Association, Inc. (the "HCA") entered into a Letter of Intent, which, among other things, set forth the terms and conditions under which responsibility for the completion and management of the Club Facilities would be turned over to the Club, and certain other property would be conveyed to the Club, the HCA, or both. Bank of Scotland agreed to release these properties from the lien of its mortgage.

11

Pursuant to the Letter of Intent, Oceanside (and its general partner), the Club, and HCA entered into an "Umbrella Agreement" dated March 30, 2012. Pursuant to the Umbrella Agreement, Oceanside turned over responsibility for the completion and management of the Club Facilities to the Club and Oceanside was released from various obligations relating to the completion and operational costs of the Club Facilities and completing certain road and other infrastructure improvements relating to Phase 1 of Hokuli'a. Oceanside agreed to convey: (1) to the Club, various properties related to the Golf Facilities; (2) to HCA and to Hokuli'a Community Services, Inc. (a private utility company serving Hokuli'a), certain common areas and shared infrastructure facilities; (3) to the Club and HCA, jointly, 52 lots within the project.

Subsequently, the Club and HCA sold the lots they received under the Umbrella Agreement to an affiliate of SKFI, in exchange for cash and the affiliate's obligation to complete or fund the completion of certain improvements for the benefit of the Club and HCA members (and which indirectly benefit the Hokuli'a Project).

## B.  Litigation and Settlements

### 1.  *Kelly Litigation*

After work on Hokuli'a had commenced unusually heavy rainfall incidents in the vicinity of the Hokuli'a during September and November 2000, caused soil

12

runoff into the ocean. Four area residents filed with the Third Circuit Court of the State of Hawaii, a complaint ("Complaint") for injunctive and other relief, alleging that the soil runoff violated certain Oceanside permits and State water quality laws. The Complaint was subsequently amended to add an additional plaintiff and additional State and County defendants allege additional causes of action, and seek further injunctive and other relief. The case, styled *Kelly, et al. v. 1250 Oceanside Partners, et al.*, Civ. No. 00-1-0192K (the "Kelly Litigation"), asserted a variety of claims against Oceanside, the County and various State agencies, under theories of on public nuisance, violation of historic preservation laws, breach of the public trust, desecration of graves, violation of procedural due process, violation of the Coastal Zone Management Act, violation of the plaintiffs' rights of access, and violation of the State Land Use Law, Chapter 205 of the Hawaii Revised Statutes.

During various times beginning in November, 2000, development of the project was suspended as a result of various Court orders issued in the Kelly Litigation. In April 2002, the Court invalidated the project entitlements for the member's lodge and in October 2002, the Court determined that a historic trail (Stepping Stone Trail) that traverses the project was owned by the State of Hawaii. Oceanside successfully defended most of the other claims in the lawsuit.

In September, 2003, the Court issued findings of fact and conclusions of law determining that the Hokuli'a Project violated Chapter 205, the state land use law,

13

and enjoining Oceanside from pursuing any further construction activities or development of Hokuliʻa, with the exception of the golf course and the shoreline park, until it had obtained a declaratory ruling or reclassification of the project area from the Land Use Commission in accordance with Chapter 205. The County was enjoined from issuing any further permits or approvals for the Hokuliʻa project until Oceanside complied with the Court's order. Oceanside and the County appealed the Court's decision to the Hawaii Supreme Court.

In March, 2006, while the appeal was pending, the parties to the Kelly Litigation entered into a Settlement Agreement ("2006 Agreement"), effective upon the Circuit Court's entry of an amended decision that would allow development of Hokuliʻa to resume.

After considering the Settlement Agreement and a stipulation of facts, the Circuit Court vacated its prior judgment and on March 14, 2006, entered a new judgment that allowed development of Hokuliʻa to resume. Some lots were sold in 2007, but market conditions worsened and Oceanside suspended all sales of Hokuliʻa lots after Bank of Scotland declared a default and project development was suspended for lack of funds. In November, 2009, Oceanside suspended its land sales registration with HUD and the State of Hawaii.

From 2006 through the filing of the Petition, Oceanside satisfied various obligations under the 2006 Agreement, either directly or through the AMICO

14

Settlement discussed below. In December 2006, Oceanside adopted and recorded an Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Hokuliʻa. In connection with the amended and restated declaration, the Hokuliʻa Park and Cultural Sites Association, Inc. ("PCSA") was created, to be responsible for various historic preservation and cultural matters at Hokuliʻa, including maintenance of the shoreline park and various trails and historic and cultural sites. The Development, Cultural and Community Plan being implemented by the Reorganized Debtors under Article V of the Plan undertakes certain obligations consistent with the obligations imposed on the Debtors by the 2006 Agreement. However, the 2006 Agreement is not an executory contract and will not be assumed by the Reorganized Debtors. Claims arising from the Debtors' failure to perform the 2006 Agreement will be treated as general unsecured claims.

## 2.    *The Coupe Family Litigation*

As a condition of obtaining certain regulatory approvals, and among many other conditions, Oceanside was required by the County of Hawaii to construct and dedicate the Bypass Highway (which is intended to run between Keauhou and Captain Cook). On April 20, 1998, the County and Oceanside entered into a Development Agreement setting forth (among other things) the respective responsibilities of the parties and the procedure to be followed in acquiring the

15

required property (including use of the County's power of eminent domain) and in constructing the Bypass Highway.

After Oceanside was unable to negotiate a private purchase of certain land owned by the C&J Coupe Family Ltd. Partnership (the "Coupe Family"), the County filed an action in October, 2000, in the Third Circuit Court of the State of Hawaii, against the Coupe Family seeking condemnation of the land for the Bypass Highway, thereby commencing litigation lasting *ten years* and producing three published opinions of the Hawaii Supreme Court. In 2010, the Hawaii Supreme Court upheld the County's efforts to condemn the Coupe Family property.

Oceanside substantially completed construction of the north half of the Bypass Highway at a cost of approximately $36 million, and that portion of the Bypass Highway is currently in use by the public. All parcels owned by the Debtors which comprise the Bypass Highway have been conveyed to the County, and, in connection with the settlement of the AMICO Litigation discussed immediately below, the funding for the completion of the Bypass Highway has been secured.

### 3.    *The AMICO Litigation*

Oceanside, as the developer of Hokuliʻa, entered into a number of agreements providing that it would construct certain improvements (principally relating to utilities) for the benefit of residential lots within Hokuliʻa. Oceanside

16

also agreed to construct certain recreational amenities, including a golf course, tennis courts, a beach club, and related support facilities. In connection with Oceanside's obligations to construct the improvements and amenities, Oceanside obtained bonds issued by American Motorists Insurance Company ("AMICO"). Oceanside also obtained one or more bonds issued by AMICO relating to Oceanside's obligation to construct the Bypass Highway.

For a number of reasons, including the Kelly Litigation and the Coupe Family Litigation described above, Oceanside was unable to fulfill its obligations under the bonds in a timely manner. In April, 2010, three lawsuits were filed in the State and Federal Courts concerning the bonds issued by AMICO (the "AMICO Litigation"). On September 23, 2011, Judge Ibarra of the Third Circuit Court and Magistrate Judge Chang of the United States District Court ordered a joint settlement conference concerning the AMICO Litigation. After a number of settlement conferences, the parties to the AMICO litigation entered into a Settlement Agreement dated as of March 2, 2012 (the "AMICO Settlement").

Pursuant to the AMICO Settlement:

(1) AMICO agreed to pay $12.5 million to the County to be used for the construction of the Bypass Highway.

(2) Oceanside and its general partner executed a $20 million non-recourse promissory note dated March 23, 2012 in favor of the County, secured by

17

a first mortgage on certain of Oceanside's and Front Nine's property and, in connection therewith, the County released Oceanside from its obligation to construct the Bypass Highway, which would instead be completed by the County. The County Note is due and payable on March 23, 2014.

(3)     Oceanside dedicated to the County both the north portion of the Bypass Highway (which has been completed) and the lots over which the south portion of the Bypass Highway is to be constructed.

(4)     The County suspended certain of Oceanside's improvement obligations, unrelated to the Bypass Highway, until Oceanside makes a decision concerning the nature and scope of the Hokuliʻa project when development resumes.

### 4.     *Lot Owner Litigation*

Oceanside is a party to seven Hawaii State Court lawsuits filed by a total of 19 purchasers of 11 lots within Hokuliʻa. Some of these lawsuits were filed by immediate purchasers of lots from Oceanside and seek rescission of the sale contract and/or damages; other lawsuits have been brought by subsequent purchasers of lots. Claims for rescission are not permitted under the Bankruptcy Code and the Lot Owners' claims will be limited to monetary claims. The various Plaintiffs have also asserted claims against former officers and directors of the Debtors which have resulted in the former officers and directors filing claims for

18

indemnity against the Debtors. The claims of the various Lot Owners and the former officers and directors' indemnity claims will be treated as general unsecured creditors.

## C.    Secured Financing and the Debtors' Default in Repayment

### 1.    *Bank of Scotland*

In 2001, Lyle Anderson Financial Company LLC entered into a loan agreement with the Bank of Scotland to finance certain of Anderson's development projects. The initial loan amount was $200 million, which was subsequently increased a number of times to a total loan amount of $415 million in July of 2003. The loan was then amended and restated in November of 2003 to include a number of additional Anderson entities as borrowers, including Front Nine and Pacific Star, but also including various non-debtor entities involved in Anderson's developments outside of Hawaii. As of December, 2003, the total amount outstanding under the amended and restated loan was approximately $517 million. Through a number of subsequent amendments, the maximum aggregate principal indebtedness increased to $825 million in 2006. On October 8, 2007, Oceanside (whose general and limited partner, Red Hill 1250, Inc., had previously pledged its majority ownership interest in Oceanside to obtain financing for the project) joined as a borrower and the maximum aggregate principal increased to approximately $904 million. The collateral for the debt included not only the assets of the Hawaii

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 24 of 67

projects but also other Anderson development projects outside of Hawaii. The loans were generally cross-collateralized across all borrowers.

On January 15, 2008, the Bank of Scotland declared an event of default. The Bank of Scotland contended that the balance outstanding, as of January 1, 2008, was $946,250,794.53. The Bank of Scotland exercised its asserted rights under the loan documents and certain guaranty pledges made by the borrowers' parents to remove and replace the directors and managers of the borrowers. Pursuant to a Cooperation and Release Agreement, dated as of October 20, 2008, Anderson and certain Anderson entities and affiliates were given releases by the Bank of Scotland in exchange for the execution of certain releases and waivers and an agreement to cooperate and not interfere with the enforcement of the Bank of Scotland's loan. Mr. Anderson and certain of the officers whom he had appointed were removed from management positions within the companies. The New York restructuring firm of Marotta Gund Budd & Dzera was retained to take over management of the Hokuli'a companies.

As noted above, in January, 2008, the Bank of Scotland declared a default on the nearly $1 billion in secured debt owed by various Anderson entities, including the Debtors as well as entities involved in developments outside Hawaii. The development of Hokuli'a effectively stopped. In order to facilitate the disposition of the various Anderson loans, the Bank of Scotland and its advisors

20

concluded that it should sever the cross-collateralized U.S.-based indebtedness of the former Anderson entities into three geographic "baskets": one each for Hawaii, New Mexico, and Arizona. Accordingly, in October, 2011, the Anderson debt and collateral held by the Bank of Scotland was severed and separated. Oceanside, Front Nine, Pacific Star, and certain related non-debtor entities, remain liable for the Hawaii-based debt in the principal amount of approximately $494 million, secured by the Hokuliʻa Project and the Keopuka Project (the "Hawaii Loan"); but they are no longer liable for the debt associated with the former Anderson projects outside Hawaii.

On or about December 28, 2012, Sun Kona Finance I, LLC, a Delaware limited liability company ("SKFI"), closed its acquisition of the Hawaii Loan – the post-severance component of the Bank of Scotland debt secured by Hawaii assets. As of the Petition Date, the aggregate outstanding balance of the Hawaii Loan was $627,166,062.35, inclusive of principal, interest, and protective advances.

### 2. *Ackerman Ranch, Inc.*

In October, 2005, Oceanside purchased approximately 250 acres of additional land (the "Ackerman Property") from Ackerman Ranch, Inc. ("Ackerman"), financing the purchase by means of a $13.4 million "carryback" note and mortgage. The Ackerman Property, which had previously been leased to Oceanside, was intended to be the site of a part of Phase 3 of the Hokuliʻa Project.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 26 of 67

After the note matured in October, 2010, Ackerman agreed to forebear enforcement and to continue to accept quarterly interest-only payments. When Oceanside allegedly failed to make the interest payment due on October 1, 2011, Ackerman demanded payment of the entire note balance, and subsequently filed an action for foreclosure of its mortgage in the Third Circuit Court. The foreclosure action remains pending. Ackerman filed a Proof of Claim asserting that the balance due in the Ackerman Loan as of the Petition Date was $15,790,502.80.

### 3. *Textron*

Oceanside sold a number of Hokuli'a lots pursuant to transactions in which a portion of the purchase price took the form of a promissory note and a "carry back" mortgage on the buyer's lot ("Carryback Notes & Mortgage"). On or about June 29, 2006, Oceanside entered into a loan agreement with Textron Financial Corporation ("Textron"), pursuant to which Oceanside pledged the Carryback Notes and Mortgages to Textron, and Textron provided funds to Oceanside through a revolving line of credit with a maximum principal indebtedness of $100 million (the "Textron Loan").

On June 26, 2008, and on a number of subsequent occasions, Textron delivered notices of default, acceleration, and demand for payment to Oceanside. On January 18, 2013, Textron sold the Textron Loan (including Textron's security

interests in the Carryback Notes and Mortgages to Sun Kona Finance II ("SKFII"). The balance due on the Textron Loan as of the Petition Date was $5,334,852.97.

## III. EVENTS AND CIRCUMSTANCES LEADING TO THE FILING OF THESE CHAPTER 11 CASES

### A. Purpose in Filing

Development of the Hokuli'a Project and the intended future development of the Keopuka Project has been severely hindered over the years by the adverse events and circumstances set forth above. During that time, the Debtors have incurred significant secured and unsecured debt.

The Debtors commenced these proceedings in order to propose a plan of reorganization that will restructure and resolve the Debtors' secured and unsecured debt in accordance with the Bankruptcy Code, will allow the Debtors' development projects to proceed, and will permit their respective creditors to receive payment in excess of the liquidation value of their claims.

The businesses of Oceanside, Front Nine, and Pacific Star, are deeply intertwined. Substantially all of the assets of each are related to the Hokuli'a Project or the Keopuka Project. As set forth in the financing section above, the Debtors appear to be jointly and severally liable on a secured loan arising from the development of Hokuli'a, currently held by SKFI. The SKFI liens encumber substantially all of each of the Debtor's assets.

23

As illustrated in the chart attached hereto as Exhibit C, one hundred percent (100%) of the outstanding voting securities of each of the three Debtors (i.e., Oceanside, Front Nine and Pacific Star) is held or controlled indirectly by LAFC Hawaii Holding Company, LLC, a Delaware limited liability company. Thus, both Front Nine and Pacific Star are statutory affiliates of Oceanside.

## B. Bankruptcy Filing and Post-Petition Developments

### 1. Filing

On March 6, 2013 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Hawaii (the "Court").

### 2. DIP Financing Motion

On the Petition Date, the Bankruptcy Court conducted hearings on various first day motions (such as motions seeking permission to pay pre-petition wages, retain professionals, maintain bank accounts, etc.). The Court also approved the Debtors' Motion for Order Authorizing Debtor to Obtain Interim and Final Post-Petition Financing on a Secured and Superpriority Basis and Scheduling a Final Hearing on the Motion (the "DIP Financing Motion") pursuant to which Debtor sought interim authority to borrow up to $100,000 of a proposed $2,500,000 line of credit from SKFI to be secured by a lien on all of the Debtor's real and personal

24

property ("DIP Loan"). The Court approved the DIP Loan on a final basis by Order entered May 6, 2013. The DIP Loan is secured by a Lien on all of the Debtors' real and personal property.

As of July 30, 2013, a total of $827,939 in advances has been made to the Debtors under the DIP Loan. The Debtors anticipate that as of the Effective Date, the total draws under the DIP Loan will be approximately $2,250,000. The Plan provides that all of the advances from SKFI on the DIP Loan will be satisfied through issuance of new Equity Interests in the Reorganized Debtors to SKFI.

### 3.  *Appointment of Official Unsecured Creditors Committee ("Committee")*

Although the Office of the United States Trustee ("UST") solicited the Debtor's 20 largest unsecured creditors to serve on the Committee, it was unable to obtain the consent of three creditors willing to serve on the Committee. As a result, no Committee has been appointed in this case.

### 4.  *Post-Petition Management.*

Pursuant to the rights it had succeeded to under the loan documents, SKFI replaced the management of the Debtors and Craig Pickett was appointed to manage the Debtor entities on January 12, 2013.

After the Petition Date, Craig Pickett continued in his role as the sole manager of the Debtor entities. Mr. Pickett had and has a long-term relationship with SunChase Holdings, Inc. and its owner, William A. Pope. Mr. Pope, through

SunChase Kona, LLC, is one of the two investors in Sun Kona Venture, LLC ("SKV"), the entity that controls SKFI. S. Robson Walton, through one of his entities, Lake Avenue Investments, LLC, is the other investor in SKV. SKV also owns three other entities having an interest in the Hokuliʻa Project. The chart attached hereto as Exhibit D shows the relationship of the various SKV entities and ownership.

Because of the relationship between Mr. Pickett and the SunChase entities and the lack of a creditors committee in these cases, the Office of the United States Trustee requested that SKFI cause two independent directors to be appointed to the entities that control the Debtors' management and that an independent restructuring officer be appointed to manage the three Debtor entities. As a result G. Richard Robinson was appointed as the Chief Restructuring Officer ("CRO") for the Debtors. Mr. Robinson is an experienced real estate agent, consultant, and investor. From 1991 to 2005, Mr. Robinson was employed as an asset manager for Kamehameha Schools and more recently has acted as a CRO for other Chapter 11 companies.

James M. Shough is a commercial real estate developer and owner from Phoenix, Arizona. Andrew C. Gianulias is a real estate and commercial law attorney and residential and commercial developer, from Sacramento, California. Messrs. Shough and Gianulias were appointed as independent directors of Red Hill

26

1250, Inc., the general partner of Oceanside, Front Nine Holdings, Inc., the manager of Front Nine and Keopuka Pacific Holdings, Inc., the manager of Pacific Star. Mr. Pickett is the third director and sole officer of the three manager entities.

### 5.    *Current Financial Condition*

The Debtors' Schedules, as amended, filed herein showed the following Assets and Liabilities as of the Petition Date:

| DEBTOR | ASSETS | LIABILITIES* |
|--------|--------|--------------|
| | | |
| Oceanside | $44,581,783 | $748,563,577 |
| Front Nine | 18,357,085 | 646,607,458 |
| Pacific Star | 5,337,240 | 627,374,355 |

*The debt to SKFI in the amount of $626,326,775 is carried on the books of each of the Debtors in that they are jointly and severally liable for the SKFI debt.

As of the Petition Date, the Debtors had no income producing property or any other source of income other than payments on the five performing CB Notes and Mortgages.

The Debtors estimate that the Administrative Claims that will have to be paid upon the Effective Date will be approximately $400,000. Executory Contract cure claims in the amount of approximately $5,000 will also be paid on the Effective Date.

The additional capital necessary to emerge from Chapter 11 will be provided by the Exit Loan from SKFI which will provide the Debtors with a line of credit of

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308  Filed 08/15/13  Page 32 of 67

up to $65,000,000. Based on the Debtor's projections attached hereto as Exhibit B, the Exit Loan will allow the Debtor to pay its outstanding Administrative Claims and Cure Claims upon emergence, pay all other restructured debts as they become due, and will provide adequate working capital for the Debtors going forward.

## IV.  SUMMARY OF THE PLAN

The Discussion of the Plan set forth below is qualified in its entirety by reference to the Plan, the terms of which are controlling. Holders of Claims and Interests and other interested parties are urged to read the Plan in its entirety so that they may make an informed judgment concerning the Plan.

### A.  Classification and Treatment of Claims and Equity Interests

The Plan provides for the treatment of 12 Classes of Claims and 3 Classes of Equity Interests. The treatment of Claims described below applies only to Allowed Claims and Equity Interests. Claims that are (i) listed in the Debtors' schedules as disputed, contingent, or unliquidated, (ii) the subject of a pending objection before the Bankruptcy Court or other pending litigation, or (iii) that have not been allowed pursuant to a Final Order of the Bankruptcy Court, will receive distributions under the Plan only if and after they become Allowed Claims. The Reorganized Debtors retain the right to initiate proceedings to subordinate or otherwise object to Claims prior to the proposed deadline of 60 days from the Effective Date.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 33 of 67

### 1. Administrative Expenses (Unclassified Claim)

The Plan provides that the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense, Cash in an amount equal to such Allowed Administrative Expense on the later of the Effective Date or the date such Administrative Expense becomes an Allowed Administrative Expense, or on such different terms as may be acceptable to the holder of the Allowed Administrative Expenses. Goods and services provided to the Debtor in the ordinary course of its business during the Chapter 11 Case from the Petition Date through and including the Effective Date ("Ordinary Course Administrative Expenses") shall be paid upon the date upon which such liability is payable in the ordinary course of the Debtor's business, consistent with the current agreement of the parties.

The Confirmation Order shall contain a bar date for the filing of Administrative Expense Claims, other than Administrative Expenses which are Ordinary Course Administrative Expenses. The Confirmation Order shall also contain a deadline for the Reorganized Debtor to object to Administrative Expense Claims.

The Debtor estimates that there will be approximately $400,000 in accrued administrative claims as of the Effective Date.

29

## 2.  *Priority Tax Claims (Unclassified Claim)*

Priority Tax Claims are claims by governmental units entitled to priority treatment pursuant to Code Section 507(a)(8).  Types of taxes included in Section 507(a)(8) are pre-petition, income, real property, excise, and employment taxes. An Allowed Priority Tax Claim held by any taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such entity; (b) the estimated claim amount held by such entity, if estimated by the Bankruptcy Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by final order or as compromised and settled by the Reorganized Debtor and such taxing authority.

Each holder of an Allowed Priority Tax Claim shall receive on account of such Claim regular installment payments in Cash (i) of a total value, as the Effective Date, equal to the Allowed amount of such Claim, (ii) over a period not longer than five years from the Petition Date; and (iii) at a three percent (3.00%) interest rate per annum or such other rate as may be approved to by the parties.

The Plan Proponents do not believe that there will be any Priority Tax Claims as of the Effective Date.

30

### 3. *Class 1 – Other Priority Claims*

The Plan classifies all Other Priority Claims arising under Code Section 507. in Class 1. Types of Other Priority Claims, subject to certain monetary limits, include domestic support claims, wages, commissions, employee benefits, customer deposits, and certain personal injury claims.

Except to the extent that the holder of an Allowed Other Priority Claim agrees to a different treatment, the holder of an Allowed Other Priority Claim shall receive on account of such Allowed Claim, Cash in the amount equal to the holder's Allowed Claim, on the later of (a) the Effective Date; and (b) the date on which an order allowing such Claim becomes a Final Order, and, in each case, or as soon thereafter as is practicable.

Class 1 is unimpaired and the holders of Claims in Class 1 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan. The Plan Proponents are not aware of any Other Priority Claims.

### 4. *Class 2 – Allowed SKFI Secured Claim*

The total amount of principal and interest due on the SKFI Loan as of the Petition Date was $627,166,062.35. The SKFI Loan is secured by the SKFI Collateral which is comprised of all of the Debtors' real and personal property, excluding (i) the Ackerman Collateral which is encumbered by the Ackerman Loan and Mortgage, (ii) the SKFII Collateral which is encumbered by the SKFII Loan

and Mortgage, and (iii) four titled vehicles. The SKFI Loan is subordinate to the County Mortgage Note and County Mortgage on the County Collateral.

The total value of the Debtors' assets listed in the Debtors' Schedules, excluding the SKFII Collateral and the Ackerman Collateral, is approximately $40,531,000. The County's security interest senior to SKFI is $20,000,000, leaving assets valued at approximately $20,531,000, to satisfy SKFI's secured debt.

The SKFI Secured Claim shall be reduced to $40,000,000 ("Reduced SKFI Claim"). The Reduced SKFI Claim shall be secured by a first priority secured Lien on all of the Debtors' unencumbered real and personal property and a second priority secured Lien on the Debtors' real and personal property encumbered by Ackerman, the County, or SKFII. The Reduced SKFI Claim shall be paid in full on or before December 31, 2033 with interest at the published Applicable Federal Rate in effect on the Effective Date. Revised SKFI loan documents in the form attached to the Plan Supplement as Exhibits A to D shall be executed by the parties and recorded as appropriate. In consideration of the Confirmation of the Plan as filed by SKFI and the Debtors, the balance of the SKFI Claim in excess of $40,000,000 (approximately $587,166,000), shall be released in full and shall not participate in the Unsecured Creditors Fund.

Class 2 is impaired and is entitled to vote to accept or reject the Plan.

32

### 5. *Class 3 – Allowed Red Hill Secured Claim*

The total amount of principal and interest due on the Red Hill Loan as of the Petition Date was $61,038,000. The Red Hill Loan is secured by the Red Hill Collateral which is comprised of the Oceanside real property, excluding the Ackerman Collateral. The value of the Red Hill Collateral is approximately $24,523,000. The Red Hill Loan and Mortgage were assigned to Bank of Scotland as additional collateral and the interest of Bank of Scotland is now held by SKFI.

In consideration of the Confirmation of the Plan as filed by SKFI and the Debtors, the Red Hill Secured Claim shall be extinguished, the Red Hill Mortgage and other security interest shall be released. Red Hill shall take nothing under the Plan and Red Hill shall not participate in the Unsecured Creditors Fund.

Class 3 is impaired and deemed to reject the Plan.

### 6. *Class 4 – Allowed County Secured Claim*

The total amount of principal due on the County Loan as of the Petition Date was $20,000,000. The County's Mortgage Note does not provide for the payment of interest. The County Loan is secured by the County Collateral comprised of 80 lots owned by Oceanside or Front Nine having an appraised value of approximately $20,000,000. The County Loan matures on March 23, 2014.

[The treatment of the Allowed County Secured Claim is subject to ongoing negotiations between the Plan Proponents and the County. The Plan Proponents

33

anticipate reaching a mutually agreeable treatment prior to the hearing on the approval of the Disclosure Statement and will file an appropriate Amended Plan.]

Class 4 is impaired and entitled to vote to accept or reject the Plan.

### 7. Class 5 –Allowed Ackerman Secured Claim

The total amount of principal and interest due on the Ackerman Loan as of the Petition Date was approximately $15,790,502.80. The Ackerman Loan is non-recourse and is secured by a first lien on the Ackerman Collateral which is comprised of two parcels of real property totaling approximately 250 acres owned by Oceanside. The first parcel (Parcel 1) of approximately 28.5 acres is located east of the Project immediately above the Bypass Highway. The Second parcel (Parcel 2) of approximately 221.5 acres is located below the Bypass Highway, adjacent to the other Hokuli‘a lands.

In full satisfaction of the Ackerman Claim, Ackerman shall receive the following:

(i)     A new $6,000,000 non-recourse note secured by Parcel 2, with interest only at five percent (5%) for the first eight years and amortized in full over the next eight years. The note and mortgage shall provide for a pro rata security release as lots are sold;

(ii)    The cash proceeds of four lots sold on Parcel 2. Beginning with the sale of the tenth lot, Ackerman shall receive an amount equal to the average net

proceeds from the sale of the preceding nine lots and the tenth lot, and continuing in a similar fashion upon the sale of the 20th, 30th, and 40th lots. Ackerman's net proceeds for each of the four "Lots" shall be not less than $750,000. Any net proceeds over $750,000 per "Lot" shall be retained by Ackerman;

     (iii)  Parcel 1 shall be deeded back to Ackerman and Ackerman shall deed the three-acre sliver parcel makai of the Bypass Highway to Oceanside;

     (iv)  The well agreement for well and easement on the Ackerman property mauka of the Bypass Highway will be extended and modified to allow for a potable or irrigation water well and access to the Bypass Highway sleeves;

     (v)  Oceanside shall have, at its election, the option to deed Parcel 2 to Ackerman in full satisfaction of the above obligations.

Copies of the Revised Ackerman Purchase Money Promissory Note and Mortgage are attached to the Plan Supplement as Exhibits F and G. The balance of the Ackerman Claim shall be released and Ackerman shall not participate in the Unsecured Creditors Fund.

Class 5 is impaired and is entitled to vote to accept or reject the Plan.

### 8. *Class 6 – Allowed SKFII Secured Claim*

The total amount of principal and interest due on the SKFII Secured Claim was $5,334,852.97 as of the Petition Date. The SKFII Secured Claim is secured by the SKFII Collateral which is comprised of Oceanside's interest in twenty-three

Carryback Notes and Mortgages. The balance due on the Carryback Notes and Mortgages was $18,026,701as of the June 15, 2013. However, eighteen of the twenty-three Carryback Notes were in default. Oceanside has commenced collection activities, including foreclosures with regard to certain of the Carryback Notes and Mortgages and the actual value of the Carryback Notes and Mortgages may be substantially less than the outstanding balance.

The SKFII Claim shall be an Allowed Secured Claim in the amount of $5,334,852.97 as of the Petition Date, secured by the SKFII Collateral. The Allowed SKFII Secured Claim shall be paid in full with interest at the rate of 4% per annum on or before December 1, 2023, from the liquidation of the SKFII Collateral, pursuant to the terms of the Revised SKFII Note, attached to the Plan Supplement as Exhibit H.

Class 6 is impaired and entitled to vote to accept or reject the Plan.

### 9.    *Class 7 – Allowed PCSA Oceanside Secured Claim*

The PCSA Oceanside Secured Claim arises from the failure of Oceanside to pay PCSA dues pre-petition.

The total amount of the PCSA Oceanside Secured Claim was $18,480.49 as of the Petition Date. The PCSA Oceanside Secured Claim is secured by Lien rights granted to PCSA in the Hokuli'a CC&Rs and pursuant to State law.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 41 of 67

The Allowed PCSA Oceanside Secured Claim shall be paid in full in 6 equal monthly installments without interest, commencing on the 30th day after the Effective Date.

Class 7 is impaired and entitled to vote to accept or reject the Plan.

### 10.   Class 8 – Allowed PCSA Front Nine Secured Claim

The total amount of the PCSA Front Nine Secured Claim was $10,605.34 as of the Petition Date.  The PCSA Front Nine Secured Claim is secured by Lien rights granted to PCSA in the Hokuli'a CC&Rs and pursuant to State law.

The Allowed PCSA Front Nine Secured Claim shall be paid in full in six equal monthly installments without interest, commencing on the 30th day after the Effective Date.

Class 8 is impaired and entitled to vote to accept or reject the Plan.

### 11.   Class 9 – Allowed Oceanside General Unsecured Claims

The general unsecured claims can be broken down into four categories, (i) unliquidated indemnity claims filed by former officers and directors who are or may become defendants in the Lot Owner Litigation, (ii) lot owners who have asserted claims totaling approximately $31,979,679 arising from the failure of Oceanside to timely complete the project and other cause, (iii) vendors and other parties who have contractual and other claims against Oceanside unrelated to the lot sales totaling approximately $1,718,245; and (iv) claims arising from the

37

rejection of executory contracts and leases; and excluding (x) claims of affiliates which will be released under the Plan and Claims by HCA and the Club which will be cured upon assumption of the Umbrella Agreement; and (y) claims of holders who elect for their general unsecured claims against Oceanside to be treated as a Convenience Class Claim under Class 12. Several unsecured creditors filed Proofs of Claim without stating an amount claimed so that the total amount of unsecured claims may be greater than stated above. Additionally, the indemnity claims filed by the officers and directors are in certain respects duplicative of the Lot Owner Claims in that the Debtors should only be liable for one or the other, not both.

The holder of an Allowed Oceanside General Unsecured Claim shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge, and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund. The Plan Proponents believe that many of the lot owners' claims are overstated as are some of the vendor and other claims. Disputed claims will be resolved in accordance with the provisions of Article VI of the Plan. Based on the filed and scheduled claims without reduction, the pro rata distribution from the Unsecured Creditors Fund would be approximately two and one-half percent (2.2%) of each claim. As the overstated claims are reduced, the percentage payout on the remaining claims should increase to approximately 4% of the respective claims. See Liquidation Analysis attached hereto as Exhibit E.

38

Class 9 is impaired and the holders of Allowed Claims in Class 9 are entitled to vote to accept or reject the Plan.

12.    *Class 10 – Allowed Front Nine General Unsecured Claims*

Front Nine listed one unsecured creditor holding a claim totaling $87.50 as unliquidated, but not disputed in its Schedules, excluding claims of affiliates which will be released under the Plan and the claim of the Club which will be cured upon the assumption of the Umbrella Agreement. The only Proofs of Claim filed against Front Nine were indemnity claims filed by former officers and directors which are duplicates of the Proofs of Claims they filed against Oceanside. If the holder of the General Unsecured Claim against Front Nine elects for its claim to be classified as a Convenience Class Claim in Class 12 below, then said claim will be excluded from Class 10 and there will be no holders of a claim in Class 10.

The holder of an Allowed Front Nine General Unsecured Claim shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge, and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund.

Class 10 is impaired and the holders of Allowed Claims in Class 10 are entitled to vote to accept or reject the Plan.

39

### 13.   *Class 11 – Allowed Pacific Star General Unsecured Claims*

Pacific Star listed three unsecured creditors holding claims totaling $2,851 as unliquidated, but not disputed in its Schedules, excluding claims of affiliates which will be released under the Plan.  The only Proofs of Claim against Pacific Star were indemnity claims filed by officers and directors which are duplicates of the Proofs of Claim they filed against Oceanside.   If a holder of a General Unsecured Claim against Pacific Star elects for its claim to be classified as a Convenience Class Claim in Class 12 below, then said claim shall be excluded from Class 11.

The holder of an Allowed Pacific Star General Unsecured Claim shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge, exchange and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund.

Class 11 is impaired and the holders of Allowed Pacific Star General Unsecured Claims in Class 11 are entitled to vote to accept or reject the Plan.

### 14.   *Class 12 – Allowed Convenience Class Claims*

Convenience Class Claims are General Unsecured Claims against one of the Debtors which are:  (i) in the amount of $12,000 or less, or (ii) in the amount greater than $12,000, but which the holder agrees to reduce to $12,000 in order to be treated as a Convenience Class Claim.   The Debtors estimate that there are

40

approximately $20,000 in Convenience Class Claims that fall under the $12,000 threshold. Other unsecured creditors whose claims exceed $12,000 may elect to participate in Class 12 by reducing their Claims to $12,000.

Holders of Allowed Convenience Class Claims shall receive Cash in an amount equal to one hundred percent (100%) of the Allowed amount of such Convenience Class Claim, 30 days after the Effective Date or as soon thereafter as is practicable.

Class 12 is impaired, and the holders of Allowed Claims in Class 12 are entitled to vote to accept or reject the Plan.

### 15. *Class 13 – Allowed Oceanside Equity Interests*

The Equity Interests in Oceanside are held by Hokuli'a Holding Company, LLC and Red Hill 1250, Inc.. Pursuant to the Plan, the balance due on the DIP Loan will be exchanged for new Equity Interests in Oceanside and old equity will be extinguished.

On the Effective Date, the Class 13 Allowed Oceanside Equity Interests shall be extinguished and the holders of the Oceanside Equity Interests shall receive nothing under the Plan.

Class 13 is impaired and the holders of Allowed Claims in Class 13 are deemed to reject the Plan.

41

### 16. *Class 14 – Allowed Front Nine Equity Interests*

The Equity Interests in Front Nine are held by Front Nine Holding, Inc. and Hokuliʻa Holding Company, LLC. Pursuant to the Plan, the balance due on the DIP Loan will be exchanged for new Equity Interests in Front Nine, and the old Equity Interests in Front Nine will be extinguished.

On the Effective Date, the Allowed Equity Interests in Front Nine shall be extinguished under the Plan and the holders of Allowed Front Nine Equity Interests shall receive nothing under the Plan.

Class 14 is impaired and the holders of Allowed Front Nine Equity Interests in Class 14 are deemed to reject the Plan.

### 17. *Class 15 –Allowed Pacific Star Equity Interests*

The Equity Interests in the Pacific Star were held by Keopuka Pacific Holdings, Inc. and Keopuka Holding Company, LLC. Pursuant to the Plan, the balance due on the DIP Loan will be exchanged for the new Equity Interests in Pacific Star and the old Equity Interests will be extinguished.

On the Effective Date, the Allowed Equity Interests in Pacific Star shall be extinguished and the holders of Allowed Pacific Star Equity Interests shall receive nothing under the Plan.

Class 15 is impaired under the Plan and the holders of Allowed Pacific Star Equity Interests in Class 15 are deemed to reject the Plan.

## B.  Summary of Other Provisions of the Plan

### 1.  Revesting of Assets

The Debtors will, as the Reorganized Debtors, continue to exist on and after the Effective Date as separate legal entities, formed under the laws of their respective states, with all of the powers of a legal entity under the applicable non-bankruptcy law, and without prejudice to any right to alter or terminate its existence (whether by merger or otherwise).  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estate of the Debtors, including all development rights, water rights, permits, contract rights, and Rights of Action, and any property acquired by the Debtors under or in connection with the Plan will vest in the respective Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and interests.  On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 2.  Time and Method of Distributions Under the Plan

The Reorganized Debtors shall serve as the disbursing agent to hold and distribute Cash and such other property as may be distributed pursuant to the Plan,

43

provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Plan. Even if the disbursing agent is a person other than the Reorganized Debtors, nonetheless the disbursing agent shall be an agent of the Reorganized Debtors and not a separate taxable entity with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors. No Cash payment of less than ten dollars ($10.00) shall be made by the Disbursing Agent to any holder of a Claim.

### 3. *Provisions for Treatment of Disputed Claims*

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expense Claims under the Plan, including the determination of the amount or number of distributions due to the holders of Allowed Claims and Allowed Administrative Expense Claims, each Disputed Claim shall be treated as if it were an Allowed Claim for purposes of voting on the Plan, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtor), such amount or

44

number as determined by the Bankruptcy Court shall be used as to such Claim. Objections to Claims must be filed and served within 60 days of the Effective Date.

### 4. *Discharge of the Debtor and Injunction*

Except as provided in the Plan or Confirmation Order, the rights afforded under the Plan and the treatment of Claims, Administrative Expense Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and termination of all Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation will: (i) discharge the Debtors and Reorganized Debtors from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim or Administrative Expense Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of Interest holders in the Debtors. As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting

45

against the Debtors, the Reorganized Debtor, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.

5. *Retention of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and their successors, any assigns hereunder and future assigns will retain and may exclusively enforce any rights of action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such rights of action unless the Bankruptcy Court orders otherwise. Absent such express waiver or release, the Reorganized Debtors, or their successors or assigns may pursue rights of action, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns).

6. *Exemption from Transfer Taxes*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or any other Person pursuant to the Plan

including (a) the issuance of any stock, (b) the creation of any mortgage deed of trust, or other security interest, and (c) the making of any agreement or instrument in furtherance of, or in connection with, this Plan or the Umbrella Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

### 7. *Executory Contracts and Unexpired Leases*

Section 365 of the Code provides for the assumption or rejection of executory contracts and unexpired leases by a debtor. The term "executory contract" is not defined in the Code, but is generally regarded to mean a contract with regard to which both parties to the contract have not completed performance of their obligations under the contract. If only one party has remaining obligations to perform, the contract is not executory.

Schedule G to each of the Debtors' Schedules listed all of the contracts that the Debtors believed to be executory as of the filing date. Parties to non-executory contracts with the Debtors who believe they held claims arising from the Debtors' default under the contract were required to file a proof of claim prior to the Claims Bar Date.

Article VII of the Plan provides for the assumption of executory contracts and an unexpired leases by the Debtors and for the treatment of claims arising from

47

the Debtors' failure to assume (rejection) of contracts listed in the Debtors'
Schedules G. Attached to the Plan Supplement as Schedule 7.1 is a listing of all of
the executory contracts and unexpired leases to be assumed by the Debtors
together with a statement of any cure payments to be made by the Debtors on the
Effective Date. Any contract or unexpired lease not listed on Schedule 7.1,
whether or not listed on the Debtors' Schedules G, shall be deemed rejected as of
the Effective Date.

## V. VOTING AND CONFIRMATION OF THE PLAN

### A. General

The following discussion is intended solely for the purpose of providing
basic information concerning certain confirmation issues. The Plan Proponents
cannot and do not represent that the discussion contained below is a complete
summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court may confirm
the Plan. Some of the requirements discussed in this Disclosure Statement include
acceptance of the Plan by the requisite number of holders of Claims and Interests,
whether the Plan pays such holders at least as much as they would receive in a
liquidation of the Debtor under Chapter 7 of the Bankruptcy Code and whether the
Plan is feasible. These requirements, however, are not the only requirements for
confirmation, and the Bankruptcy Court will not confirm the Plan unless and until

48

it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement.

**B.     Voting Procedures and Requirements**

Pursuant to the Bankruptcy Code, only classes of Claims against or Equity Interests in the Debtor that are "impaired" and that will receive a distribution or retain an interest under the terms of the Plan are entitled to vote to accept or reject the Plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, classes of Claims or Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance. In order for a class to be deemed to have voted to accept the Plan, at least fifty percent (50%) by number of creditors and two-thirds by amount of claims need to vote in favor of the Plan.

**C.     Best Interests Test; Liquidation Analysis**

The Best Interests Test requires that, if a holder of a Claim or Equity Interest is in an impaired Class does not vote to accept the Plan, such holder receives or retains an amount under the Plan not less than the amount that such holder would

49

receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, a trustee would be appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Under those priorities, secured creditors generally are paid first from the sales proceeds of properties securing their liens. Administrative expenses generally are paid next. Unsecured creditors then are paid from any remaining sales proceeds, according to their statutory and contractual rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, shareholders receive the balance, if any, that remains after all creditors are paid.

A chapter 7 trustee may pursue payments made by the Debtor prior to the Petition Date that are avoidable under the Bankruptcy Code, such as claims to recover preferential and fraudulent transfers. The Debtors made payments totaling approximately $936,000 to vendors during the 90-day preference period which may be preferential transfers. However, the Plan Proponents believe that many of the recipients would have defenses to a preference claim including (i) that the payment was in the ordinary course of the Debtors' operations, (ii) based on

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308  Filed 08/15/13  Page 55 of 67

subsequent advances to the Debtors' pre-petition, and (iii) on other grounds such that recovery of the payments made to vendors is highly unlikely.

Payments to parties that were or could be considered insiders during the one-year period prior to the Petition Date totaled approximately $278,000. These payments may be subject to the same defenses available to vendors with regard to the 90-day payments discussed above. Additionally, collectability and cost of collection would be factors in making any recovery or preferential payment. As a result, it is unlikely that any significant recovery could be made from preferential payments.

On December 14, 2012, Oceanside and Front Nine granted the County a mortgage on a total of 79 parcels and on December 18, 2012, the County was granted a mortgage on one additional parcel to secure the payment of the $20,000,000 due the County under the settlement of the AMICO Litigation. The grant of the mortgage was within 90-day window applicable to preferential transfers. However, the 80 parcels that were mortgaged to the County were also encumbered by the Bank of Scotland first mortgage. Bank of Scotland agreed to subordinate, but not release, its mortgage on the 80 parcels and as a result in the event the County mortgage was set aside, the 80 parcels would remain subject to Bank of Scotland's mortgage now held by SKFI.

Having considered the various transfers that might be deemed to be preferential and the defenses available to the various recipients, the Plan Proponents have concluded that no significant benefit would be obtained in pursuing preferential transfers in these cases.

Finally, the Plan Proponents believe that the Debtors may have a course of action against certain individuals for a fraudulent conveyance in the amount of $1,000,000, which is being evaluated as to collectability and other factors. No decision has been made by the Plan Proponents as to whether the claims should be pursued.

The Plan Proponents' Liquidation Analysis is attached hereto as Exhibit E. The Liquidation Analysis shows that in a liquidation of the Debtors under Chapter 7 general unsecured creditors would receive an amount equal to between .96% and 1.31% of their respective claims.

For the Bankruptcy Court to be able to confirm the Plan, it must find that holders of Claims and Interests who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation of the Debtor. The Plan Proponents submit that this requirement is met here because general unsecured creditors will participate in a pro rata share of the $750,000 Unsecured Creditor Fund and receive an amount that is between approximately 2.2% and 4% of their respective claims or more, which is

52

substantially more than they would receive if this chapter 11 reorganization case were converted to a liquidation case under chapter 7 of the Bankruptcy Code.

**D.     Feasibility**

To confirm the Plan, the Bankruptcy Court must find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  This requirement is referred to as the "feasibility" requirement.

Although no assurances can be given, the Plan Proponents believe that the Reorganized Debtors will be able to timely perform all obligations described in the Plan, and, therefore, that the Plan is feasible.  To demonstrate the feasibility of the Plan, the Plan Proponents have prepared financial projections for fiscal years 2014-2021, as set forth in Exhibit B to this Disclosure Statement.

The Plan Proponents caution, however, that no representations can be made as to the accuracy of the projections or as to the Reorganized Debtor's ability to achieve the projected results.  Many of the assumptions upon which the projections are based are subject to uncertainties outside the control of the Plan Proponents.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 58 of 67

Reorganized Debtor's financial results. Therefore, the actual results may vary from the projected results and the variations may be material and adverse.

THE PROJECTIONS WERE NOT PREPARED IN COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS.

The Plan Proponents believe that the feasibility/success of a large scale real estate development like Hokuli'a is dependent on three primary factors: (1) the market for the proposed units, (2) the expertise of the developer, and (3) the availability of adequate financing to complete the project in a timely manner. The completion of Hokuli'a is a long term project and as evidenced by the projections, significant lot sales are not expected to occur until 2017 and 2018. The Plan Proponents anticipate that the project will not be sold out until at least 2028. Over the period, the Plan Proponents expect that the market will fluctuate for reasons beyond their control.

The Plan Proponents do have control over the developer and financing. Although the overall project is a partnership between entities owned by William A. Pope and Samuel Robson (Rob) Walton, the development team for the project will

be provided by Mr. Pope and his company, SunChase Holdings, Inc. ("SunChase"). SunChase is a privately held investment company focused on investment, development, and sale of residential and commercial real estate, including large scale master planned communities. Attached hereto as F is a copy of SunChase's web pages which can also be accessed at *sunchaseholdings.com*. Exhibit F provides detail regarding SunChase's experience, major projects, and key personnel. The Plan Proponents believe that the SunChase team has the requisite skill and experience to successfully complete Hokuliʻa.

The principals behind the entities that will own the Reorganized Debtors and provide the financing for the project are Mr. Pope and Mr. Walton. Mr. Pope is the sole owner of SunChase Holdings, Inc. and his background and experience are outlined in Exhibit F attached hereto. Mr. Walton is currently Chairman of Walmart, worldwide. According to Forbes, his net worth was $21 billion as of March 9, 2011. The Plan Proponents believe that SKFI and its principals have the capacity to provide the funding necessary to complete the Plan and the overall development of Hokuliʻa successfully.

### E.    Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponents have

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308   Filed 08/15/13   Page 60 of 67

considered each of these issues in the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy Code.

## F.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Reorganization Cases and any of the proceedings related to the Reorganization Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.

## G.    Bankruptcy Code Exemptions from Registration Requirements

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa and applicable state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor

56

or such an affiliate, or principally in such exchange and partly for cash or property. As a result, the Plan Proponents believe that the new Equity Interests to be issued to SKFI are exempt from registration.

## VI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in Cash, or are otherwise unimpaired under the Plan (*e.g.*, holders of Administrative Expense Claims, holders of Priority Tax Claims), or (ii) holders whose Claims or Equity Interests are or may be extinguished without a distribution in exchange therefor.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The Plan Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance

can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Consequences to Holders of Certain Claims

Each holder of a Claim will recognize gain or loss measured by the difference between (i) any cash and the fair market value of any other property received by such holder and (ii) its adjusted tax basis in the Claim. This income, gain or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands. Holders of Claims in the form of accounts or notes receivable acquired in the ordinary course of a trade or business for the performance of services or for the sale of inventory will recognize ordinary income, gain or loss. In addition, if a holder of a Claim has taken an ordinary deduction for the worthlessness of the

58

Claim under the Code in a prior taxable year, any income or gain realized will be taxed as ordinary income to the extent of the ordinary deduction claimed.

## B.    Consequences to the Debtors

Each of the Debtors was a pass through entity for tax purposes.  The Plan Proponents believe that the tax consequences of the Debtors was passed through to Lyle Anderson or an entity owned by Lyle Anderson.  As of the Petition Date, none of the Debtors held or retained any tax attributes such as net operating losses that might be impacted by the Plan.  The Reorganized Debtors will also be pass through entities for tax purposes.  As a result, the Plan Proponents do not believe that confirmation of the Plan will cause any tax consequences to the Debtors or the Reorganized Debtors.

## VII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that the confirmation of the Plan is preferable to all other alternatives.  Consequently, the Plan Proponents urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly

59

completing and returning their Ballots so that they will be received on or before the voting deadline, _____, 2013.

DATED: Honolulu, Hawaii, _AUGUST 14, 2013_.


1250 OCEANSIDE PARTNERS,
a Hawaii limited partnership

By: _____
G. Rick Robinson
Its: Chief Restructuring Officer


FRONT NINE, LLC,
a Delaware limited liability company

By: _____
G. Rick Robinson
Its: Chief Restructuring Officer


PACIFIC STAR COMPANY, LLC,
an Arizona limited liability company

By: _____
G. Rick Robinson
Its: Chief Restructuring Officer


60

SUN KONA FINANCE I, LLC,
a Delaware limited liability company


By _____
           Philip Handley
           Its Chief Financial Officer

61

SUN KONA FINANCE I, LLC,
a Delaware limited liability company


By _____
　　　　Philip Handley
　　　　Its Chief Financial Officer



Submitted by:


SIMON KLEVANSKY
ALIKA L. PIPER
NICOLE D. STUCKI
Counsel for Debtors and
Debtor-in-Possession


JAMES A. WAGNER
ALLISON A. ITO
Counsel for Sun Kona Finance I, LLC

61