KLEVANSKY PIPER LLP
SIMON KLEVANSKY
ALIKA L. PIPER
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone: (808) 536-0200
Facsimile: (808) 237-5757
E-Mail: sklevansky@kplawhawaii.com
apiper@kplawhawaii.com

Counsel for Debtors
and Debtors-in-Possession

WAGNER CHOI & VERBRUGGE
JAMES A. WAGNER
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
E-Mail: jwagner@hibklaw.com
aito@hibklaw.com

Counsel for Creditor
SUN KONA FINANCE I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Bk. No. 13-00353 (Chapter 11) |
| 1250 OCEANSIDE PARTNERS, a Hawaii limited partnership, | |
| Debtor and Debtor-in-Possession. | |

# EXHIBIT A

| | |
|---|---|
| In re | Bk. No. 13-00354 |
| FRONT NINE, LLC, a Delaware limited liability company, | |
| Debtor and Debtor-in-Possession. | |
| In re | Bk. No. 13-00355 |
| PACIFIC STAR COMPANY, LLC, dba Pacific Star Properties, an Arizona limited liability company, | |
| Debtor and Debtor-in-Possession. | |

**DEBTORS' AND SUN KONA FINANCE I, LLC'S JOINT
CONSOLIDATED PLAN OF REORGANIZATION
DATED AS OF AUGUST 15, 2013; EXHIBIT A**

# TABLE OF CONTENTS

**Page**

I. DEFINITIONS AND RULES OF CONSTRUCTION ... 1

    1.   Defined Terms ... 1
    2.   Interpretation; Application of Definitions and Rules of Construction ... 24
    3.   Plan Supplement ... 24
    4.   Exhibits ... 25

II. CLASSIFICATION OF CLAIMS ... 25

    2.   Undesignated Claims ... 26

III. TREATMENT OF CLAIMS ... 32

    3.1   Class 1:  Other Priority Claims ... 32
    3.2   Class 1:  Allowed SKFI Secured Claim ... 33
    3.3   Class 3:  Allowed Red Hill Secured Claim ... 33
    3.4   Class 4:  Allowed County Secured Claim ... 34
    3.5   Class 5:  Allowed Ackerman Secured Claim ... 35
    3.6   Class 6:  Allowed SKFII Secured Claim ... 37
    3.7   Class 7:  Allowed PCSA Oceanside Secured Claim ... 37
    3.8   Class 8:  Allowed PCSA Front Nine Secured Claim ... 37
    3.9   Class 9:  Allowed Oceanside General Unsecured Claims ... 38
    3.10  Class 10:  Allowed Front Nine General Unsecured Claims ... 39
    3.11  Class 11:  Allowed Pacific Star General Unsecured Claims ... 39
    3.12  Class 12:  Allowed Convenience Class Claims ... 40
    3.13  Class 13:  Allowed Oceanside Equity Interests ... 40
    3.14  Class 14:  Allowed Front Nine Equity Interests ... 41
    3.15  Class 15:  Allowed Pacific Star Equity Interests ... 41

IV. ACCEPTANCE OR REJECTION OF THE PLAN ... 42

    4.1   Voting Classes ... 42
    4.2   Voting Rights of Holders of Disputed Claims ... 42
    4.3   Presumed Acceptance and Rejection of Plan ... 43
    4.4   Presumed Rejection of Plan ... 43

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 3 of 123

|  | 4.5 | Nonconsensual Confirmation | 43 |

| V. | IMPLEMENTATION OF THE PLAN | | 43 |

|  | 5.1 | General Means of Implementation | 43 |
|  | 5.2 | Revesting of Assets | 45 |
|  | 5.3 | Exemption from Transfer Taxes | 46 |
|  | 5.4 | Post-Confirmation Management | 47 |
|  | 5.5 | Issuance and Execution of Plan Related Documents; Action | 47 |
|  | 5.6 | Occurrence of the Debtors' Discharge | 47 |
|  | 5.7 | Certain Fees and Expenses | 48 |

| VI. | DISTRIBUTIONS | | 48 |

|  | 6.1 | Reorganized Debtors to Serve as Disbursing Agent | 48 |
|  | 6.2 | Disputed Claims That Do Not Become Allowed Claims | 48 |
|  | 6.3 | No Distributions to Non-Filing Parties | 49 |
|  | 6.4 | De Minimis Distributions | 49 |
|  | 6.5 | Record Date for Distributions | 49 |
|  | 6.6 | Saturday, Sunday, or Legal Holiday | 50 |
|  | 6.7 | Delivery of Distributions, Address of Holder | 50 |

| VII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 51 |

|  | 7.1 | Rejection Generally | 51 |
|  | 7.2 | Objections to Assumption | 52 |
|  | 7.3 | Payments Related to Assumption | 52 |
|  | 7.4 | Approval of Rejection | 53 |
|  | 7.5 | Objections to Rejection | 53 |
|  | 7.6 | Bar Date for Rejection Claims | 54 |

| VIII. | PROCEDURES FOR RESOLVING DISPUTED CLAIMS; AND LITIGATION | | 54 |

|  | 8.1 | Objections to Claims | 54 |
|  | 8.2 | Authority to Prosecute Objections | 55 |
|  | 8.3 | Estimation of Tax Claims | 55 |
|  | 8.4 | Temporary or Permanent Resolution of Disputed Claims | 56 |
|  | 8.5 | Setoff | 57 |
|  | 8.6 | Rights of Action | 58 |

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 4 of 123

IX.   EFFECTIVENESS OF THE PLAN                                    60

    9.1   Conditions Precedent                                     60
    9.2   Effective Date                                            60
    9.3   Notice of Effective Date                                  60

X.    CRAMDOWN                                                     61

    10.1  Cramdown Request                                          61

XI.   RETENTION OF JURISDICTION AND MISCELLANEOUS
    MATTERS                                                     61

    11.1  Retention of Jurisdiction                                 61
    11.2  Headings                                                  66
    11.3  Notices                                                   66
    11.4  Successors and Assigns                                    67
    11.5  Severability of Plan Provisions                           67
    11.6  No Waiver                                                 68
    11.7  Inconsistencies                                           69
    11.8  Payment of Statutory Fees                                 69
    11.9  Indemnification Obligations                               69
    11.10 Governing Law                                             70
    11.11 Withholding, Reporting, and Payment of Taxes              70

XII.  EFFECT OF CONFIRMATION                                       71

    12.1  Binding Effect of Confirmation                            71
    12.2  Good Faith                                                71
    12.3  No Limitations on Effect of Confirmation                  71
    12.4  Discharge of Claims, Administrative Expenses and Interests  72
    12.5  Judicial Determination of Discharge                       73
    12.6  Injunctions                                               73
    12.7  Exculpation and Limitations of Liabilities                75

XIII. MODIFICATION OR WITHDRAWL OF PLAN                            77

XIV.  CONFIRMATION REQUEST                                         78

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 5 of 123

# DEBTORS' AND SUN KONA FINANCE I, LLC'S JOINT CONSOLIDATED PLAN OF REORGANIZATION DATED AS OF AUGUST 15, 2013; EXHIBIT A

1250 OCEANSIDE PARTNERS; FRONT NINE, LLC; and PACIFIC STAR COMPANY, LLC (collectively, "Debtor" or "Debtors") and SUN KONA FINANCE I, LLC propose the following joint Chapter 11 plan pursuant to Section 1121(a) of the Bankruptcy Code ("Plan"). The Disclosure Statement which will accompany the Plan will discuss the Debtors' history, business, assets, and results of operations, and contain a summary and discussion of the Plan. Holders of Claims and Equity Interests are encouraged to read the Disclosure Statement before voting to accept or reject the Plan.

## I.

## DEFINITIONS AND RULES OF CONSTRUCTION

1.    **Defined Terms.**

As used herein, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined):

1.1    **"Ackerman"** means Ackerman Ranch, Inc.

1.2    **"Ackerman Collateral"** means that certain parcel of real property identified by Tax Map Key Nos. (3) 7-9-12:4, 6, 11, and 29, which

1

property is collateral for the Ackerman Loan, as more fully described in the Ackerman Mortgage.

  **1.3**  **"Ackerman Loan"** means that certain loan evidenced by that certain Purchase Money Non-Recourse Promissory Note dated October 27, 2005, in the principal amount of $13,416,700, in favor of Ackerman, secured by the Ackerman Mortgage.

  **1.4**  **"Ackerman Mortgage"** means that certain Purchase Money Real Property Mortgage; Security Agreement; Assignment of Rents; and Fixture Filing and Financing Statement, dated October 27, 2005, and recorded in the Bureau of Conveyances on October 27, 2005, as Document No. 2005-219344 which Mortgage secures the Ackerman Loan.

  **1.5**  **"Administrative Claims Bar Date"** means the General Administrative Claims Bar Date, the Professional Fee Claims Bar Date or the Administrative Tax Claims Bar Date applicable to a particular Administrative Expense Claim.

  **1.6**  **"Administrative Expense Claim"** means a claim that is for payment of any cost or expense of administration of the Chapter 11 Case, allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expense of preserving the Estate, any actual and necessary post-petition expense of operating the business of

2

the Debtors in Possession, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330, 331, or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate of the Debtor under Section 1930 of chapter 123 of title 28 of the United States Code.

1.7　**"Allowed Administrative Expense Claim"** means an Administrative Expense Claim: (a) for which a request for payment is Filed on or before the Administrative Claims Bar Date and as to which no objection to such Administrative Expense Claim is filed on or before the deadline to object to an Administrative Expense Claim, in the amount set forth in such request; (b) that is allowed pursuant to a Final Order, in the amount set forth therein; or (c) is an Ordinary Course Administrative Expense as to which no objection has been Filed. Unless otherwise specified herein or by Final Order of the Bankruptcy Court, the amount of any Allowed Administrative Expense Claim shall not include interest on such Administrative Expense Claim accruing from and after the Petition Date.

1.8　**"Allowed Claim"** means, except as otherwise provided herein or by Final Order of the Bankruptcy Court, a Claim, proof of which was timely and properly Filed or, if no proof of claim was Filed, which has been or hereafter is listed by a Debtor on its respective Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which no objection to the

3

allowance thereof, or request for estimation, has been interposed, and that is not otherwise a Disputed Claim.

    **1.9** **"Allowed General Unsecured Claim"** means a General Unsecured Claim to the extent it is or has become an Allowed Claim.

    **1.10** **"Allowed Secured Claim"** means a Secured Claim to the extent it is or has become an Allowed Claim.

    **1.11** **"Ballot"** means the form or forms approved by the Bankruptcy Court for voting on the Plan.

    **1.12** **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as now in effect or hereafter amended, and as applicable to the Chapter 11 Case.

    **1.13** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Hawaii or, in the event such court ceases to exercise jurisdiction over the Chapter 11 Case, such other court that exercises jurisdiction over the Chapter 11 Case.

    **1.14** **"Bankruptcy Rules"** means, collectively, (i) the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, and (ii) the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect or hereafter amended.

U.S. Bankruptcy Court - Hawaii #13-00353 Dkt # 308-1 Filed 08/15/13 Page 9 of 123

1.15 **"Bureau of Conveyances"** means the Office of the Assistant Registrar for the Bureau of Conveyances of the State of Hawaii.

1.16 **"Business Day"** means any day which is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

1.17 **"Cash"** means legal tender of the United States of America and equivalents thereof.

1.18 **"Cash Collateral Stipulations"** mean those certain stipulations entered into by the Debtor with certain of its creditors regarding the Debtor's use of cash collateral, which stipulations have been approved by order of the Bankruptcy Court.

1.19 **"CC&Rs" or "Hokuli'a CC&Rs"** means the Amended Restated Declaration of Covenants, Conditions, and Restrictions for Hokuli'a, recorded December 5, 2006, as amended by subsequently recorded documents.

1.20 **"Chapter 11 Cases"** mean the cases under chapter 11 of the Bankruptcy Code that were commenced by the filing of voluntary petitions on March 6, 2013, before the Bankruptcy Court, which cases are styled, *In re 1250 Oceanside Partners*, Bk. No. 13-00353; *In re Front Nine, LLC*, Bk. No. 13-00354; and *In re Pacific Star Company, LLC*, Bk. No. 13-00355 ("Chapter 11").

1.21 **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against one of the Debtors, as applicable.

5

1.22   **"Claims Objection Bar Date"** means the first business day following the 60th day after the Effective Date by which objections to scheduled claims or creditors' Proofs of Claim filed against the respective Debtors must be filed.

1.23   **"Class"** means one of the Classes of Claims or Classes of Equity Interests designated in Article II of the Plan.

1.24   **"Club"** means The Club at Hokuli'a, Inc.

1.25   **"Code"** means the referenced section number of the Bankruptcy Code.

1.26   **"Committee"** means the Official Committee of Unsecured Creditors as appointed by the Office of the United States Trustee pursuant to Section 1102 of the Bankruptcy Code to serve in the Chapter 11 Case. In the event no Committee is appointed in these cases, the term "Committee" shall mean and include the twenty largest unsecured creditors as listed on Form 4, filed herein on the Petition Date.

1.27   **"Confirmation"** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.28   **"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket for the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 11 of 123

**1.29** **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court on Confirmation of the Plan as such hearing may be continued from time to time.

**1.30** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**1.31** **"County"** means the County of Hawaii.

**1.32** **"County Collateral"** means those certain 80 lots which are collateral for the County Loan as more fully described in the County Mortgage.

**1.33** **"County Loan"** means that certain loan evidenced by the County Mortgage Note (the "County Mortgage Note") dated March 23, 2012, in the principal amount of $20,000,000, in favor of the County and secured by the County Mortgage.

**1.34** **"County Mortgage"** means (a) that certain Mortgage; Security Agreement; Assignment of Rents and Leases and Financing Statement, dated March 23, 2012, and recorded in the Bureau of Conveyances on December 18, 2012, as Document No. A-47350486, and (b) that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded in the Bureau of Conveyances on December 14, 2012 as Document No. A-47310140.

7

**1.35** **"Debtor" or "Debtors"** mean 1250 Oceanside Partners; Front Nine, LLC; and Pacific Star Company, LLC.

**1.36** **"Debtors in Possession"** mean, as applicable, any of the Debtors when acting in the capacity of representative of the Estates in the Chapter 11 Cases.

**1.37** **"DIP Loan"** means that certain loan approved by the Court, pursuant to that certain Final Order Authorizing Debtor to Obtain Post-Petition Financing on a Secured and Superpriority Basis entered on May 6, 2013 as Docket No. 131.

**1.38** **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 as such disclosure statement may be amended, modified or supplemented from time to time.

**1.39** **"Disbursing Agent"** means 1250 Oceanside Partners as agent to hold and distribute the consideration to be distributed to holders of Allowed Administrative Expenses and Allowed Claims, pursuant to the Plan, or the Confirmation Order, or such other person who may, after the Confirmation Date and after notice and a hearing, be appointed as the Disbursing Agent by Final Order of the Bankruptcy Court.

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 13 of 123

**1.40** **"Discharged Claim"** means all Claims against the Debtors discharged on the Discharge Date.

**1.41** **"Discharge Date"** means the date on which all Claims against the Debtors shall be deemed discharged under the Plan and the Confirmation Order, which date shall be the Effective Date; provided, however, the Debtors' Post Confirmation Obligations shall continue in effect after the Discharge Date until such time as they are satisfied.

**1.42** **"Disputed Administrative Expense Claim"** means an Administrative Expense Claim: (a) for which a request for payment is Filed on or before the Administrative Claims Bar Date; or (b) an Ordinary Course Administrative Claims, and as to which an objection to such is Filed on or before the applicable objection deadline.

**1.43** **"Disputed Claim"** means any Claim listed in the Schedules as disputed, contingent, or unliquidated, or for which a Proof of Claim has been filed as to which the Debtor or any other party in interest has Filed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, and/or any order of the Bankruptcy Court, which objection or request for estimation has not been withdrawn or determined by a Final Order.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 14 of 123

1.44 **"Distribution(s)"** means the Cash be distributed to holders of Allowed Administrative Expense Claims and Allowed Claims under or pursuant to this Plan.

1.45 **"Effective Date"** means the date specified in Article IX hereof.

1.46 **"Equity Interests"** mean an interest in the Debtors, as applicable, represented by an issued and outstanding equity security as defined in Section 101(16) of the Bankruptcy Code.

1.47 **"Estate(s)"** shall mean with respect to the Debtors the estate(s) created by Section 541(a) of the Bankruptcy Code.

1.48 **"Estate Causes of Action"** shall mean any and all manner of the Debtors' Rights of Action, claims, obligations, suits, debts, judgments, demands, rights of offset or recoupment, damages (actual, compensatory or punitive), counterclaims or affirmative defenses, whatsoever, whether in law or in equity, including but not limited to the claims arising under or pursuant to Sections 510, 541 through 551, inclusive, and section 553, of the Bankruptcy Code, and objections to Filed proofs of Claim and to Scheduled Claims.

1.49 **"Exit Loan"** means a line of credit in the amount of $65,000,000, to be provided to the Reorganized Debtors by SKFI to cover the Reorganized Debtors' obligations to their creditors under this Plan and to cover their projected operating expense shortfalls as set forth in the cashflow projections

10

attached as Exhibit B to the Disclosure Statement. The Exit Loan shall be secured by all of the Reorganized Debtors' real and personal property junior only to the secured claims of (a) Ackerman, with respect to the Ackerman Collateral, (b) the County with respect to the County Collateral, (c) SKFII with respect to the SKFII Collateral and (d) SKFI with respect to the SKFI Collateral.

**1.50** **"File," "Filed," "Files," or "Filing"** means properly and timely filed with the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Case, and served on Persons, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

**1.51** **"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors, as applicable, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been

U.S. Bankruptcy Court - Hawaii #13-00353 Dkt # 308-1 Filed 08/15/13 Page 16 of 123

affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

1.52 **"Front Nine"** means Front Nine, LLC, a Delaware limited liability company, one of the Debtors herein.

1.53 **"General Unsecured Claim"** means any Claim that is not a Secured Claim, Administrative Expense Claim, Unclassified Claim, Priority Tax Claim, or Other Priority Claim, including, without limitation, unsecured obligations of the Debtors for money borrowed, guarantees of other Persons, non-priority employee-related unsecured Claims, and unsecured Claims arising from the rejection of executory contracts and unexpired leases.

1.54 **"HCA"** means the Hokuliʻa Community Association, Inc., a Hawaii nonprofit corporation

1.55 **"Hokuliʻa" or "Hokuliʻa Project"** means the real estate development project undertaken by the Debtors and certain affiliated entities to develop approximately 1,800 acres of land as a large scale luxury real estate development on the Island of Hawaii.

1.56 **"IRS Code"** means the Internal Revenue Code of 1986, as amended.

**1.57** **"Lien"** means any mortgage, pledge, deed of trust, assessment, lien, security interest, lease, adverse claim, levy, constructive trust claim, equitable lien, charge or other encumbrance of any kind, or any other type of preferential arrangement, easement, right of way, conditional sale contract, title retention contract, limitation, or restriction of any kind on title and ownership of property.

**1.58** **"Non-Filing Party"** means any Person who does not File a proof of claim or interest prior to the applicable bar date, and for whom (a) the Schedules do not list a claim or interest, or (b) for whom the Schedules list a claim or interest as disputed, contingent, or unliquidated.

**1.59** **"Notice Parties"** means the Debtors and SKFI with notice being provided at the addresses, and in the manner (including providing a copy to their respective counsel), as set forth in Section 11.3 hereof, or such other addresses as provided pursuant to Section 11.3 hereof.

**1.69** **"Oceanside"** means 1250 Oceanside Partners, a Hawaii limited partnership, one of the Debtors herein.

**1.61** **"Order for Relief Date"** means March 6, 2013, the date the Bankruptcy Court entered an order for relief in the Chapter 11 Cases.

**1.62** **"Ordinary Course Administrative Expense Claims"** means costs or expenses allowable under section 503(b)(1)(A) incurred for goods and services provided to the Debtors in the ordinary course of their business during the

13

Chapter 11 Cases from the Order for Relief Date, through and including the Effective Date; provided, however, that Ordinary Course Administrative Expense Claims shall not include Professional Fee Claims

**1.63** **"Other Priority Claim"** means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim.

**1.64** **"Owned Real Property"** means the land described in the Debtors' schedules, together with all buildings, structures, improvements, and fixtures located thereon, together with all easements and other rights appurtenant thereto.

**1.65** **"PCSA"** means Hokuli'a Park and Cultural Sites Association, Inc., a Hawaii nonprofit corporation.

**1.66** **"PCSA Secured Claim"** means a Claim by the PCSA for unpaid pre-petition PCSA dues in respect of which the PCSA is granted a lien pursuant to the CC&Rs and Hawaii statutes.

**1.67** **"Pacific Star"** means Pacific Star Company, LLC, an Arizona limited liability company, one of the Debtors herein.

**1.68** **"Person"** means any individual, corporation, limited liability company, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, the United States Trustee, a government or

14

any political subdivision, governmental unit, official committee appointed by the United States Trustee, unofficial committee of creditors, or the executors, administrators or other legal representatives of any of the foregoing.

    **1.69** **"Petition Date"** means March 6, 2013, the date on which voluntary petitions commencing the Chapter 11 Cases were filed.

    **1.70** **"Plan"** means this Joint Consolidated Plan of Reorganization for the Debtors, including all exhibits hereto and all documents incorporated by reference to the Plan Supplement, either in their present form or as they may amended, or modified from time to time.

    **1.71** **"Plan Obligations"** means collectively the obligations of the Debtors under the Plan and the Confirmation Order.

    **1.72** **"Plan Payment Obligation"** means the payments to be made under the Plan from and after the Effective Date by the Disbursing Agent to holders of Allowed Administrative Expense Claims, and holders of Allowed Claims.

    **1.73** **"Plan Supplement"** means the compilation of the forms of certain documents more fully described in Section I.3 below, as amended, modified or supplemented from time to time.

    **1.74** **"Plan Transactions"** mean the execution and delivery of documents in connection with, and the consummation, implementation and

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 20 of 123

performance of the rights and obligations under, or pursuant to, the Plan and the Confirmation Order.

1.75 **"Priority Tax Claim"** means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.76 **"Professional Person"** means for purposes of this Plan, any professional person employed by the Debtor, or the Committee pursuant to sections 327 or 1103 of the Bankruptcy Code, or otherwise pursuant to an order of the Bankruptcy Court, or any professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case under or pursuant to section 503(b)(4) of the Bankruptcy Code.

1.77 **"Professional Fee Claim"** means a Claim under sections 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional Person or other Person for services rendered or expenses incurred from the Petition Date in the Chapter 11 Case, through and including the Effective Date.

1.78 **"Pro Rata," "Pro Rata Share," and "Pro Rata Basis"** mean a proportionate share, so that with respect to distributions to: (x) an applicable Class or Classes of Claims the ratio of the consideration distributed on account of an Allowed Claim to the amount of the Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in

16

such applicable Class or Classes to the amount of all Allowed Claims in the applicable Class or Classes.

1.79 **"Real Property"** means each parcel of Owned Real Property.

1.80 **"Red Hill"** means Red Hill 1250, Inc., a Washington corporation.

1.81 **"Red Hill Collateral"** means that certain property identified in the Red Hill Mortgage.

1.82 **"Red Hill Loan"** means that certain loan evidenced by that Amended and Restated Secured Demand Promissory Note, dated November 26, 2003, made by Oceanside in favor of Lyle Anderson Financial Company, LLC, and endorsed to Red Hill (the "Red Hill Note").

1.83 **"Red Hill Mortgage"** means that certain Mortgage Real Property Mortgage; Security Agreement; Assignment of Rents; and Financing Statement recorded in the Bureau of Conveyances on December 3, 2003 as Document No. 2003-267193; Assignment of Real Property Mortgage; Security Agreement; Assignment of Rents; and Financing Statement recorded in the Bureau of Conveyances on December 3, 2003 as Document No. 2003-267194; as assigned by that certain Collateral Assignment Of Mortgage recorded in the Bureau of Conveyances on December 3, 2003 as Document No. 2003-267195; as further amended by that certain Amendment To Collateral Assignment Of Mortgage

17

recorded in the Bureau of Conveyances on December 2, 2005 as Document No. 2005-246934; as further amended by that certain Amendment Of Real Property Mortgage, Security Agreement, Assignment Of Rents And Financing Statement recorded in the Bureau of Conveyances on June 29, 2006 as Document No. 2006-119784; as further amended by that certain Second Amendment To Collateral Assignment Of Mortgage recorded October 13, 2006 as Document No. 2006-188200; as further amended by that certain Amendment Of Real Property Mortgage, Security Agreement, Assignment Of Rents And Financing Statement recorded in the Bureau of Conveyances on February 1, 2007 as Document No. 2007-019393; as further amended by that certain Amendment Of Real Property Mortgage, Security Agreement, Assignment Of Rents And Financing Statement recorded in the Bureau of Conveyances on December 21, 2007 as Document No. 2007-219837; as further amended by that certain Amendment Of Real Property Mortgage, Security Agreement, Assignment Of Rents And Financing Statement recorded in the Bureau of Conveyances on January 18, 2008 as Document No. 2008-008571; as further amended by that certain Partial Release Of Mortgage recorded in the Bureau of Conveyances on April 20, 2012 as Document No. A-44930018; as further amended by that certain Partial Release Of Mortgage recorded in the Bureau of Conveyances on June 22, 2012 as Document No. A-45560072A thru A-45560072B; as further amended by that certain Partial Release

18

Of Mortgage recorded in the Bureau of Conveyances on September 21, 2012 as Document No. A-46470929A thru A-46470929C; as further amended by that certain Subordination Of Mortgage Agreement recorded in the Bureau of Conveyances on December 14, 2012 as Document No. A-47310131A thru A-47310131C; as further amended by that certain Subordination Of Mortgage Agreement recorded in the Bureau of Conveyances on December 18, 2012 as Document No. A-47350491A thru A-47350491C; and as further assigned by that certain Assignment Of Collateral Assignment Of Mortgage recorded in the Bureau of Conveyances on January 2, 2013 as Document No. A-47500343.

1.84 **"Reorganized Debtors"** means the Debtors upon the Confirmation Order becoming a Final Order and includes the restructured Oceanside 1250, LLC and Pacific Star Company, LLC, as provided for in Section 5.1.B of the Plan.

1.85 **"Rights of Action"** means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law,

19

equity or otherwise, and whether commenced or arising before or after the Effective Date.

**1.86** "**Schedules**" means the schedules of assets and liabilities, list of equity security holders and statement of financial affairs filed by the Debtors as amended from time to time.

**1.87** "**Secured Claim**" means a Claim against the Debtors to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Estate securing such Claim.

**1.88** "**Secured Property Tax Claim**" means a Secured Claim of a governmental unit for a tax exacted on the value of the real property of the Estates.

**1.89** "**Securities Act**" means the Securities Act of 1933, as amended and as applicable to the Chapter 11 Cases.

**1.90** "**SKFI**" means Sun Kona Finance I, LLC, a Delaware limited liability company.

**1.91** "**SKFI Collateral**" means (a) those certain 63 parcels that are collateral for the SKFI Loan as more fully described in the SKFI Mortgage; and (b) the property identified in the SKFI UCC.

**1.92** "**SKFI Loan**" means that certain loan evidenced by (a) that certain Substitute Fifth Amended and Restated Term Note B in the aggregate

20

principal amount of $164,052,366.67 (the "Hawaii Term Note"); (b) that certain Substitute Fifth Amended and Restated Revolving A Note B in the aggregate principal amount of up to $109,368,244.45 (the "Hawaii Revolving A Note"); and (c) that certain Substitute Seventh Amended and Restated Revolving B Note B in the aggregate principal amount of up to $220,998,138.34 (the "Hawaii Revolving B Note").

    **1.93**  **"SKFI Mortgage"** means that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated October 28, 2007 and recorded in the Bureau of Conveyances on September 18, 2009 as Document No. 2009-144213; as amended by that certain Partial Release of Mortgage recorded in the Bureau of Conveyances on April 20, 2012 as Document No. A-44930024; as amended by that certain Partial Release of Mortgage recorded in the Bureau of Conveyances on June 22, 2012 as Document No. A-45560078; as amended by that certain Partial Release of (1) Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing and (2) Assignment of Leases, Lease Payments and Profits recorded in the Bureau of Conveyances on June 27, 2012 as Document No. A-45610744A through A-45610744B; as amended by that certain Partial Release of Mortgage recorded in the Bureau of Conveyances on September 21, 2012 as Document No. A-46470927; as amended by that certain Partial Release of Mortgage recorded in the Bureau of Conveyances as Document

21

No. A-47310121; as amended by that certain Subordination Agreement recorded in the Bureau of Conveyances on December 14, 2012 as Document No. A-47310129; as amended by that certain Subordination of Mortgage Agreement recorded in the Bureau of Conveyances on December 18, 2012 as Document No. A-47350489; and as assigned to SKFI pursuant to that certain Assignment of Mortgage recorded on January 2, 2013 as Document No. A-47500336.

    **1.94** **"SKFI UCC"** means (a) the UCC 1 Financing Statement recorded on July 12, 2006 in the Bureau of Conveyances as Document No. 2006-127307 (as amended, continued and assigned from time to time); (b) the UCC 1 Financing Statement recorded on March 19, 2008 in the Bureau of Conveyances as Document No. 2008-043436 (as amended, continued and assigned from time to time; (c) the UCC 1 Financing Statement recorded on December 3, 2003 in the Bureau of Conveyances as Document No. 2003-267192 (as amended, continued and assigned from time to time; (d) the UCC 1 Financing Statement recorded on December 3, 2003 in the Bureau of Conveyances as Document No. 2003-267189 (as amended, continued and assigned from time to time; and (e) the UCC 1 Financing Statement recorded on December 9, 2003 with the Secretary of State for the State of Delaware as Document No. 3323783 4 (as amended, continued and assigned from time to time).

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 27 of 123

**1.95** **"SKFII"** means Sun Kona Finance II, LLC, a Delaware limited liability company.

**1.96** **"SKFII Collateral"** means (1) the Receivables Collateral, as more fully described in the SKFII Security Agreement, and (2) the collateral identified in the SKFII UCC.

**1.97** **"SKFII Loan"** means that certain loan evidenced by that certain Promissory Note dated June 29, 2006 by Oceanside in favor of Textron Financial Corporation, in the original principal amount of $100,000,000.00, which was endorsed by Textron Financial Corporation to SKFII.

**1.98** **"SKFII Security Agreement"** means that certain Loan and Security Agreement dated June 29, 2006 by and between Oceanside, as borrower, and Textron Financial Corporation, as lender; as assigned by Textron Financial Corporation to SKFII pursuant to that certain Omnibus Assignment and Assumption Agreement dated January 23, 2013.

**1.99** **"SKFII UCC"** means that certain UCC Financing Statement naming 1250 Oceanside Partners as Debtor and Textron Financial Corporation as secured party, recorded in the Bureau of Conveyances on June 29, 2006 as Document No. 2006-120567, as continued by UCC Financing Statement Amendment recorded in the Bureau of Conveyances on March 8, 2011 as Document No. 2011-040020, as assigned to SKFII pursuant to that certain UCC

23

Financing Statement Amendment recorded in the Bureau of Conveyances on January 24, 2013, as Document No. A-47720610.

      **1.100 "Unsecured Creditors Fund"** means a fund in the amount of $750,000, to be funded by SKFI, pursuant to the Plan.

2. **Interpretation; Application of Definitions and Rules of Construction.**

      Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective section in, article of, or schedule or exhibit to, this Plan, as the same may be amended, waived or modified from time to time.

      The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules and shall be construed in accordance with the rules of construction applied thereto.

3. **Plan Supplement.**

      Forms of certain documents referred to herein are contained in a separate Plan Supplement on File (or to be Filed) with the Clerk of the Bankruptcy Court. The Plan Supplement will be Filed with the Bankruptcy Court on or before the Confirmation Hearing in accordance with the deadline to be set by the

24

Bankruptcy Court. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement or excerpts therefrom upon written request to counsel for Debtors.

4. **Exhibits.**

All exhibits and schedules to the Plan and all documents contained in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

## II.

## CLASSIFICATION OF CLAIMS

The categories of Claims listed below classify Allowed Claims for all purposes, including voting, confirmation, and distribution pursuant to the Plan:

| Class | Status |
|---|---|
| Class 1: Other Priority Claims | Unimpaired – deemed to accept Plan |
| Class 2: Allowed SKFI Secured Claim | Impaired – entitled to vote |
| Class 3: Allowed Red Hill Secured Claim | Impaired – deemed to reject Plan |
| Class 4: Allowed County Secured Claim | Impaired – entitled to vote |
| Class 5: Allowed Ackerman Secured Claim | Impaired – entitled to vote |
| Class 6: Allowed SKFII Secured Claim | Impaired – entitled to vote |

25

| Class | Status |
|---|---|
| Class 7: Allowed PCSA Oceanside Secured Claim | Impaired – entitled to vote |
| Class 8: Allowed PCSA Front Nine Secured Claim | Impaired – entitled to vote |
| Class 9: Allowed Oceanside General Unsecured Claims | Impaired – entitled to vote |
| Class 10: Allowed Front Nine General Unsecured Claims | Impaired – entitled to vote |
| Class 11: Allowed Pacific Star General Unsecured Claims | Impaired – entitled to vote |
| Class 12: Allowed Convenience Class Claims | Impaired – entitled to vote |
| Class 13: Allowed Oceanside Equity Interests | Impaired – deemed to reject the Plan |
| Class 14: Allowed Front Nine Equity Interests | Impaired – deemed to reject the Plan |
| Class 15: Allowed Pacific Star Equity Interests | Impaired – deemed to reject the Plan |

## 2.     Undesignated Claims.

2.1     Administrative Expense Claims and Priority Tax Claims are not classified in accordance with Section 1123(a)(1) of the Bankruptcy Code and holders of such claims are not entitled to vote to accept or reject the Plan.

2.2     **Administrative Expense Claims.**  Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Allowed Administrative Expense Claim shall be paid by the Reorganized Debtors, in full, in

26

Cash, 30 days after the later of (i) the Effective Date, (ii) the due date thereof in accordance with its terms, (iii) the date upon which such Administrative Claim becomes an Allowed Claim, (iv) for any liability incurred in the ordinary course of business, the date upon which such liability is payable in the ordinary course of such Debtor's business, consistent with past practices or (v) such other date as may be agreed by the parties.

    **2.3**    **Compensation and Reimbursement Claims.** On, or as soon as practicable after, the Effective Date, each holder of an Allowed Claim that is based upon awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 330 or 331 of the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court: (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date, and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes a Final Order; or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor.

    **2.4**    **Administrative Claim Bar Date.**

      **2.4.1**  **General Administrative Claim Bar Date.** Except as otherwise provided herein, unless previously Filed or paid, requests for payment of

Administrative Expense Claims (other than Ordinary Course Administrative Claims) must be Filed pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date (the **"General Administrative Claims Bar Date"**); provided, however, that the General Administrative Claims Bar Date may be extended from time to time upon the mutual agreement of the Reorganized Debtors and the applicable holder of an Administrative Expense Claim, or pursuant to an order of the Court. Holders of Administrative Expense Claims that are required to File a request for payment of such Administrative Expense Claims and that do not File such a request by the applicable Administrative Claims Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtor, the Estate or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date. Unless extended by the Bankruptcy Court or by agreement of the Reorganized Debtors and the Filing party, objections to such requests must be Filed and served on the requesting party by the later of (A) 120 days after the Effective Date or (B) 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

        **2.4.2** **Professional Fee Claims Bar Date.** A professional or other Person asserting a Professional Fee Claim for services rendered to the Estate or the Committee before the Effective Date must File and serve an application for

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 33 of 123

final allowance of such Professional Fee Claim, as it relates to services provided to the Estate or the Committee prior to the Effective Date, no later than 60 days after the Effective Date (the "**Professional Fee Claims Bar Date**"); provided, however, that the Professional Fee Claims Bar Date may be extended from time to time upon the mutual agreement of the Reorganized Debtors and the applicant or pursuant to an order of the Court. Unless extended by the Bankruptcy Court, objections to any Professional Fee Claim must be Filed and served on the requesting party no later than 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. If a request for payment of a Professional Fee Claim is not made by the applicable Professional Fee Claim Bar Date, such claim will be forever barred against the Debtor, the Estate, or their respective property, and such Professional Fee Claim will be deemed discharged as of the Effective Date.

      **2.4.3** <u>**Administrative Tax Claims Bar Date**</u>**.** Any request for payment of an Administrative Expense Claim asserted by a governmental unit for a tax claim (an "**Administrative Tax Claim**") must be Filed and served, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date (the "**Administrative Tax Claims Bar Date**"), provided, however, that the Administrative Tax Claim Bar Date may be extended from time to time upon the mutual agreement of the Reorganized Debtors and the applicable governmental

29

unit, or pursuant to an order of the Court. If a request for payment of an Administrative Tax Claim is not made by the applicable Administrative Tax Claim Bar Date, such claim will be forever barred against the Debtor, the Estate, or their respective property, and such Administrative Tax Claims will be deemed discharged as of the Effective Date. Unless extended by the Bankruptcy Court, objections to any such Filed Administrative Tax Claim must be Filed and served on the requesting party by the later of (A) 120 days after the Effective Date or (B) 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

### 2.5 <u>Payment of Priority Tax Claims.</u>

An Allowed Priority Tax Claim held by any taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such Person; (b) the estimated claim amount held by such Person, if estimated by the Bankruptcy Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by Final Order or as compromised and settled by the Reorganized Debtors and such taxing authority.

Each holder of an Allowed Priority Tax Claim shall receive on account of such Claim regular installment payments in Cash (i) of a total value, as the Effective Date, equal to the Allowed amount of such Claim, (ii) over a period

30

not later than five years from the Petition Date; and (iii) at a 3.00% interest rate per annum or such other rate as may be approved by the parties.

The Debtors do not believe there will be any Priority Tax Claims.

**2.6     Other Provisions Concerning Treatment of Priority Tax Claims.**

Notwithstanding the provisions of Section 2.5, the holder of an Allowed Priority Tax Claim against a Reorganized Debtors shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty shall be subordinated to the Classes 9, 10, 11, and 12. The holder of an Allowed Priority Tax Claim against the Debtor shall not assess or attempt to collect any penalty arising with respect to or in consideration with such Allowed Priority Tax Claim from the Debtors, the Debtors' Estates, and their respective property.

**2.7     DIP Loan.**

Upon the Effective Date, the balance due under the DIP Loan shall be converted to the equity interests in the Reorganized Debtors.

31

# III.

## TREATMENT OF CLAIMS

This Section pertains to the Treatment of claims upon Confirmation of the Plan. To the extent the Treatment of Claims provided for herein affects the rights of creditors or Equity Interest holders all such adjustments are deemed to occur only upon the Effective Date.

### 3.1    Class 1:    Other Priority Claims

**3.1.1 Classification:** Class 1 consists of all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, except Employee Priority Claims, Priority Tax Claims and Administrative Expenses.

**3.1.2 Treatment:** Except to the extent that the holder of an Allowed Other Priority Claim agrees to a different treatment, the holder of an Allowed Other Priority Claim shall receive on account of such Allowed Claim, Cash in the amount equal to the holder's Allowed Claim, on the later of (a) the Effective Date; and (b) the date on which an order allowing such Claim becomes a Final Order, and, in each case, or as soon thereafter as is practicable.

Class 1 is unimpaired, and the holders of Claims in Class 1 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 37 of 123

**3.2   Class 2:   Allowed SKFI Secured Claim**

   **3.2.1  Classification:**  Class 2 consists of the Allowed Secured Claim of SKFI against Oceanside, Front Nine, and Pacific Star in the amount of $627,166,062.35 as of the Petition Date.

   **3.2.2  Treatment:**  The SKFI Secured Claim shall be reduced to $40,000,000 ("Reduced SKFI Claim").  The Reduced SKFI Claim shall be secured by a first priority secured Lien on all of the Debtors' unencumbered real and personal property and a second priority secured Lien on the Debtors' real and personal property encumbered by Ackerman, the County, or SKFII.  The Reduced SKFI Claim shall be paid in full on or before December 31, 2033 with interest at the published Applicable Federal Rate in effect on the Effective Date.  Revised SKFI loan documents in the form attached to the Plan Supplement as Exhibits A to D shall be executed by the parties and recorded as appropriate.  In consideration of the confirmation of the Plan as filed by SKFI and the Debtors, the balance of the SKFI Claim in excess of $40,000,000 (approximately $587,166,000) shall be released in full and SKFI shall not participate in the Unsecured Creditors Fund.

   Class 2 is impaired and is entitled to vote to accept or reject the Plan.

**3.3   Class 3:   Allowed Red Hill Secured Claim**

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 38 of 123

**3.3.1 Classification.** Class 3 consists of the Allowed Secured Claim of Red Hill against Oceanside in the amount of $61,038,000 as of the Petition Date.

**3.3.2 Treatment:** In consideration of the confirmation of the Plan as filed by SKFI and the Debtor, the Red Hill Secured Claim shall be extinguished, the Red Hill Mortgage and other security interest shall be released. Red Hill shall take nothing under the Plan and Red Hill shall not participate in the Unsecured Creditors Fund.

Class 3 is impaired and deemed to reject the Plan.

### 3.4 Class 4: Allowed County Secured Claim

**3.4.1 Classification.** Class 4 consists of the Allowed Secured Claim of the County against Oceanside and Front Nine in the amount of $20,000,000 as of the Petition Date.

**3.4.2 Treatment:** [The treatment of the Allowed County Secured Claim is subject to ongoing negotiations between the Plan Proponents and the County. The Plan Proponents anticipate reaching a mutually agreeable treatment prior to the hearing on the approval of the Disclosure Statement and will file an appropriate Amended Plan.]

Class 4 is impaired and entitled to vote to accept or reject the Plan.

**3.5     Class 5:     Allowed Ackerman Secured Claim**

      **3.5.1  Classification**.  Class 5 consists of the Allowed Secured Claim of Ackerman solely to the extent that the Ackerman Secured Claim is allowed and secured by the Ackerman Collateral.

      **3.5.2  Treatment:**  The total amount of principal and interest due on the Ackerman Loan as of the Petition Date was approximately $15,790,502.80. The Ackerman Loan is non-recourse and is secured by a first lien on the Ackerman Collateral which is comprised of two parcels of real property totaling approximately 250 acres owned by Oceanside.  The first parcel (Parcel 1) of approximately 28.5 acres is located east of the Project immediately above the Bypass Highway.  The second parcel (Parcel 2) of approximately 221.5 acres is located below the Bypass Highway, adjacent to the other Hokuliʻa lands.

      In full satisfaction of the Ackerman Claim, Ackerman shall receive the following:

      (i)     A new $6,000,000 non-recourse note secured by Parcel 2, with interest only at 5% for the first eight years and amortized in full over the next eight years.  The note and mortgage shall provide for a pro rata security release as lots are sold;

      (ii)    The cash proceeds of four lots sold from Parcel 2.  Beginning with the sale of the tenth lot, Ackerman shall receive an amount equal to the average net

35

proceeds from the sale of the preceding nine lots and the tenth lot, and continuing in a similar fashion upon the sale of the 20th, 30th, and 40th lots. Ackerman's net proceeds for each of the four "lots" shall be not less than $750,000. Any net proceeds over $750,000 per "lot" shall be retained by Ackerman;

    (iii)    Parcel 1 shall be deeded back to Ackerman and Ackerman shall deed the 3-acre sliver parcel makai of the Bypass Highway to Oceanside;

    (iv)    The well agreement for a well and easement on the Ackerman property mauka of the Bypass Highway will be extended and modified to allow for a potable or irrigation water well and access to the Bypass Highway sleeves;

    (v)    Oceanside shall have, at its election, the option to deed Parcel 2 to Ackerman in full satisfaction of the above obligations.

Copies of the Revised Ackerman Purchase Money Promissory Note and Mortgage are attached to the Plan Supplement as Exhibits F and G. The balance of the Ackerman Claim shall be released and Ackerman shall not participate in the Unsecured Creditors Fund.

Class 5 is impaired and is entitled to vote to accept or reject the Plan.

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 41 of 123

**3.6    Class 6:    Allowed SKFII Secured Claim**

**3.6.1 Classification**.  Class 6 consists of the Allowed Secured Claim of SKFII in the amount of $5,334,852.97 as of the Petition Date, solely to the extent that the SKFII Claim is allowed and secured by the SKFII Collateral.

**3.6.2 Treatment:**  The SKFII Claim shall be an Allowed Secured Claim in the amount of $5,334,852.97 as of the Petition Date, secured by the SKFII Collateral.  The Allowed SKFII Secured Claim shall be paid in full with interest at the rate of 4% per annum on or before December 1, 2023, from the liquidation of the SKFII Collateral, pursuant to the terms of the Revised SKFII Note, attached to the Plan Supplement as Exhibit I.

Class 6 is impaired and entitled to vote to accept or reject the Plan.

**3.7    Class 7:    Allowed PCSA Oceanside Secured Claim**

**3.7.1 Classification:**  Class 7 consists of the PCSA Secured Claim against Oceanside in the amount of $18,480.49 as of the Petition Date.

**3.7.2 Treatment:**  The Allowed PCSA Oceanside Secured Claim shall be paid in full in 6 equal monthly installments without interest, commencing on the 30th day after the Effective Date.

Class 7 is impaired and entitled to vote to accept or reject the Plan.

**3.8    Class 8:    Allowed PCSA Front Nine Secured Claim**

37

**3.8.1 Classification:** Class 8 consists of the Allowed PCSA Secured Claim against Front Nine in the amount of $10,605.34 as of the Petition Date.

**3.8.2 Treatment:** The Allowed PCSA Front Nine Secured Claim shall be paid in full in 6 equal monthly installments without interest, commencing on the 30th day after the Effective Date.

Class 8 is impaired and entitled to vote to accept or reject the Plan.

**3.9 Class 9: Allowed Oceanside General Unsecured Claims**

**3.9.1 Classification:** Class 9 consists of the Allowed General Unsecured Claims against Oceanside in the amount of approximately $33,700,000 as of the Petition Date, subject to dispute and resolution as provided for in the Plan. If a holder of Class 9 Claim elects for its claim to be classified as a Convenience Class Claim under Class 12 below, then such claim shall be excluded from Class 9.

**3.9.2 Treatment:** The holder of an Allowed Oceanside General Unsecured Claim shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge, and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund.

Class 9 is impaired and the holders of Allowed Claims in Class 9 are entitled to vote to accept or reject the Plan.

38

**3.10    Class 10:    Allowed Front Nine General Unsecured Claims**

 **3.10.1  Classification:**  Class 10 consists of the Allowed Front Nine General Unsecured Claims in the amount of approximately $87.50, subject to dispute and resolution in accordance with the Plan.  If a holder of a Class 10 Claim elects for its claim to be classified as a Convenience Class Claim under Class 12 below, then such claim shall be excluded from Class 10.

 **3.10.2  Treatment:**  The holder of an Allowed Front Nine General Unsecured Claim shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge, and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund.

 Class 10 is impaired and the holders of Allowed Claims in Class 10 are entitled to vote to accept or reject the Plan.

**3.11    Class 11:  Allowed Pacific Star General Unsecured Claims**

 **3.11.1  Classification:**  Class 11 consists of the General Unsecured Claims against Pacific Star in the amount of approximately $2,851, subject to dispute and resolution in accordance with the Plan.  If a holder of a Class 11 Claim elects for its claim to be classified as a Convenience Class Claim under Class 12 below, then such claim shall be excluded from Class 11.

 **3.11.2  Treatment:**  The holders of an Allowed Pacific Star General Unsecured Claims shall receive on account of its Allowed General Unsecured

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 44 of 123

Claim in full and complete satisfaction, discharge, exchange and release thereof, a Pro Rata Distribution from the Unsecured Creditors Fund.

Class 11 is impaired and the holders of Allowed Pacific Star General Unsecured Claims in Class 11 are entitled to vote to accept or reject the Plan.

### 3.12   Class 12 – Allowed Convenience Class Claims

**3.12.1  Classification:**  Class 12 consists of the holders of General Unsecured Claims against one of the Debtors which are:  (i) in the amount of $12,000 or less, or (ii) in the amount greater than $12,000, but which the holder agrees to reduce to $12,000 in order to be treated as a Convenience Class Claim. The Debtors estimate that there are approximately $20,000 in Convenience Class Claims that fall under the $12,000 threshold.

**3.12.2 Treatment:**  Holders of Allowed Convenience Class Claims shall receive Cash in an amount equal to 100% of the Allowed amount of such Convenience Claim, 60 days after the Effective Date or as soon thereafter as is practicable.

Class 12 is impaired, and the holders of Allowed Claims in Class 12 are entitled to vote to accept or reject the Plan.

### 3.13   Class 13:    Allowed Oceanside Equity Interests

**3.13.1  Classification:**  Class 13 consists of the Allowed Oceanside Equity Interests held by Hokuliʻa Holding Company, LLC and Red Hill 1250, Inc.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 45 of 123

**3.13.2  Treatment:**  On the Effective Date, the Class 13 Allowed Oceanside Equity Interests shall be extinguished and the holders of the Oceanside Equity Interests shall receive nothing under the Plan.

Class 13 is impaired and the holders of Allowed Claims in Class 13 are deemed to reject the Plan.

### 3.14   Class 14:  Allowed Front Nine Equity Interests

**3.14.1  Classification:**  Class 14 consists of the Equity Interests in Front Nine held by Front Nine Holding, Inc. and Hokuliʻa Holding Company, LLC.

**3.14.2  Treatment:**  On the Effective Date, the Allowed Equity Interests in Front Nine shall be extinguished under the Plan and the holders of Allowed Front Nine Equity Interests shall receive nothing under the Plan.

Class 14 is impaired and the holders of Allowed Front Nine Equity Interests in Class 14 are deemed to reject the Plan.

### 3.15   Class 15:  Allowed Pacific Star Equity Interests

**3.15.1  Classification:**  Class 15 consists of the Allowed Equity Interests in Pacific Star held by Keopuka Pacific Holdings, Inc. and Keopuka Holding Company, LLC.

41

**3.15.2 Treatment:** On the Effective Date, the Allowed Equity Interests in Pacific Star shall be extinguished and the holders of Allowed Pacific Star Equity Interests shall receive nothing under the Plan.

Class 15 is impaired under the Plan and the holders of Allowed Pacific Star Equity Interests in Class 15 are deemed to reject the Plan.

## IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1     Voting Classes**

Each holder of an Allowed Claim in Classes 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12 shall be entitled to vote to accept or reject the Plan ("Voting Classes").

**4.2     Voting Rights of Holders of Disputed Claims**

The holder of a Disputed Claim may vote to accept or reject the Plan based on the scheduled amount of the Disputed Claim or the amount claimed on the Proof of Claim filed by the creditor and such vote will be counted for purposes of voting on the Plan. Allowance of a Disputed Claim for voting purposes is without prejudice to the rights of the Debtors, SKFI, and other parties in interest to dispute the claim for purposes of distribution under the Plan and all such rights and objections are reserved.

### 4.3 Presumed Acceptance and Rejection of Plan

Class 1 is unimpaired under the Plan and, therefore, is conclusively presumed by the Bankruptcy Code to accept the Plan.

### 4.4 Presumed Rejection of Plan

Classes 3, 13, 14, and 15 will neither receive nor retain any property under the Plan and, therefore, are presumed by the Bankruptcy Code to reject the Plan.

### 4.5 Nonconsensual Confirmation

In the event that any impaired class of Claims or class of Equity Interests shall fail to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor and SKFI reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, and/or (ii) modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

## V.

## IMPLEMENTATION OF THE PLAN

### 5.1 General Means of Implementation

The Plan will be implemented and consummated through various means contemplated by the Bankruptcy Code, including, without limitation, through the actions and transactions summarized as follows:

43

A.     Conversion of DIP Loan.  The outstanding balance due on the DIP
Loan shall be contributed to Oceanside, Front Nine, and Pacific Star in
consideration of the new equity interests in Oceanside, Front Nine, and Pacific Star
to be held by SKFI.

B.     Restructuring of the Debtor Entities.  As of the Effective Date, the
following shall occur:

1.     The general partner and limited partner interest in Oceanside
held by Red Hill 1250, Inc. and Hokuliʻa Holding Company, LLC, respectively,
shall be deemed extinguished for all purposes and 100% of the general partner and
limited partner interests in Oceanside shall be deemed to be held by SKFI for all
purposes.

2.     The old membership interests in Front Nine held by Front Nine
Holding, Inc. and Hokuliʻa Holding Company, LLC shall be deemed extinguished
for all purposes and 100% of the membership interests in Front Nine shall be
deemed to be held by SKFI for all purposes.

3.     The old membership interests in Pacific Star held by Keopuka
Pacific Holdings, Inc. and Keopuka Holding Company, LLC shall be deemed
extinguished and 100% of the membership interests in Pacific Star shall be deemed
to be held by SKFI for all purposes.

44

4.      Oceanside shall be converted from a Hawaii limited partnership to a Delaware member-managed limited liability company.  The name of the reorganized Oceanside shall be Oceanside 1250, LLC.  The sole member of the restructured Oceanside shall be SKFI.  Attached to the Plan Supplement as Exhibits J and K are copies of the proposed Articles and Operating Agreement for Oceanside 1250, LLC.

5.      Front Nine shall be merged into Oceanside 1250, LLC.

6.      Pacific Star shall be converted to a single-member Arizona limited liability company.  The sole member of Pacific Star shall be SKFI. Attached to the Plan Supplement as Exhibits L and M are copies of the proposed Amended Articles and Operating Agreement for Pacific Star.

C.      <u>Funding Exit Loan</u>.  SKFI shall fund the Exit Loan.  Copies of the Exit Loan documents are attached to the Plan Supplement as Exhibits M to O.

D.      <u>Continued Development</u>.  The Reorganized Debtors shall implement the Development, Cultural and Community Plan attached hereto as Exhibit A and incorporated herein by reference.

**5.2     Revesting of Assets**

Subject to the restructuring provided for in Section 5.1. above, the Debtors will, as the Reorganized Debtors, continue to exist on and after the Effective Date as separate legal entities, formed under the laws of their respective

45

states, with all of the powers of a legal entity under the applicable non-bankruptcy law, and without prejudice to any right to alter or terminate its existence (whether by merger or otherwise). Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all property of the Estate of the Debtors, including all development rights and agreements, permits, contract rights, entitlements, and Rights of Action, and any property acquired by the Debtors under or in connection with the Plan will vest in the respective Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and interests. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims or interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 5.3 Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtors or any other Persons pursuant to the Plan including (a) the issuance of the New Ownership Interests, (b) the creation of any mortgage, deed or trust, or other security interest, (c) the merger of Front Nine into the reorganized Oceanside 1250, LLC, and (d) the making of any agreement or

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 51 of 123

instrument in furtherance of, or in connection with, this Plan or the Umbrella Agreement (as defined in Schedule 7.1 of the Plan Supplement), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

### 5.4 Post-Confirmation Management

From and after the Effective Date, Craig Pickett shall be the sole officer/manager of the Reorganized Debtors.

### 5.5 Issuance and Execution of Plan Related Documents; Action

On and after the Confirmation Date, all actions contemplated by the Plan shall be taken by the Debtors and such actions shall be deemed authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the following: (a) the adoption and the filing of articles of association for Oceanside 1250, LLC and the amended articles of Pacific Star Company, LLC; and (b) the execution and the delivery of, and the performance under, all other documents and agreements contemplated by or relating to the Plan.

### 5.6 Occurrence of the Debtor's Discharge

The Debtors' discharge under the Bankruptcy Code, the Plan, and the Confirmation Order shall occur on the Effective Date.

47

### 5.7 Certain Fees and Expenses

From and after the Effective Date, the expenses incurred in the ordinary course of the business, fees and expenses of Professional Persons, amounts payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6), shall be paid by the Reorganized Debtors, in the ordinary course of business, or pursuant to a Final Order of the Bankruptcy Court.

## VI.

## DISTRIBUTIONS

### 6.1 Reorganized Debtors to Serve as Disbursing Agent

Oceanside shall serve as the disbursing agent to hold and distribute Cash and such other property as may be distributed pursuant to the Plan, provided however, that Oceanside, in its sole and absolute discretion, may employ another Person, on such terms as may be determined by Oceanside, to hold and distribute Cash and such other property as may be distributed pursuant to the Plan.

### 6.2 Disputed Claims That Do Not Become Allowed Claims

To the extent that a Disputed Claim is disallowed, subordinated, voided, voided for the benefit of the Debtor's Estate, or recharacterized, no distribution shall be made on account of such Disputed Claim.

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 53 of 123

Administrative Expense Claims under the Plan, including the determination of the amount or number of distributions due to the holders of Allowed Claims and Allowed Administrative Expense Claims, each Disputed Claim shall be treated as if it were an Allowed Claim, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

### 6.3    No Distributions to Non-Filing Parties

Pursuant to Bankruptcy Rule 3003(c)(2), (a) no distribution under the Plan shall be made to any party whose claim is listed by the Debtor as disputed, contingent, or unliquidated if such party fails to file a Proof of Claim, and (b) any and all Claims of such non-filing parties shall be disallowed.

### 6.4    De Minimis Distributions

No Cash payment of less than ten dollars ($10.00) shall be made by the Reorganized Debtors to any holder of a Claim.

### 6.5    Record Date for Distributions

From and after the Confirmation Date, there shall be no further changes in the holders of record of Claims.  The Debtors shall not recognize any

49

transfer of Claims occurring after the Confirmation Date, but shall instead be entitled to recognize and deal for all purposes with only those holders of record stated on the applicable transfer ledgers on the dockets of Claims for the Chapter 11 Cases as of the Confirmation Date.

### 6.6 Saturday, Sunday, or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.7 Delivery of Distributions, Address of Holder

For purposes of all notices and Distributions under this Plan, the Debtor shall be entitled to rely on the name and address of the holder of each Claim as specified by, and Distributions to holders of Claims shall be made by regular U.S. first class mail to, the following addresses: (1) the address set forth on the respective Filed proof of Claim of such holder; (2) the address set forth in any written notice of address change delivered by the holder to the Debtors after the date of any related Filed proof of Claim, or (3) the address reflected on the Schedules if no proof of Claim is Filed and the Debtors have not received a written notice of a change of address.

50

# VII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1    Rejection Generally

On the Effective Date, all executory contracts or unexpired leases to which the Debtor is a party shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contracts or unexpired leases (i) shall have been previously assumed by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to assume pending on or before the Effective Date, (iii) are listed on the schedule of assumed executory contracts or unexpired leases to be filed with the Plan Supplement as **Exhibit 7.1.** Exhibit 7.1 sets forth the proposed Cure Amount, if any, that the Debtors propose to pay upon assumption of the respective executory contracts and unexpired leases. The Debtors reserve the right to amend **Exhibit 7.1** at any time up to ten (10) days prior to the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Article VII shall vest in and be fully enforceable by the respective Reorganized Debtors in accordance with its terms, except as modified by the provisions of this Plan, or any

51

order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

## 7.2    Objections to Assumption

Any party in interest wishing to object to the assumption of an executory contract or unexpired lease, shall File and serve any objection to such assumption by the same deadline and in the same manner established for filing objections to Confirmation, unless the assumption of such executory contract or unexpired lease is the subject of an amendment to **Exhibit 7.1**, in which case the deadline is the date that is the earlier of: (a) twenty (20) days after the date of such amendment; or (b) the day that is five (5) days before the initial Confirmation Hearing.

## 7.3    Payments Related to Assumption

Any defaults under each executory contract and unexpired lease to be assumed under the Plan, shall be cured, pursuant to Bankruptcy Code Section 365(b)(1), by payment of the amount (the **"Cure Amount"**), if any, and shall be paid on or as soon as practicable after the Effective Date by the Debtor or on such terms as may be agreed upon between the parties.  In the case of a dispute with respect to such Cure Amount set forth in a timely Filed objection to the assumption or assignment, the Debtor shall pay such Cure Amount in Cash on or

as soon as practicable after entry of a Final Order resolving the dispute, and approving the assumption.

### 7.4 Approval of Rejection

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of the executory contracts and unexpired leases as provided for under the Plan pursuant to Bankruptcy Code Sections 365 and 1123(b)(2). If an executory contract previously has been rejected, or is hereby rejected, under which the Debtors are a licensor of intellectual property (as defined in Bankruptcy Code Section 101(35A)), the licensee under such contract shall retain and may exercise its rights and remedies under Bankruptcy Code Section 365(n); provided, however, that nothing in the Plan, or any Exhibits to the Plan, shall constitute an admission by the Debtors that the Debtors are licensors of intellectual property, or that Bankruptcy Code Sections 101(35A) or 365(n) apply to any such contract.

### 7.5 Objections to Rejection

Any party in interest wishing to object to the rejection of an executory contract or unexpired lease not identified for assumption, as provided under the Plan, shall File and serve any objection by the same deadline and in the same manner established for filing objections to Confirmation, unless the rejection is the subject of an amendment to **Exhibit 7.1**, in which case the deadline is the date that

53

is the earlier of: (a) twenty (20) days after the date of such amendment; or (b) the day that is five (5) days before the initial Confirmation Hearing. Failure to File and serve any such objection by the applicable deadline shall constitute consent to the rejection.

### 7.6 Bar Date for Rejection Claims

Any Claim by any party to an executory contract or unexpired lease rejected by the Debtor hereunder shall be classified in Classes 9, 10, 11, provided, however, that: (a) any Claim arising from rejection of an executory contract or unexpired lease which has not been barred by a prior order of the Bankruptcy Court, shall be forever barred and shall not be enforceable unless a Proof of Claim is Filed within 60 days after the mailing of the Notice of Effective Date; and (b) nothing herein shall constitute a waiver of the Claims Bar Date, if applicable.

## VIII.

## PROCEDURES FOR RESOLVING

## DISPUTED CLAIMS; AND LITIGATION

### 8.1 Objections to Claims

All objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Case. If an objection to a Proof of Claim or a scheduled

U.S. Bankruptcy Court - Hawaii  #13-00353  Dkt # 308-1  Filed  08/15/13  Page 59 of 123

Claim is required to be Filed and has not been Filed by the Claims Objection Bar Date, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

### 8.2 Authority to Prosecute Objections.

After the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

### 8.3 Estimation of Tax Claims

In addition to any other available remedies or procedures with respect to Tax Claims or Tax issues or liabilities, the Reorganized Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to the Effective Date. If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Court shall determine the amount of the subject Tax liability or Claim in the event that the appropriate governmental entity timely determines a Tax to be due in excess of

55

the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability or Claim in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors and any successors to the Debtor shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

### 8.4 Temporary or Permanent Resolution of Disputed Claims

The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim, including without limitation any Tax Claim, pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether the Reorganized Debtors have previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the

56

Reorganized Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative Expense Claim and the rights of the Holder of such Claim, Interest or Administrative Expense Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### 8.5   Setoff

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense Claim and the distributions to be made pursuant to the Plan on account of such Claim, Interest or Administrative Expense Claim (before any distribution is made on account of such Claim, Interest or Administrative Expense Claim), the Rights of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim, Interest or Administrative Expense Claim. Neither the failure to set off nor the allowance of any Claim, Interest or Administrative Expense Claim hereunder will constitute a waiver or release by the Reorganized Debtors of any such Rights of Action that it may have against such Holder.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 62 of 123

### 8.6 Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Rights of Action subject only to any <u>express</u> waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Rights of Action. Absent such express waiver or release, the Reorganized Debtors, or their successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors (or its successors or future assigns). The Rights of Actions may be asserted or prosecuted before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action upon or after Confirmation or Consummation.

58

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 63 of 123

*By example only and without limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtors or any successor to or assign of it, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in the Debtor's Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.*

Notwithstanding any allowance of a Claim or Administrative Expense Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim or Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time, determine that it has a defense under 11 U.S.C. § 502(d), *e.g.*, the Reorganized Debtors hold a Right of Action for an Avoidance claim against the Holder of such Claim or Administrative Expense Claim and such Holder after demand refuses to pay the amount due in respect thereto.

59

# IX.

## EFFECTIVENESS OF THE PLAN

### 9.1    Conditions Precedent

The Plan shall not become effective unless and until the following conditions shall have been satisfied, or waived by the Debtor in its sole and absolute discretion:

**9.1.1**   The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and SKFI shall become a Final Order.

### 9.2    Effective Date

The Effective Date of the Plan shall be the date that is the second Business Day after the Conditions Precedent set forth in Section 9.1 above have been satisfied.

### 9.3    Notice of Effective Date

As soon as practicable after the Effective Date has occurred, the Debtor shall File with the Bankruptcy Court and serve on all creditors and parties the rejected executor contracts and leases an informational notice specifying the Effective Date, as a matter of record.

60

# X.

## CRAMDOWN

### 10.1   Cramdown Request

The Plan Proponents request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# XI.

## RETENTION OF JURISDICTION AND
## MISCELLANEOUS MATTERS

### 11.1   Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases  pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan is carried out, provided, however, that the Bankruptcy Court shall not have jurisdiction with respect to Tax Claims that arise

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 66 of 123

solely after the Effective Date. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)     establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim or Administrative Expense Claim (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with Bankruptcy Code section 505, resolve any objections to the allowance or priority of Claims or Administrative Expense Claims, or resolve any dispute as to the treatment necessary to reinstate a Claim or Administrative Expense Claim pursuant to the Plan;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which a Debtor was a party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expense Claims arising therefrom;

(d)     ensure that Distributions to holders of Allowed Claims or Administrative Expense Claims are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

(e)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending before the Effective Date or that may be commenced thereafter;

(f)     except as otherwise provided in the Confirmation Order or in the Plan, enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the Confirmation Order or any Person's rights arising under or obligations incurred in connection with the Plan, or the Confirmation Order;

(h)     subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date

63

pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or, the Confirmation Order,

(j)     consider and act on the compromise and settlement of any Claim against, or Right of Action of the Debtor;

(k)     decide or resolve any Right of Action under the Bankruptcy Code;

(l)     enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtor, wherever located;

64

(m)     hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Case, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtor, and (iv) estimate or allow any Tax Claims asserted against the Debtor;

(n)     determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(o)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Chapter 11 Case, or the Plan;

(p)     remand to state court any claim, cause of action, or proceeding involving the Debtor that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

(q)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in

65

connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

(r)    determine any other matter not inconsistent with the Bankruptcy Code; and

(s)    enter an order concluding the Chapter 11 Case.

## 11.2  Headings

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

## 11.3  Notices

All notices and requests in connection with the Plan shall be in writing and shall be hand delivered or sent by facsimile or U.S. mail addressed to:

| If to Debtor: | 1250 Oceanside Partners<br>P.O. Box 430<br>Kealakekua, Hawaii  96750<br>Attn:  G. Rick Robinson<br>Tel.:  (808) 224-0638 |
| --- | --- |
| Copy to: | Klevansky Piper, LLP<br>841 Bishop Street, Suite 1707<br>Honolulu, Hawaii  96813<br>Attn: Simon Klevansky, Esq.<br>Fax: (808) 237-5757<br>Tel.: (808) 536-0200 |

66

```
If to SKFI:        Sun Kona Finance I, LLC
                   5665 N. Scottsdale Road, Suite 135
                   Scottsdale, Arizona  85250-5912
                   Attn:  Philip Handley
                   Fax:  (480) 398-2627
                   Tel.:  (480) 398-2626

Copy to:           Wagner Choi & Verbrugge
                   745 Fort Street, Suite 1900
                   Honolulu, Hawaii  96813
                   Attn:  James A. Wagner, Esq.
                   Fax:  (808) 566-6900
                   Tel.:  (808) 533-1877
```

## 11.4    Successors and Assigns

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

## 11.5    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no

67

way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

### 11.6 No Waiver

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of any Person to object to any Claim for purposes of voting, the failure of any Person to object to a Claim or Administrative Expense Claim prior to Confirmation or the Effective Date, the failure of any Person to assert a Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been Filed with respect to a Claim, nor any action or inaction of any Person with respect to a Claim, Administrative Expense Claim, or Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtors or their successors or representatives, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim or Administrative Expense Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

68

### 11.7 Inconsistencies

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of such documents shall control; provided, however, in the event of a conflict between either the Plan or such documents or exhibits and the Confirmation Order, the Confirmation Order shall control.

### 11.8 Payment of Statutory Fees

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code and thereafter until entry of an order by the Court closing these Cases.

### 11.9 Indemnification Obligations

The Reorganized Debtors shall indemnify, to the fullest extent required by the Reorganized Debtors' constituent documents and applicable non-bankruptcy law, any person serving as a director or officer of the Reorganized Debtors on or after the Petition Date for any act or omission of such person as a director or officer of the Debtor, regardless of whether such act or omission occurred prior to or after the Petition Date.

69

### 11.10 Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Hawaii (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### 11.11 Withholding, Reporting, and Payment of Taxes

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtors shall report and pay taxes as may be required by applicable law. In addition, to the extent required by applicable law, reported distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

70

# XII.

## EFFECT OF CONFIRMATION

### 12.1 Binding Effect of Confirmation

Confirmation will bind the Debtors, all holders of Equity Interests, Claims or Administrative Expense Claims and other parties in interest to the provisions of the Plan whether or not the Equity Interest, Claim or Administrative Expense Claim of such holder is impaired under the Plan and whether or not the holder of such Claim, Administrative Expense Claim or Equity Interest has accepted the Plan.

### 12.2 Good Faith

Confirmation of the Plan shall constitute a finding that: (i) this Plan has been proposed by the Plan Proponents in good faith and in compliance with applicable provisions of the Bankruptcy Code; (ii) all Persons' solicitations of acceptances or rejections of this Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### 12.3 No Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

71

## 12.4   Discharge of Claims, Administrative Expenses and Interests

Except as provided in the Plan or Confirmation Order, as of the Effective Date the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and Equity Interests hereunder will be in exchange for and in complete satisfaction, discharge and release of all Claims, Administrative Expense Claims and Equity Interests, including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or the Confirmation Order, Confirmation will discharge the Debtors from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim or Administrative Expense Claim based on such debt has accepted the Plan.  As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors, their respective successors or property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.

72

### 12.5 Judicial Determination of Discharge

As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors any other or further Claims, Administrative Expense Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date. In accordance with the foregoing, except as provided in the Plan or in the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims, Administrative Expense Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharges shall void any judgment obtained against the Debtors, at any time, to the extent that such judgment relates to a discharged liability, Claim, or Administrative Expense Claim. Notwithstanding the foregoing, federal and state governmental agencies shall not be subject to the foregoing discharge with respect to the exercise and enforcement of any of their respective regulatory or police rights and powers.

### 12.6 Injunctions

**12.6.1 Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability, or Equity Interest, that is satisfied,**

73

disallowed, extinguished, or released, as applicable, will be permanently enjoined from taking any of the following actions on account of any such discharged or satisfied Claim, debt, liability, or Equity Interest:

(a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Estates, or their respective property, other than to enforce any right pursuant to the Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Estates, or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Estate, or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Estates; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, provided however, that nothing herein shall affect or otherwise impair the existing right of setoff by the United States of mutual pre-petition obligations.  Notwithstanding the foregoing, federal and state governmental agencies shall not be subject to the foregoing injunction with respect to the exercise and enforcement of any of their respective regulatory or police rights and powers.

74

**12.6.2** As of the Effective Date, all Persons that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released, disallowed, satisfied, or extinguished, pursuant to the Plan will be permanently enjoined from taking any of the following actions against any Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities, including, without limitation: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Lien; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing, federal and state governmental agencies shall not be subject to the foregoing injunction with respect to the exercise and enforcement of any of their respective regulatory or police rights and powers.

**12.7 Exculpation and Limitation of Liabilities**

To the maximum extent permitted by law and as of the Confirmation Date, none of the Debtors, the Estates, SKFI, nor any of their employees, officers,

directors, agents, members, representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "Exculpated Person"), shall have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the Chapter 11 Cases, formulation of the Plan, the Disclosure Statement, the Plan Transactions, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the Plan Transactions contemplated therein. Each Exculpated Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Section is necessary to, *inter alia*, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Debtors. The Confirmation Order's approval of the Plan also constitutes a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding anything to the contrary, nothing in this Section 12.7 shall limit, modify, impair or affect any right or remedy of the Exculpated Parties with respect to (i) the Plan; (ii) the transactions contemplated

76

by the Plan; or (iii) any agreement, document, certification, or undertaking entered into in connection with the Plan, or the transactions contemplated by the Plan.

# XIII.

## MODIFICATION OR WITHDRAWAL OF PLAN

**13.1**   The Plan Proponents may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and the Plan Proponents reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Plan Proponents determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

**13.2**   After confirmation of the Plan, the Plan Proponents may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Plan.  After confirmation of the Plan, the Plan Proponents may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

77

# XIV.

## CONFIRMATION REQUEST

**14.1**   The Plan Proponents request that the Court confirm the Plan

and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code

notwithstanding the rejection of the Plan by any impaired Class.

DATED:  Honolulu, Hawaii, *AUGUST 14, 2013*

1250 OCEANSIDE PARTNERS,
a Hawaii limited partnership

By: _____
    G. Rick Robinson
    Its: Chief Restructuring Officer


FRONT NINE, LLC,
a Delaware limited liability company

By: _____
    G. Rick Robinson
    Its: Chief Restructuring Officer

78

PACIFIC STAR COMPANY, LLC,
an Arizona limited liability company

By: _____

     G. Rick Robinson
     Its: Chief Restructuring Officer


SUN KONA FINANCE I, LLC,
a Delaware limited liability company


By _____

     Philip Handley
     Its Chief Financial Officer


Submitted by:


_____
SIMON KLEVANSKY
ALIKA L. PIPER
NICOLE D. STUCKI
Counsel for Debtors and
Debtor-in-Possession


_____
JAMES A. WAGNER
ALLISON A. ITO
Counsel for Sun Kona Finance I, LLC

PACIFIC STAR COMPANY, LLC,
an Arizona limited liability company

By: _____
      G. Rick Robinson
      Its: Chief Restructuring Officer


SUN KONA FINANCE I, LLC,
a Delaware limited liability company

By _____
      Philip Handley
      Its Chief Financial Officer


Submitted by:


_____
SIMON KLEVANSKY
ALIKA L. PIPER
NICOLE D. STUCKI
Counsel for Debtors and
Debtor-in-Possession


_____
JAMES A. WAGNER
ALLISON A. ITO
Counsel for Sun Kona Finance I, LLC

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 85 of 123

HOKULIʻA

DEVELOPMENT, CULTURAL AND COMMUNITY PLAN


I.   Continued Development of the Hokuliʻa Project

     A.   Original Development Plan. As governed by the Development Agreement dated
          April 20, 1998 and recorded on April 30, 1998, by and between the County of
          Hawaii (the "County") and 1250 Oceanside Partners ("Oceanside") (the
          "Development Agreement"), the original development plan for the Hokuliʻa
          Project envisioned the construction of 730 agricultural lots, each at least one-acre
          in size; a twenty-seven hole golf course, golf clubhouse and related amenities; an
          80 unit members' lodge (the "Members Lodge"); and a public coastline park of
          approximately 140-acres (the "Shoreline Park").

     B.   Revised Development Plan.

          1.   Oceanside will continue development of the Project in accordance with the
               Development Agreement and related permits and entitlements previously
               issued by the State of Hawaii, the County of Hawaii, and their respective
               regulatory agencies, all as were in effect on March 6, 2013. The revised
               development plan for the Hokuliʻa Project is of reduced intensity and
               density than the original development plan in the following major
               respects:

               a.   Oceanside will forego development of the 80 unit Members Lodge
                    at Hokuliʻa.

               b.   Oceanside will develop fewer than 730 agricultural lots at
                    Hokuliʻa, although the exact number of lots to be developed has
                    yet to be determined. Under current County zoning and State land
                    use limitations, the minimum size of the lots is one acre.

               c.   The golf course will not be expanded to 27 holes.

          2.   Pursuant to the Umbrella Agreement dated March 30, 2012 by and among
               The Club at Hokuliʻa, Inc. (the "Club"), Hokuliʻa Community
               Association, Inc. ("HCA"), Oceanside and Red Hill 1250, Inc., as
               amended ("Umbrella Agreement"), Oceanside will transfer the Hokuliʻa
               golf course to the Club, which will be responsible for development of the
               golf related amenities.

          3.   Pursuant to the Umbrella Agreement, Oceanside will transfer certain
               private roadways within the Hokuliʻa project to the HCA and will transfer
               the wastewater treatment plant site and improvements and various well

EXHIBIT A

sites, water reservoir sites and improvements to Hokuliʻa Community Services, Inc.

4.    Oceanside will transfer the Shoreline Park and certain agricultural and cultural preservation sites to the Hokuliʻa Park and Cultural Sites Association, Inc. ("PCSA"), which will be responsible for the maintenance and upkeep of those sites.

C.    Bypass Highway.  The northern portion of the Mamalahoa Bypass Highway ("Bypass Highway") has been completed and dedicated to the County.  In 2012, Oceanside and the County entered into an agreement pursuant to which the County agreed to complete the southern portion of the Bypass Highway and Oceanside agreed to pay the County $20 million towards the cost of that construction.  The County's secured claim with related to that agreement is addressed in Section 3.4 of the Plan.  Oceanside has been advised by the County that construction of the southern portion of the Bypass Highway is anticipated to begin during the first half of 2014 and be completed in 2015.

D.    State Land Use.  The development area of the Hokuliʻa project is located within the State Land Use Agricultural district.  In October 2006, Oceanside filed a Petition for Land Use District Boundary Amendment ("LUC Petition") with the Land Use Commission of the State of Hawaii ("LUC"), requesting a change in the State Land Use classification of most of the Hokuliʻa project lands from Agriculture to Rural and the reclassification of a small portion of the lands from Agricultural to Conservation.  By order of the LUC, action on the LUC Petition was stayed pending the submission and acceptance of a supplemental environmental impact statement.  Due to the occurrence of subsequent events (including the pending Bankruptcy cases) affecting Oceanside and the Hokuliʻa project, multiple land ownerships within the project boundary, as well as significant changes to economic, legal and regulatory environment under which the Hokuliʻa project will be developed, Oceanside anticipates that significant modifications to the LUC Petition would be necessary before it could be accepted and processed by the LUC.  Oceanside is in the process of evaluating how and whether to proceed with the LUC, as Oceanside would like to accomplish the Rural reclassification of the project lands, if feasible.  Unless and until the Hokuliʻa project lands are reclassified to the State land use Rural District, Oceanside will continue to develop the project within the State land use Agriculture District and in accordance with corresponding County land use requirements.

II.    Cultural and Historic Preservation Matters

A.    Historic Sites.  Many sites of historic and cultural significance, including burial sites, have been identified within the Hokuliʻa project lands.  Some of these sites are located on (or in the case of lava tubes, beneath) lands presently owned by Oceanside, while others are located on lands that were formerly owned by Oceanside but are now or will be owned by private lot owners, the HCA, the

PCSA and/or the Club. Oceanside will continue to work with State Historic Preservation Division ("SHPD") of the Department of Land and Natural Resources ("DLNR") regarding historic and cultural sites at Hokuli'a.

B.  Hokuli'a Park and Cultural Sites Association, Inc. The PCSA was established pursuant to the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Hokuli'a, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. 2006-22401 on December 5, 2006 and subsequently amended from time to time ("CCRs"). All owners of agricultural lots at Hokuli'a, including Oceanside and Front Nine, are by virtue of such ownership members of the PCSA. Under the CCRs, the PCSA has the ability to fund its operations through the assessment of dues to Hokuli'a lot owners, including Oceanside and Front Nine.

1.  Purpose. The PCSA was organized for the purpose of:

a.  Preserving, operating, and maintaining the Shoreline Park, the Old Government Road, Stepping Stone Trail and Old Cart Road; the Stepping Stone Trail Interpretive Sites, the Agricultural Preserves, the Cultural Preserves and Historical Sites, located within Hokuli'a, in a manner consistent with the Hokuli'a Shoreline Public Access Plan, the Project Preservation Plan and applicable covenants, contracts and agreements.

b.  Developing educational materials and programs designed to encourage a deep understanding of and appreciation for the importance of the cultural resources at Hokuli'a and developing standards for the proper maintenance of and care for such resources, including the development of an educational package and acculturation program for the benefit of people new to Hawaii and Kona, to be given to the buyers of dwellings and lots at Hokuli'a.

c.  Appointing a Cultural Liaison to work with Descendants on access to portions of Hokuli'a authorized by the PCSA Bylaws; and

d.  Preserving, operating and maintaining the Stepping Stone Trail, the Old Cart Road, the Old Government Road, and the Canoe Landing, as such purposes are more specifically set forth in the PCSA By-Laws and subject to such approvals as may be required from the DLNR.

2.  Responsibility and Coordination. Oceanside will continue to be responsible for initial implementation of the preservation measures for cultural sites (including burial sites) that are located on lands presently owned by Oceanside, including the lands that will be transferred to the

PCSA as described above. The PCSA has responsibility for maintenance of all preservation sites (including burial sites) within Hokuliʻa.

3. <u>Consultation</u>. Oceanside will consult with PCSA regarding the following:

    a.     All plans, policies and practices relating to the improvement, operation or use of any part or all of the Shoreline Park

    b.     All plans, policies and practices regarding the treatment of cultural, historical and burial sites at Hokuliʻa.

    c.     The selection of any firm or individual retained by Oceanside to conduct archaeological work, or to monitor construction work, at the Hokuliʻa Project in the future.

    d.     The roles of, and the resources being devoted by, the State and County in the management of cultural, historical and burial sites at Hokuliʻa.

C.     <u>Native Hawaiian Burial Sites</u>. Identification, protection and appropriate treatment of burial sites at Hokuliʻa is of highest priority to Oceanside. During the pendency of current bankruptcy proceeding, Oceanside has taken substantial steps towards the resolution of pending burial site issues.

1.     <u>Burial Site Protection and Reinterments</u>. Oceanside is proceeding to implement the permanent burial site protection measures that have been approved by SHPD and the Hawaii Island Burial Council ("<u>HIBC</u>"). For burial remains to be reinterred, Oceanside will proceed with the reinterments in consultation with the PCSA, SHPD and the certified lineal and cultural descendants. For burial sites that do not yet have approved burial protection plans, Oceanside will consult as may be necessary with its archaeologists, SHPD, HIBC, the certified lineal and cultural descendants and the PCSA to finalize and obtain approval of the plans. The implementation of the permanent burial site protection measures and processing of approvals for the remaining burial sites will continue to be given a high priority as Oceanside emerges from bankruptcy.

2.     <u>Block Reports and Lava Tube Resurveys</u>. Oceanside has been working with its archaeologists, SHPD and the PCSA to complete and submit to SHPD any outstanding block reports and lava tube resurvey reports. The purpose of the block reports is to advise SHPD of any significant historic sites, including burial sites, that were discovered in the course of monitoring of land clearing at Hokuliʻa during the early stages of Project development. The purpose of the lava tube resurveys was to confirm the location of the various lava tubes at Hokuliʻa and whether the lava tubes contained any cultural or burial remains.

3. <u>Classification of Burial Sites</u>. All burial sites identified in the block reports and lava tube resurveys are treated as "previously identified" within the meaning of HRS § 6E-43 and Haw. Admin. R. § 13-300-2. With the exception of those burials identified in the block reports and lava tube resurveys, all burial sites identified after March 14, 2006 on the Hokuli'a site constitute "inadvertent discoveries" within the meaning of HRS § 6E-43.6 and shall be treated in accordance with HRS § 6E-43.6 and Haw. Admin. R. § 13-300-2.

4. <u>Lava Tubes</u>. Oceanside presently does not intend to submit any additional applications to SHPD for variances that would allow Oceanside to cross or breach any portion of any lava tube known to contain burials as of March 2000, as such lava tube was mapped at the time. With respect to burial lava tubes discovered after March of 2000, and portions of burial lava tubes missed or incorrectly mapped before March of 2000, Oceanside will use reasonable efforts to avoid applying for any further variances from the Burial Treatment Plan that was approved by SHPD in March 2000.

D. <u>Agricultural Preserves</u>. Oceanside has designated three areas within the Hokuli'a Project to be set aside and maintained as agricultural preserves ("<u>Agricultural Preserves</u>"). The Agricultural Preserves are intended to provide areas where traditional Native Hawaiian agricultural crops may be cultivated by Hokuli'a residents and by others authorized by the PCSA to engage in such activities.

1. The three Agricultural Preserves and their approximate acreage are:
(a) Ke'eke'e Agricultural Preserve (approximately 2.50 acres);
(b) Kanaueue Agricultural Preserve (approximately 3.50 acres); and
(c) Hokukano Agricultural Preserve (approximately 3.50 acres). The approximate locations of the Agricultural Preserves are shown on Exhibit A-1.

2. Oceanside will be transferring title to the Agricultural Preserves to the PCSA, which will be responsible for their use and maintenance. The Ke'eke'e Agricultural Preserve is intended to be an active agricultural preserve, with crops planted and cultivated. The Kanaueue Agricultural Preserve is intended to be a non-active preserve designed primarily for the preservation of remnants of the Kona Field System located within the preserve. The Hokukano Agricultural Preserve is intended to be an active area, except as needed to protect and preserve remnants of the Kona Field system located within the preserve.

E. <u>Cultural Preserves</u>. Oceanside has established two cultural practice and preservation sites ("<u>Cultural Preserves</u>"). The Cultural Preserves are intended to provide areas where lineal and cultural descendants may engage in traditional cultural practices.

1.    The two Cultural Preserves consist of an area near site 21833 (approximately 6 acres) ("Hokuli'a Cultural Area") and (ii) the Pu'u Oahu Cultural Area, which consists of an area of approximately 6 acres contiguous to the current Conservation District area makai of Pu'u Ohau. The approximate locations of the Cultural Preserves are shown on Exhibit A-2.

2.    Oceanside will be transferring title to the Cultural Preserves to the PCSA, which will be responsible for their use and maintenance.

F.    <u>Pu'u Ohau</u>. Oceanside recognizes the cultural significance of Pu'u Ohau and the importance of protecting Kamaeo'kalani's burial site that is located near the summit of Pu'u Ohau. Oceanside also recognizes that Pu'u Ohau contains numerous other Native Hawaiian burial sites, both known and unknown. Oceanside is exploring alternatives, such as signage, for protecting and discouraging inappropriate access to the burial sites at Pu'u Ohau. In coordination with the PCSA, Oceanside will consult with the Hokuli'a lineal and cultural descendants and SHPD regarding practical and culturally appropriate long term measures to be implemented.

G.    <u>Native Hawaiian Artifacts and Relics</u>. Oceanside and the PCSA are working with their archaeological consultants to develop and maintain a comprehensive inventory of the Native Hawaiian artifacts and relics discovered by Oceanside or its agents on the Hokuli'a site or in connection with Hokuli'a. Oceanside presently anticipates that the PCSA will eventually take possession of and store the artifacts and relics now under the control of Oceanside and that in consultation with descendants, the PCSA will develop a protocol providing for the care and final curation or disposition of such artifacts and relics.

III.    <u>Lineal and Cultural Descendants</u>

A.    <u>Recognition</u>. Oceanside accepts the prior certification of lineal and cultural descendants of Hokuli'a and will work with the PCSA and SHPD to maintain a current list of the certified descendants. Oceanside recognizes and accepts the descendants as an integral and important part of the Hokuli'a community.

B.    <u>Descendant Access</u>. The certified lineal and cultural descendants of the Hokuli'a lands have traditional and customary access rights to the Hokuli'a lands for the purposes of caring for and worshiping of burial remains at Hokuli'a. Oceanside and the PCSA are in the process of finalizing a comprehensive Descendant Access Plan which addresses the Descendants' access rights and policies and procedures intended to provide reasonable regulation and accommodation. The Descendant Access Plan will be administered by the PCSA. Generally, the Descendant Access Plan is anticipated to contain the following components:

1. With respect to burial sites located within a subdivided lot and within 100 feet of a finished home, descendants will have access from sunrise to sunset, for the purposes of caring for and worshiping the burial remains.

2. With respect to burial sites located within a subdivided lot but not within 100 feet of a finished home, descendants will have access at all times, for the purposes of caring for and worshiping the burial remains.

3. With respect to burial sites located outside of the subdivisions, descendants will have access at all times, for the purposes of caring for and worshiping the burial remains, subject to any limitations on access set forth in the Shoreline Public Access Plan and the Hokuli'a Project Preservation Plan.

4. Descendants will have access to the Hokuli'a Cultural Area and the Agricultural Preserves from sunrise to sunset. Descendants will not be entitled to engage in any agricultural activities within the Agricultural Preserves unless expressly authorized to do so by the PCSA.

5. Descendant access to the Shoreline Park and the Pu'u Oahu Cultural Area will be consistent with the Shoreline Public Access Plan and the Project Preservation Plan.

6. Visits to any authorized site, including a burial site located outside the Shoreline Park (which has capacity and use limitations, as set forth in the Shoreline Park and Management Access Plan), involving ten or more individuals, will require a special permit issued by the PCSA.

7. Cultural activities, including caring for and worshipping burial remains, to be performed at night at any location within 100 feet of a completed home, including midnight ceremonies, and cultural activities to be conducted at any location which involve significant noise, artificial light or other conditions which may disturb or (absent warning) alarm others in the area, will require a special permit issued by the PCSA. In considering applications for such permits, PCSA will seek to insure that reasonable accommodations are made with respect to the interests of the applicants and any homeowners who might be affected by the proposed activity, in an effort to achieve an environment of respect and understanding.

8. In the event that any gate needs to be opened in order for descendants to gain access to any area to which access is authorized, PCSA will be responsible for providing a Cultural Liaison, available during normal business hours generally at a location within the Hokuli'a site, to provide the descendants an access pass which will open the pertinent gate. Descendant families who wish to plan ahead may reserve use of an access pass for a particular use. If the access pass is not returned within a designated period, it will be deactivated.

IV.  Historic Trails.  There also are three historic trails at Hokuliʻa, commonly referred to as the Old Government Road ("OGR"), Stepping Stone Trail ("SST") and ("Old Cart Road").  These three trails are owned by the State of Hawaii.

   A.  Alignment.

      1.  The OGR traverses the Hokuliʻa property from North to South.  The alignment of the OGR is set forth in the Quitclaim Deed recorded at the Bureau of Conveyances on August 20, 1997 as Doc. No. 97-111438.  The OGR is ten (10) feet in width.

      2.  The SST traverses the Hokuliʻa property from North to South.  The alignment of the SST is set forth in the unrecorded Quitclaim Deed delivered by Oceanside to the DLNR in August 2007.  The SST is five (5) feet in width and is contiguous with the OGR along a portion of its alignment.  Oceanside is working with the DLNR to finalize the quitclaim deed for the SST in conjunction with the crossing easements described below.

      3.  The OCR extends from Puʻu Ohau through the Southern boundary of the Hokuliʻa property and is located within the Shoreline Park or just outside the boundary of the Shoreline Park.  The alignment of the OCR is set forth in the unrecorded Quitclaim Deed delivered by Oceanside to the DLNR in August 2007.  The OCR is ten (10) feet in width and is contiguous with the SST along a portion of its alignment.  Oceanside is working with the DLNR to finalize the quitclaim deed for the OCR.

   B.  Crossing Easements.  On March 23, 2007, the Board of Land and Natural Resources approved Oceanside's request for various easements across the OGR and SST for drainage, golf cart pathway, pedestrian pathway, roadway and utility purposes.  Two of these easements (R-2 and SST-1) were recorded at the Bureau of Conveyances on October 18, 2007 as Document No. 2007-184795.  Oceanside is working with the DLNR to accomplish the finalization and recordation of the remaining easements in conjunction with the finalization and recordation of the quitclaim deed for the SST.  The approximate locations of the crossing easements is shown on the map attached as Exhibit A-3.

   C.  Pedestrian Connector.  As part of the Quitclaim Deed for the OCR, Oceanside will grant the DLNR an easement, for pedestrian access purposes, between the OCR and the OGR in the vicinity of Road J-3.  The approximate location of this easement is shown on the map attached as Exhibit A-4.  Oceanside is working with the DLNR to accomplish the finalization and recordation of this easement in conjunction with quitclaim deed for the OCR.

   D.  Memorandum of Agreement.

      1.  In 2003, Oceanside and the DLNR entered into a Memorandum of Agreement (the "OGR-MOA") for the maintenance of the OGR.

Maintenance responsibilities for the OGR under the OGR-MOA will eventually be transferred to the PCSA.

2. Oceanside and the PCSA have been in negotiations with the DLNR for a memorandum of agreement for the SST and the OCR. Oceanside presently anticipates that the memorandum of agreement will provide for (i) Oceanside's initial clearing of vegetation along the alignments of those trails and marking of the trail alignments, (ii) the PCSA's responsibilities for ongoing maintenance and reasonable access and usage regulations, and (iii) limitation of use of the trails to pedestrian access only.

E. <u>Interpretation and Restoration.</u>

1. In consultation with the PCSA, the descendants and SHPD, Oceanside will develop an interpretive area for the SST within the Pu'u Ohau Cultural Preserve.

2. In consultation with the PCSA, the descendants and SHPD, Oceanside may decide to restore or recreate a short portion of the SST treadway using the waterworn stones that presently are being curated by Oceanside. If implemented, the extent of any treadway recreation or restoration will in any event be limited by the quantity and usability of the stones presently in Oceanside's possession and Oceanside will not be recreating or restoring the treadway along the entire length of the SST.

3. Oceanside will coordinate with the Club and the PCSA regarding the installation of signs warning golfers of the presence of the SST and possible trail users and warning trail users of potential golf hazards.

V. <u>Protection of Ocean Resources</u>

A. <u>Water Quality Monitoring.</u> The existing water monitoring program required of Oceanside by the County is continuing.

B. <u>Baseline Study.</u> Oceanside engaged a qualified consultant to conduct an assessment of groundwater nutrient fluxes to the near shore waters in West Hawaii, for the area from North Kohala (Waika) to South Kona (Napo'opo'o). The study is being finalized and prepared for submission to peer review.

C. <u>Best Practices.</u> Oceanside is coordinating with the Club regarding the Club's continued utilization of best management practices for the golf course and landscape maintenance.

VI. <u>Charitable and Community Matters</u>

A. <u>Charitable Contributions.</u> Oceanside will commit to and undertake the following for the benefit of the Kona community:

1. Oceanside will contribute $500,000 (for affordable housing) to the Hawaii Island Community Development Corporation, payable $100,000 sixty days after the Effective Date and $100,000 annually thereafter on the same date in each of the following four years.

2. Oceanside will make the following contributions to the Hawaii Community Foundation for the purpose of funding Drug Abuse and Prevention Programs (50%) and Scholarship Programs (50%), targeted to the Kona Community. The greater of:

   a. An amount equal to one quarter of one percent (1/4%) of the gross sale price of all future lots sold by Oceanside in phases 2 and 3 of the project, as and when the lots are sold; or

   b. One million dollars ($1,000,000), payable as follows:

      (1) $100,000 sixty days after the Effective Date; and

      (2) $100,000 on the same date each year thereafter in each of the following nine years.

   Any payments of all or a portion of the $1,000,000 provided for in this subsection (b) shall be a credit against the one quarter of one percent payment due under subsection (a) above.

B. <u>Hiring</u>. Subject to management's sole discretion and candidate qualifications, Oceanside will give consideration to hiring prior employees of Oceanside or local Kona candidates when filling open staff positions at Hokuliʻa.

C. <u>Kona Scenic Park</u>. Subject to obtaining the necessary governmental permits and approvals, Oceanside will convey to the County approximately 2.27 acres of land contiguous to the Kona Scenic Park (the "<u>Park Addition</u>"). Oceanside may reserve easements for access to a potential well site and utility purposes over the Park Addition.

4850-6493-8004.8

10.

Exhibits to Development, Cultural and Community Plan

A-1          Map - Agricultural Preserves

A-2          Map - Cultural Preserves

A-3          Map - Trail Crossing Easements

A-4          Map - Pedestrian Connector

4850-6493-8004.8



EXHIBIT A-1

U.S. Bankruptcy Court - Hawaii  #13-00353   Dkt # 308-1   Filed  08/15/13   Page 97 of 123



HŌKŪLI'A

EXHIBIT A-2



## KEY MAP
### HOKULIA
Stepping Stone Trail and Old Government Road Crossing Easements
North Kona and South Kona, Island of Hawaii

EXHIBIT A-3



EXHIBIT A-4

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 308-1   Filed  08/15/13   Page 100 of 123

### CASH FLOW

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,809,431 | $1,809,431 |
| **Development Expenses** | | | | | | | | | | | | | |
| General Conditions | $1,204,412 | $49,412 | $69,412 | $49,412 | $49,412 | $49,412 | $44,564 | $44,564 | $44,564 | $44,564 | $44,564 | $44,564 | $1,738,855 |
| Direct Overhead | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $3,600,000 |
| Infrastructure | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $21,806 | $261,667 |
| Other | $76,803 | $276,803 | $20,076,803 | $76,803 | $76,803 | $76,803 | $76,803 | $76,803 | $76,803 | $76,803 | $76,803 | $76,803 | $21,121,635 |
| Total Development Expenses | $1,603,020 | $648,020 | $20,468,020 | $448,020 | $448,020 | $448,020 | $443,173 | $443,173 | $443,173 | $443,173 | $443,173 | $443,173 | $26,722,156 |
| Interest Expense | $5,223 | $7,352 | $519,690 | $77,220 | $78,932 | $526,271 | $83,808 | $85,525 | $532,870 | $90,428 | $92,166 | $539,513 | $2,638,996 |
| Principal Payment on Term Debt | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,803,431 |
| Cash Flow Surplus / (Deficit) Before Financing | ($1,608,243) | ($655,372) | ($20,987,710) | ($525,241) | ($526,952) | ($974,291) | ($525,980) | ($528,697) | ($976,042) | ($533,600) | ($535,339) | ($976,686) | ($29,355,152) |
| Draw / (Payment) on Exit Loan | $1,608,243 | $655,372 | $20,987,710 | $525,241 | $526,952 | $974,291 | $525,980 | $528,697 | $976,042 | $533,600 | $535,339 | $976,686 | $29,355,152 |
| Cash Flow Surplus / (Deficit) after Financing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

### DEBT SCHEDULE

| | | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5KFI | [1] | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 |
| Ackerman | [2] | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 |
| 5FKII | [3] | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 | $5,334,826 |
| Exit Loan | [4] | $1,608,243 | $2,263,615 | $23,251,325 | $23,776,565 | $24,303,517 | $25,277,809 | $25,804,789 | $26,333,486 | $27,309,528 | $27,843,128 | $28,378,467 | $29,355,152 | $29,355,152 |
| Total Debt | | $52,943,069 | $53,598,441 | $74,586,151 | $75,111,391 | $75,638,343 | $76,612,635 | $77,139,615 | $77,668,312 | $78,644,354 | $79,177,954 | $79,713,293 | $78,886,548 | $78,886,548 |

### CLASS PAYMENTS

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative | $400,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 |
| 5KFI Secured | $0 | $0 | $316,000 | $0 | $0 | $316,000 | $0 | $0 | $316,000 | $0 | $0 | $316,000 | $1,264,000 |
| County Secured | $0 | $0 | $20,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,000,000 |
| Ackerman Secured | $0 | $0 | $75,000 | $0 | $0 | $75,000 | $0 | $0 | $75,000 | $0 | $0 | $75,000 | $300,000 |
| 5KFII Secured | $0 | $0 | $53,348 | $0 | $0 | $53,348 | $0 | $0 | $53,348 | $0 | $0 | $1,856,779 | $2,016,824 |
| CSA Oceanside Secured | $0 | $3,080 | $3,080 | $3,080 | $3,080 | $3,080 | $0 | $0 | $0 | $0 | $0 | $0 | $18,480 |
| CSA Front Nine Secured | $0 | $1,768 | $1,768 | $1,768 | $1,768 | $1,768 | $0 | $0 | $0 | $0 | $0 | $0 | $10,605 |
| General Unsecured | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $750,000 | $750,000 |
| Convenience Claims | $0 | $0 | $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,000 |

[1] $40.0mm 20 year term debt, quarterly payments at AFR rate (3.16%) Interest-Only
[2] $6.0mm 15 year term debt, 5% interest paid quarterly, interest-only for years 1-8 and fully amortized from years 9-16
[3] $5.3mm 10 year term debt, 4% Interest-Only paid quarterly (However, assumed P&I payments from underlying borrowers are applied)
[4] $65.0mm 8 year revolving line of credit, AFR + 75 basis points (9.91%) Interest-Only paid monthly

### CASH FLOW

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2014 - 2021 Total |
|---|---|---|---|---|---|---|---|---|---|
| Net Revenue | $1,809,431 | $348,661 | $21,512,633 | $28,210,000 | $30,030,000 | $49,140,000 | $55,510,000 | $45,500,000 | $232,060,724 |
| Development Expenses | | | | | | | | | |
| General Conditions | $1,738,855 | $484,769 | $1,011,769 | $1,084,769 | $1,084,769 | $1,084,769 | $1,022,569 | $934,769 | $8,447,038 |
| Direct Overhead | $3,600,000 | $2,800,000 | $1,950,000 | $1,725,000 | $1,555,000 | $1,672,000 | $1,224,000 | $1,221,000 | $15,747,000 |
| Infrastructure | $261,667 | $2,556,667 | $21,104,551 | $23,002,160 | $14,982,272 | $18,471,731 | $21,366,201 | $27,499,576 | $129,244,824 |
| Other | $21,121,635 | $2,587,271 | $6,658,952 | $2,582,158 | $2,238,962 | $4,714,901 | $1,762,032 | $1,810,295 | $43,476,205 |
| Total Development Expenses | $26,722,156 | $8,428,707 | $30,725,271 | $28,394,087 | $19,861,003 | $25,943,401 | $25,374,802 | $31,465,640 | $196,915,067 |
| Interest Expense | $2,638,996 | $3,243,523 | $3,775,106 | $3,941,727 | $3,635,094 | $2,860,445 | $1,794,003 | $1,564,000 | $23,452,894 |
| Principal Payment on Term Debt | $1,803,431 | $201,405 | $1,353,433 | $1,740,938 | $235,620 | $0 | $0 | $6,357,937 | $11,692,763 |
| Cash Flow Surplus / (Deficit) Before Financing | ($29,355,152) | ($11,524,974) | ($14,341,178) | ($5,866,752) | ($6,298,283) | $20,336,154 | $28,341,196 | $6,112,423 | $0 |
| Draw / (Payment) on Exit Loan | $29,355,152 | $11,524,974 | $14,341,178 | $5,866,752 | ($6,298,283) | ($20,336,154) | ($28,341,196) | ($6,112,423) | $0 |
| Cash Flow Surplus / (Deficit) after Financing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

### DEBT SCHEDULE

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2014 - 2021 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| AFI | [1] | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $40,000,000 | $33,642,063 | $33,642,063 |
| Ackerman | [2] | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 | $6,000,000 |
| AFKII | [3] | $3,531,395 | $3,329,990 | $1,976,557 | $235,620 | $0 | $0 | $0 | $0 | $0 |
| Exit Loan | [4] | $29,355,152 | $40,880,126 | $55,221,304 | $61,088,056 | $54,789,773 | $34,453,619 | $6,112,423 | $0 | $39,642,063 |
| Total Debt | | $78,886,548 | $90,210,117 | $103,197,862 | $107,323,676 | $100,789,773 | $80,453,619 | $52,112,423 | $39,642,063 | $39,642,063 |

### CLASS PAYMENTS

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2014 - 2021 Total |
|---|---|---|---|---|---|---|---|---|---|
| Administrative | $400,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 |
| AFI Secured | $1,264,000 | $1,264,000 | $1,264,000 | $1,264,000 | $1,264,000 | $1,264,000 | $1,264,000 | $1,264,000 | $10,112,000 |
| County Secured | $20,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,000,000 |
| Ackerman Secured | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $2,400,000 |
| AFKII Secured | $2,016,824 | $342,661 | $1,486,633 | $1,820,000 | $245,044 | $0 | $0 | $0 | $5,911,162 |
| PCSA Oceanside Secured | $18,480 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $36,961 |
| PCSA Front Nine Secured | $10,605 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $21,211 |
| General Unsecured | $750,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $750,000 |
| Convenience Claims | $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,000 |

[1] $40.0mm 20 year term debt, quarterly payments at AFR rate (3.16%) Interest-Only

[2] $6.0mm 16 year term debt, 5% interest paid quarterly, interest-only for years 1-8 and fully amortized from years 9-16

[3] $3.5mm 10 year term debt, 4% Interest-Only paid quarterly (However, assumed P&I payments from underlying borrowers are applied)

[4] $65.0mm 8 year revolving line of credit, AFR + 75 basis points (3.91%) Interest-Only paid monthly





**EXHIBIT D**

# OCEANSIDE/FRONT NINE/PACIFIC STAR

# LIQUIDATION ANALYSIS

## Description

This liquidation analysis ("Liquidation Analysis") was prepared as part of the Disclosure Statement ("Disclosure Statement") in support of the Joint Consolidated Plan of Reorganization ("Plan") filed by the Debtors and Sun Kona Finance I, LLC ("SKFI"). The Liquidation Analysis illustrates that the Plan satisfies Section 1129(a)(7) of the Bankruptcy Code, which requires that each holder of an impaired Allowed Claim or Interest either (i) accepts the plan or (ii) receives or retains under the plan property of a value that is not less than the amount such holder would receive or retain if the Debtors were liquidating under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis may be helpful to holders of Allowed Claims in deciding whether to accept or reject the Plan. Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Plan and/or the Disclosure Statement.

The Liquidation Analysis is based on the assets projected to be held by the Debtor as of December 31, 2013. It has been assumed, hypothetically, that a plan of reorganization could not ultimately be confirmed and that on or about November 31, 2013 ("Conversion Date"), the Debtors' Chapter 11 Case would be converted to proceedings under Chapter 7. From a timing standpoint, it is assumed that a trustee ("Chapter 7 Trustee") would be appointed immediately upon the hypothetical conversion of the Chapter 11 Case.

For purposes of the Liquidation Analysis, it has been assumed that the assets will be liquidated under "forced-sale" conditions.

This analysis is based on the following assumptions:

    (i)      All of the Debtors' real and personal property is encumbered by one or more liens;

    (ii)     The Debtors' real property, excluding the Ackerman Collateral, is liquidated for $40,531,000 ("Sale Proceeds"), the value set forth in the Debtors' Schedules, and the proceeds are applied to the secured claims of the County, PCSA, and SKFI;

    (iii)    The County's secured claim in the amount of $20,000,000 is paid in full from the Sale Proceeds;

    (iv)    The PCSA secured claims in the amount of $29,085 are paid from the Sale Proceeds;

(v)     The balance of the Sale Proceeds in the amount of $20,501,915 are applied to the SKFI secured claim in the amount of $627,166,062 leaving SKFI with a general unsecured claim in the amount of approximately $606,664,147;

(vi)    Ackerman recovers $8,000,000 from the sale of the Ackerman Collateral and has an unsecured claim in the amount of approximately $7,790,000;

(vii)   The balance due on the Carryback Notes and Mortgages which comprise the SKFII Collateral as of June 15, 2013 was approximately $18,026,000. Of the twenty-three Notes, five were performing and eighteen were in default. For purposes of this Analysis, the five performing Notes were valued at 100% of the balance due, $2,360,852. The eighteen non-performing Notes were valued at $11,427,677 after discounting for collectability and other factors, for a total value of the SKFII Collateral of approximately $13,788,529;

(viii)  SKFII's $5,334,000 Claim is paid in full from the SKFII Collateral leaving a balance of $8,454,529;

(ix)    The DIP Loan of approximately $2,250,000 is paid in full from the SKFII Collateral, leaving a balance of approximately $6,204,529;

(x)     The Trustee's and Trustee's counsel's fees in the Chapter 7 would be approximately $250,000 and accrued Chapter 11 administrative expenses would be approximately $400,000. These expenses would be paid from the proceeds of the SKFII Collateral, leaving a balance of $5,354,529 for unsecured creditors;

(xi)    The Debtors' other personal property and four vehicles are liquidated for $20,000;

(xii)   For purposes of this Analysis, the preference claims to vendors and insiders in the amount of $1,264,000 and the fraudulent conveyance claims in the amount of $1,000,000 are valued at between $0 and $2,264,000;

(xiii)  The unsecured claims are allowed as filed in the total amount of approximately $33,700,862, based on the Debtors' Schedules and the proofs of claim on file;

(xiv)   No additional unsecured claims are generated from the rejection of the Executory Contracts and unexpired leases being assumed under the Plan. Although additional claims would be generated from the rejection, the amount of such claims is difficult to estimate and would not change the results of this analysis.

Based on the above assumptions, in a liquidation, the funds available for distribution to unsecured creditors would be between $6,224,529 and $8,488,529. The total unsecured claims of SKFI, Ackerman, and the general unsecured creditors would be approximately $648,155,009. The pro rata distribution to creditors would be between .96% and 1.31% of their respective claims.

**Plan Distribution to Unsecured Creditors**

The total unsecured claims are approximately $33,700,862, the funds available for distribution will be $750,000, and the pro rata distribution to the general unsecured creditors will be approximately 2.22% of their respective claims.

However, as stated in the Disclosure Statement, the Plan Proponents believe that the claims of the lots owners in the amount of approximately $32,000,000 are overstated. The Plan Proponents will file a motion with the Court to have the lot owner claims evaluated and capped for purposes of distribution under the Plan at no more than approximately $17,000,000. Assuming the Court grants the valuation motion and limits the lot owner's claims, the pro rata distribution to unsecured creditors would be approximately 4% of the respective claims.

**Conclusion**

Based on these assumptions, the Debtors believe that confirmation of the Plan would provide each holder of an Allowed Claim or interests with a recovery that is not less than it would receive or retain in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is an estimate of the proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation of the assets of the Debtors. Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtors or a Chapter 7 Trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in the Liquidation Analysis to project the liquidation values of the Debtors' assets would be realized were the Debtors to undergo an actual liquidation. The actual amounts of Allowed Claims against the Debtors could vary significantly from the Debtors' estimates, depending on, among other things, the claims asserted during the pendency of the Chapter 7 case and objections by the Chapter 7 Trustee.



# OVERVIEW

## WHO WE ARE

**SunChase Holdings, Inc.** is a privately held investment company focused on the investment, development and sale of residential and commercial real estate, including large-scale master planned communities. SunChase has a 22 year, multi-cycle history of investing and lending in both performing and distressed real estate environments. SunChase is a debt-free owner of significant real estate holdings as well as equity interests in a variety of other ventures. SunChase maintains a highly qualified team of professionals with an average of over 25 years of business experience.

In addition to its real estate activities, SunChase provides venture capital in the form of loans and equity investments to companies with high growth and return potential.

SunChase Investments LLC is an affiliated entity which provides a full scope of financial asset management services to the Company and select high net-worth individuals.

## HISTORY

**SunChase** was founded in the 1980's with early activities concentrated on opportunistic equity and real estate investments. Following the savings and loan crisis in the early 1990's, the Company utilized its real estate expertise to become active in the acquisition and sale of distressed assets, including real estate land and loan assets acquired from the Resolution Trust Company ("RTC", now the FDIC). SunChase purchased and managed RTC assets with a book value in excess of $1.5 Billion dollars. During this period, SunChase made venture and other equity investments in companies within industries such as software, aircraft and fiber optic cable.

In the1990's, SunChase became active in residential and commercial development, including taking large parcels of raw land through the entitlement and development process to become successful mixed-use communities. SunChase also actively managed and sold significant real estate holdings that it either solely-owned or managed under partnership with others.

Prior to 2006, reflecting the success of its developments and favorable real estate values, SunChase sold the majority of its single-family residential real estate holdings. SunChase continues to manage significant commercial and residential real estate holdings owned by itself and for its investors.

**EXHIBIT F**

# LOOKING FORWARD

With its significant financial resources, investment success and expertise, **SunChase** is poised to leverage its liquidity into new opportunistic deals in residential land, income producing building assets, distressed loans and other venture opportunities. SunChase has built its reputation on identifying and capitalizing on unique investment opportunities and we welcome the opportunity to evaluate and consider your investment propositions.

# OFFICE LOCATIONS

**SunChase** operates principal office locations in both **Phoenix, Arizona** (Scottsdale) and **Sacramento, California** (Roseville). These locations allow SunChase to oversee and manage existing principal assets, maintain a strategic presence in the primary growth markets of the western United States, and to scale to further geographies as opportunities evolve.

# CAPABILITIES

## REAL ESTATE

### REAL ESTATE DEVELOPMENT AND MANAGEMENT

**SunChase** has extensive experience in the acquisition and management of real estate assets and real estate backed loans. This experience, which has been gained through several real estate cycles, allows SunChase to quickly evaluate and size-up investment opportunities. Utilizing a staff of skilled real estate experts SunChase performs a broad range of real estate functions and services for itself or in partnership with select outside entities. Depending on the investment and equity partner, SunChase will typically assume a management role in a partnership, but may consider taking a more passive investment role.

SunChase's management experience and expertise includes the following:

- Acquire, entitle and *develop land*, including large master planned communities consisting of both residential and commercial properties.

- *Development and lease-up of commercial* buildings, including office, retail, industrial and apartment properties.

- Acquire and manage performing and *distressed real estate properties and loans* of all types, including bulk real estate property and loan portfolios.

**[Link to Featured Projects]**

### FEE ASSET MANAGEMENT

**SunChase** utilizes its in-house expertise to also provide real estate asset and portfolio management services to assist other key industry partners and alliances on a variety of project requirements. SunChase's experience and success affords a unique understanding of both the financial and logistical aspects of development and equity management.

SunChase offers the following specific expertise to select partners:

- Pre-Investment Due Diligence.

- Asset Analysis And Positioning

- Entitlement Procurement

- Development And Construction Management

- Disposition

# FINANCIAL INVESTING

## BUSINESS CAPITAL

Although real estate is its primary focus, **SunChase** has a long history of providing loans and equity capital to growing businesses. SunChase has put its capital to work in such diverse industries as bundled telecommunication cable, homebuilding, aircraft manufacturing and software. SunChase sources its transactions through a network of business, legal and investment banking relationships.

An ideal target investment would be a small to mid-sized company in the expansion phase where capital is the primary constraint to growth. In addition to a strong management team, a company must have a proven competitive advantage and a secure path to rapid growth. SunChase prefers to commit capital to companies in general commercial sectors such as manufacturing, distribution, business services and consumer services. It would be rare for SunChase to invest capital in early stage and highly speculative companies, or in situations involving highly complex technologies.

## FINANCIAL ASSET MANAGEMENT

**SunChase Investments LLC** is an affiliated entity which provides a full range of financial asset management and estate planning services to the SunChase family of companies and related high net-worth individuals. SunChase Investments manages its own direct investments as well as outsourcing investment services to some of the financial industry's most qualified investment advisors.

# FEATURED INVESTMENTS

For over 22 years, **SunChase** has created an impressive track record of discovering and capitalizing on some of the most impressive real estate-related opportunities in the United States, including an array of ventures from large scale land development projects and commercial ventures to some of the largest portfolio disposition pools ever assembled.

Select from the following examples of SunChase featured real estate ventures for detailed accomplishments.

**NATIONAL LAND FUND [Link]**

**MOUNTAIN HOUSE [Link]**

**ESTRELLA [Link]**

**GOODYEAR COMMERCIAL PROPERTIES [Link]**

**TERRA BAY [Link]**

**LINCOLN CROSSING [Link]**

**STERLING POINTE [Link]**

**PONT ROYAL [Link]**

# FDIC/RESOLUTION TRUST CORPORATION (RTC) PORTFOLIOS

## NATIONAL LAND FUND

Through one of its subsidiary entities **SunChase** acquired, repositioned and managed the disposition of substantial pools of real estate and financial assets for the United States Federal Government. Chief among these acquisitions was the **National Land Fund (NLF)**, one of the largest real estate and loan disposition initiatives undertaken by the United States Government's **Resolution Trust Corporation (RTC)**.

The SunChase team successfully completed the massive NLF due diligence effort and provided the valuations that resulted in winning bids on five of the six pools of real estate and loan assets with book values of approximately $1.4 billion. As a result, SunChase became the general partner in this private sector/government partnership; and over the ensuing years has successfully managed the disposition of the bulk of the assets -- providing each partner with optimum returns. **For information on remaining available assets *Go to Available Land.***

## OTHER RTC TRANSACTIONS

- SunChase participated in two smaller RTC auctions (Southwest I & II), and was also awarded the opportunity to dispose of $91,000,000 in real estate assets.

- The SunChase team was awarded the exclusive right to collect on a $370 million portfolio of 1,100 judgments, deficiencies and charge-offs (JDC's), which had all originated at failed savings and loan associations.

- Through another subsidiary, SunChase negotiated the purchase of a $65 million portfolio of loan assets from First Union Bank in Baltimore, netting SunChase a triple-digit return on its investment.

- SunChase also acquired from the RTC a portfolio of assets previously owned by Great American Federal Savings Association. These assets were varied, ranging from single family homes and subdivision lots, to the 100-acre plus mixed-use Terra Bay community in South San Francisco.

# MOUNTAIN HOUSE
## Mountain House, California

**Mountain House**, one of the most ambitious real estate development projects in California, is a 5,000 acre master planned "New Town" community located 60 miles east of downtown San Francisco, in unincorporated San Joaquin County, California. It consists of a mixed use land plan calling for 15,000 residential dwelling units and 12 million square feet of commercial, office and industrial projects.

**SunChase** acquired the project in 1991 as an assemblage of optioned parcels and then proceeded to secure all necessary local, state and federal entitlements and permits in order to break ground in 2001. The project also required the formation and staffing of a Community Services District to provide urban services to the community.

From 2001 through 2006, the SunChase team constructed a freeway interchange, sewer and water treatment plants, fire station, several neighborhood parks, a large centralized community park, miles of roadways and underground utilities and funded construction of two K-8 schools utilizing Mello Roos Bonds.

SunChase negotiated numerous lot sales to some of the nation's largest public home builders (Lennar, Pulte and Centex Homes) who constructed approximately 3,000 homes during this period, which experienced unprecedented sales demand and value increases, making Mountain House one of the most desirable communities in the region.

At the height of the real estate market, in 2005, SunChase completed the bulk sale of the balance of its residential holdings in Mountain House (8,400 lots) to Shea Homes, resulting in one of the largest real estate transactions in the history of Northern California.

**SunChase continues to own approximately 400 acres of retail, office, industrial and multi-family parcels in Mountain House.**

[Link to Mountain House website; www.mountainhouse.net]

# ESTRELLA
## Goodyear, Arizona

**Estrella** is a 19,400 acre master-planned community located in Goodyear, Arizona, a rapidly growing suburb within the Phoenix Metropolitan area.    Estrella is located just south of Interstate 10, located approximately 18 miles southwest of downtown Phoenix.  The master plan for Estrella calls for a self-sufficient mixed-use community that currently allows for the development of up to 85,000 residential units intertwined with a complimentary balance of retail, and office/industrial business parks.   Estrella is set apart due to its highly amenitized community plan as well as its picturesque Sonoran Desert-setting at the base of the Estrella Mountains and Regional Park.

**SunChase** acquired Estrella through a disposition venture partnership with the US Government's Resolution Trust Corporation (RTC) in the early 1990's.    SunChase proceeded to reposition the project's plan, phasing, financing and infrastructure obligations, while developing a new branding image in order to bring the project back to market for the following real estate cycle.

Between 1994 and 2005 the SunChase team re-negotiated the community's  entitlements; secured community facilities district financing with GMAC; constructed extensive backbone infrastructure; brought three new residential villages to market totaling over 3,600 residential lots; constructed a nationally-recognized 8,000 square foot home finding/marketing center; developed a state-of-the art multi-million dollar community clubhouse, fitness facility and Library; developed a signature Nicklaus Design Championship golf course and clubhouse; developed a 10,000 square foot retail/office building; constructed several other community facilities; and developed a new marketplace brand identity and master marketing program -- turning Estrella into one of the most desirable master plans in the Phoenix Metropolitan market place.

In 2005, at the height of the real estate market, SunChase successfully negotiated a bulk sale of the balance of its holdings in Estrella to Newland Communities, setting a record for one of the largest real estate land transactions in the State's history.

**[Link to Estrella website;  www.Estrella.com]**

# GOODYEAR COMMERCIAL PROPERTIES
## Goodyear, Arizona

**SunChase**, acting as a 50-percent managing member of SunMP, LLC, has assembled a strategic collection of prime commercial and mixed-use land assets all within the rapidly urbanizing growth area of Goodyear, located near Phoenix, Arizona. The various projects make up a significant portion of the planned future central business district of the City of Goodyear, where they are positioned to take advantage of several of Goodyear's existing and planned community improvements, including the Goodyear Airport; the brand new Goodyear Ballpark Major League Baseball Spring Training Facility; the new Estrella Falls Mall and Lifestyle center; and the planned Cancer Treatment Center of America facility.

These new developments will continue to create further synergy and demand for SunChase's various Goodyear properties as discussed below.

### CITY CENTER AIRPARK

The City Center Airpark project is a 401-acre master planned mixed-use project. The Airpark project is located next to the proposed Goodyear City Center, and has over a mile of direct frontage with the existing Phoenix-Goodyear Airport, a general aviation airport that has the third longest civilian runway in Arizona. City Center Airpark is planned to have a variety of land uses ranging from office, commercial, R & D related uses to manufacturing, warehouse, and airport related uses, and at build out will contain approximately 5,000,000 square feet of prime commercial property.

SunChase has successfully negotiated all of the major project entitlements and permits in order to take advantage of the major growth planned for the region.

### GOODYEAR CITY CENTER

The Goodyear City Center is comprised of 200 gross acres located at three of the four corners of the intersection of Estrella Parkway and Yuma Road and is envisioned to be the central urban mixed-use downtown core for the City of Goodyear. Land uses within the City Center will be a mixture of retail, commercial, entertainment, office, governmental and residential uses.

Based on current zoning, the project, when completely developed, could contain approximately 3,000 residential units, 300,000 square feet of retail space, over 1,000,000 square feet of office and 1,000 hotel rooms. SunChase has successfully negotiated all of the project's entitlements and has positioned the project to take advantage of the pending massive urban expansion planned for Goodyear.

### ESTRELLA COMMERCE PARK

This 610 gross acre parcel is planned to be primarily a manufacturing and distribution industrial park. SunChase successfully negotiated full entitlements for the project including vested Planned Area Development (PAD) zoning. At build out the project will have approximately 9,000,000 square feet of warehouse/distribution and commercial space.

### SUN D&S FARMS

The Sun DS farms property consists of 160 acres, and is entitled to be a mixed-use development containing residential, office, retail and industrial related uses. The project has fully vested zoning with an approved preliminary plat. At build out, the parcel should contain approximately 360 single family detached houses, 150,000 square of retail space and 750,000 square feet of industrial/office space.

**[Link to City of Goodyear website; www.goodyearaz.gov]**

# TERRA BAY
## South San Francisco, CA

**Terra Bay** is a mixed-use hillside master planned community consisting of 125 single family homes, 365 townhomes, 228 condominium homes and a 20 acre commercial office parcel located along the south and east sides of San Bruno Mountain in the city of **South San Francisco**.

The project, originally planned and entitled in the late 1980's was purchased by **SunChase** as a distressed asset from Great American Savings and Loan in 1992. SunChase renegotiated key aspects of the project's entitlement obligations, and repositioned the project to take advantage of the exploding real estate market of the late 1990's and 2000's.

SunChase performed backbone grading and installed the balance of backbone infrastructure, and sold finished super parcels to Centex Homes.

SunChase solicited partners for the condominium and commercial office portions of the community and subsequently entered into a joint venture with Myers Development Company. The partnership developed and sold a 12-story condominium project and sold the office parcel to Stockbridge Partners and retained a partnership interest in the development of a two-towered 697,000 sq. ft. Class "A" office building complex called "Centennial Towers".

# LINCOLN CROSSING
### Lincoln, CA

Lincoln Crossing is an 1,100 acre master planned community project located at the primary entry corridor to the Sacramento Metropolitan suburb of Lincoln, California. To take advantage of the anticipated significant growth planned for Lincoln, **SunChase** negotiated the property assemblage, attained annexation into the city, performed all of the master community planning, negotiated full entitlement status and permits and then sold the project to SunCal Communities in 2003. Entitlements SunChase procured included General Plan Amendment, Specific Plan, Annexation, Development Agreement and full mapping and engineering. The project consisted of 3,100 units and 42 acres of commercial property.

# STERLING POINTE
### Lincoln, CA

Sterling Pointe is a full service community commercial venture located in the Sacramento Metropolitan suburb city of Lincoln, California.

**SunChase** gained full entitlement status, constructed all infrastructure, sold finished super parcels to commercial developers.   SunChase selected the design forms for the project and implemented the architectural design, review and approval process for the center.

The land sale values for Sterling Pointe established new high value record benchmarks for commercial property transactions in the region. The center is now home to Lowes Home Improvement, Raley's Supermarket and numerous other national and regional tenants.

# PONT ROYAL
## Provence, France

**SunChase** acquired a 50% interest of **Pont Royal**, a French Societe, which owns the resort-anchored Pont Royal master planned community in Provence, France.   Pont Royal is located 30 minutes from the French Mediterranean port city of Marseilles, and provides guests with world class accommodations, dining and recreation.

SunChase is the managing member of the partnership and oversees all asset management, entitlements, land development, finance and property management of this world class property, which is anchored around the "Pierre and Vacances" time-share resort and a Seve Ballesteros designed championship golf course.

The project includes ownership and operation of a 300 year old hotel, named the "Moulin de Vernegues".   SunChase is adding an additional 9 holes of golf, manages the Moulin de Vernegues and is selling both high-end destination custom and production lots to regional home builders.

**[Link to Moulin de Vernegues website;** http://www.aix-en-provence.com/moulinvernegues/index2.htm]

**[Link to Pierre and Vacances website;**
http://static.pierreetvacances.com/static_usr/virtuel/village/index_pont_royal_uk.html]

# DESIRED REAL ESTATE INVESTMENTS:

SunChase is an opportunistic investor willing to evaluate investments from a wide spectrum of real estate classifications. Currently, SunChase is seeking the following real estate investment opportunities:

- ***Acquire Distressed Real Estate***, including both residential and commercial assets, in the following status:

  1. Raw, Entitled or Improved Land.
  2. Existing Commercial Buildings, including office, retail, industrial or apartment properties.
  3. Bulk distressed real estate portfolios.

- ***Acquire Distressed Real Estate Loans*** secured by any class of real estate and including bulk distressed loan portfolios.

- ***Provide Real Estate Financing*** in the form of a 1st Trust deed or "DIP" Debtor in Possession Financing.

- ***Provide Joint Venture Equity*** to select partners based on the viability of the proposed real estate investment.

# EXECUTIVE LEADERSHIP

SunChase's executive management team consists of sophisticated and seasoned professionals with diverse backgrounds and expertise in acquisition, finance, asset enhancement, investment and development. SunChase's team has consistently achieved extraordinary financial success in a variety of ventures over several economic cycles, and has consistently demonstrated that it employs some of the most successful vision, discipline, and sophistication in the business.

## WILLIAM A. POPE
**Chief Executive Officer**

Mr. Pope is the owner and CEO of SunChase Holdings, Inc.

In the 1980's Mr. Pope became involved in several companies culminating in the formation of SunChase Holdings in 1988 which engaged in the business of acquiring, developing, managing and marketing residential and commercial properties. SunChase also owned and operated several companies involved in fiber optics conduit manufacturing company, homebuilding and computer software technology. SunChase also provided venture capital to businesses involved in aircraft manufacturing and bundled cable services.

Under Mr. Pope's leadership in the early 1990's SunChase was a very active bidder in the auctions held by the Resolution Trust Company (RTC) after the failure of the savings and loan industry. SunChase was one of the most successful bidders of RTC assets winning portfolios worth book values in excess of $1.5 billion dollars.

Mr. Pope dedicates significant time to charitable and non-profit causes and has served on the boards of numerous entities such as the Boys and Girls Clubs of Metropolitan Phoenix and the ASU Business School Advisory Board. Bill and his wife Linda are active members in their community and have led numerous charitable events and organizations. The couple has received many awards in recognition of their efforts.

## DUANE A. GRIMSMAN
**Senior Vice President**

Mr. Grimsman is a member of the SunChase executive team and manages SunChase's Sacramento, California office. He is responsible for management of all real estate investments, operations and projects primarily in California and Nevada and has been a member of the SunChase Holdings team since 1990. Mr. Grimsman has over 28 years of experience in managing real estate development assets, including acquisition, entitlement processing, development and disposition of some of the largest master planned communities in California. He was primarily responsible for the acquisition, entitlement, development and disposition of the Mountain House "New Town" master planned community located in California. As a Corporate Broker and officer, Mr. Grimsman specializes in both asset acquisition and disposition negotiations for SunChase and has personally negotiated some of the largest single asset real estate transactions in the history of California. In addition to managing land development, Mr Grimsman has significant experience in the development, lease-up and disposition of commercial office, retail, industrial and multi-family residential properties.

Mr. Grimsman earned his Bachelor of Science in Business Management from Brigham Young University and is a licensed California Real Estate Broker.

**PHILIP J. HANDLEY**
**Chief Financial Officer**

Mr. Handley joined SunChase as its Chief Financial Officer in 2001. Mr. Handley is a "hands-on", operationally focused CFO responsible for the financial management of the company and its projects. He and his team are responsible for financial due diligence, planning, cost control, leverage and profitability of real estate projects. Mr. Handley is responsible for taxation, reporting and long-term strategic planning for SunChase. He also co-manages the financial investments for SunChase Investments LLC. Prior to SunChase Mr. Handley was CFO for two different companies and started his finance career at Ernst and Young LLP, where he spent over seven years in the audit and entrepreneurial services groups.

Mr. Handley is a non-practicing Certified Public Accountant, and earned a Bachelor's Degree in Business Economics from the University of California, at Santa Barbara.

**CRAIG PICKETT**
**President, SunChase Investments LLC**

Mr. Pickett runs SunChase Investments LLC and coordinates investment planning, taxation strategies and estate matters for the Company and select individuals. Prior to joining SunChase, Mr. Pickett had a 35 year career in public accounting and was a Managing Partner with Ernst & Young LLP for over 21 years. His practice focused on public companies, investees of venture capitalists and private equity firms and multi-national firms, including several S&P 500 companies. In that capacity, he provided services related to public equity and debt offerings and acquisition due diligence. Mr. Pickett has extensive knowledge of Securities and Exchange Commission (SEC) rules and regulations as well as the requirements of the Sarbanes/Oxley Act. In addition, he is familiar with international business and economic affairs particularly in Europe and Asia. Mr. Pickett serves on the Board of Directors of two companies headquartered in Singapore

Mr. Pickett is a Certified Public Accountant, and earned a Bachelor's Degree in Economics from the University of Utah, and a Master Degree in Business Administration from the University of California, at Los Angeles (UCLA).