Date Signed:
October 2, 2014



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| In re 1250 Oceanside Partners, | Case No. 13-00353 |
| --- | --- |
| | Chapter 11 |
| Debtor. | Re: Docket No. 1054 |

**MEMORANDUM OF DECISION
ON REQUEST FOR ADMINISTRATIVE EXPENSE**

The Batiste creditors objected to confirmation of the debtors' plan. A half-hour before the confirmation hearing, the Batiste creditors, the debtors, and others entered into a stipulation that doubled the unsecured creditors' recovery under the plan and allowed the plan to be confirmed without a contested hearing.

I am required to decide whether and to what extent the Batiste creditors are entitled to an administrative expense claim for attorney's fees and costs they incurred during this case. Because I find that a portion of the Batiste creditors' actions made a substantial contribution in this case, I will award them $55,000 in attorney's fees and costs.

## I. Background

This bankruptcy is the result of a failed real estate development called Hokuli'a. The debtors, companies which were originally controlled by Lyle Anderson, intended to convert a large piece of undeveloped land on the Kona coast of Hawaii Island into high-end house lots along with golf courses and luxury amenities.

Hokuli'a was just one component of Lyle Anderson's portfolio of developments. In order to secure funding for his projects, Mr. Anderson borrowed enormous sums from the Bank of Scotland, using his various developments as security. The financial arrangements between Mr. Anderson and the Bank of Scotland were complex.[1]

The Hokuli'a project got underway, and the developers were able to sell some of the house lots. Among the purchasers was a group now led by William Batiste (the Batiste creditors).

The developers told the lot purchasers that the developers would complete the project, including the amenities, by certain dates. But because of a series of misfortunes, such as lawsuits and natural disasters, the Hokuli'a development stalled and the promised amenities were never finished.

In 2008, the Bank of Scotland declared default and began to exercise its

---

[1] Dkt. 1054-1 at 3.

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 2 of 16

remedies by (among other things) replacing the management of Mr. Anderson's companies. Sun Kona Finance I, LLC (SKFI) eventually purchased from the Bank of Scotland over $600,000,000 in debt and the Bank of Scotland's security interests in the Hokuli'a project.

In the meantime, several of the lot purchasers, including the Batiste creditors, asserted claims against the developers. The purchasers alleged that the developers had breached their promises to complete the Hokuli'a development.

In 2013, the debtors, which own the Hokuli'a project, commenced these chapter 11 cases.

On August 15, 2013, the debtors and SKFI proposed a plan of reorganization.[2] The plan (briefly summarized) provided that (1) SKFI would reduce its secured claim from $627 million to $40 million and waive its unsecured claims, (2) SKFI would extend a new loan of $65 million to fund the plan and recapitalize the debtors, (3) a $20 million debt to the County of Hawaii would be paid in full, (4) the general unsecured creditors (including the lot purchasers) would receive pro rata shares of a fund of $750,000, in satisfaction of claims totaling about $33.7 million, and (5) the old equity interests in the debtors would be extinguished, and SKFI would acquire new equity interests in exchange for releasing a post-petition loan to the debtors in

---

[2] Dkt. 306.

3

possession.

The Batiste creditors raised a number of objections during the confirmation process. Their main point of contention was SKFI's interest in the project and the series of transactions that led to SKFI purchasing the secured debt. The Batiste creditors alleged that the debtors, Mr. Anderson, the Bank of Scotland, and SKFI had engaged in a wide range of allegedly wrongful conduct. Among other things, the Batiste creditors argued that the debtors were artificially burdened by an outsized portion of Lyle Anderson's debt and that, as a consequence, the debtors' unsecured creditors were unfairly disadvantaged. The Batiste creditors argued that the SKFI claims should be disallowed or subordinated, so that lot owners would be paid in full before SKFI. They initiated three adversary proceedings, objected to SKFI's claims, objected to the proposed disclosure statement and plan, conducted discovery, and filed many other papers. The Batiste creditors retained and compensated a lead law firm, a second lawyer who consulted with lead counsel on bankruptcy law issues, a real estate appraiser, and a business valuation expert. Similarly, the debtors and SKFI employed their own attorneys and professionals. All three–the Batiste creditors, the debtors, and SKFI–incurred significant expense in this litigation.

On November 11, 2013, SKFI offered to increase the unsecured creditors fund to $1,500,000, in exchange for certain releases. The Batiste creditors did not

4

accept the offer and the litigation continued.[3]

On May 12, 2014, less than half an hour before the plan confirmation hearing was to begin, the parties settled. Among other terms, the Batiste creditors agreed to withdraw their objections to plan confirmation and SKFI's claim, dismiss their adversary proceedings, and release various claims against certain individuals and entities affiliated with the debtors and SKFI. Additionally, another group of creditors (the Davis creditors) also agreed to drop their objections to confirmation.

In exchange for withdrawing the creditors' claims and objections, SKFI and the debtors increased the unsecured creditors fund, out of which the lot owners and others would be paid, from $750,000[4] to $1,550,000, and SKFI (but not the debtors) agreed that it would not oppose a request by the Batiste creditors for reimbursement of up to $250,000 of attorneys' fees plus costs.[5]

Upon withdrawal of the Davis and Batiste creditors' objections, the plan was confirmed without a contested hearing.[6]

The Batiste creditors have now filed a claim for reimbursement of a portion of their attorneys' fees and costs as administrative expenses. The debtors object.

---

[3] Dkt. 1186 at 25-26.

[4] The debtors say that the fund was increased previously to $850,000 based on an adjusted liquidation analysis. No formal plan amendment so stating was filed.

[5] Dkt. 1009 at 127.

[6] *See* the ballot tabulations before and after the settlement. Dkts. 948, 993.

5

## II.     Standard

The Bankruptcy Code provides that a creditor may recover attorney's fees as an administrative expense if the creditor makes a "substantial contribution in a case under chapter . . . 11 . . . ."[7]

In order to prevail, the claimant must prove two things. First, he must prove that he is a creditor.[8] Second, he must establish that he made a "substantial contribution" in the case.[9]

Determining whether a claimant made a substantial contribution presents a question of fact.[10] The claimant bears the burden of proof. [11]

In the Ninth Circuit, "the principal test of substantial contribution is 'the extent of benefit to the estate.'"[12] Services that "'contribute to a case are those which

---

[7] 11 U.S.C. 503(b)(3)(D).

[8] *Cellular 101, Inc. v. Channel Communications, Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1096 (9th Cir. 2004).

[9] *Id.*

[10] *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 946 (3d Cir. 1994).

[11] *Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 64 (Bankr. 9th Cir. 1988).

[12] *Cellular 101*, 377 F.3d at 1096 (quoting *In re Christian Life Center*, 821 F.2d 1370, 1373 (9th Cir. 1987)). Other courts have looked to the benefit to the estate, *the debtor, or its creditors. In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988); *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir. 1986); *In re Sentinel Mgmt. Group, Inc.*, 404 B.R. 488, 494 (Bankr. N.D. Ill. 2009); *In re D.W.G.K. Rests., Inc.*, 84 B.R. 684, 689 (Bankr. S.D. Cal. 1988). Given that the statute speaks broadly of a contribution "in a case," and that the Ninth Circuit used the phrase "benefit to the estate" without discussion, I do not think that the Ninth Circuit's formulation is limiting. In other words, benefit to the estate or to creditors generally ought to be sufficient.

6

U.S. Bankruptcy Court - Hawaii    #13-00353    Dkt # 1213    Filed  10/02/14    Page 6 of 16

foster and enhance, rather than retard or interrupt the progress o[f] reorganization.'"[13] Courts have also considered:

1) Whether the services were undertaken solely for the benefit of the party itself or for the benefit of all parties in the case;

2) Whether the services were actions that would have been taken by the party on its own behalf, absent an expectation of reimbursement from the estate;

3) Whether the party can demonstrate that its actions provided a direct, significant and demonstrable benefit to the estate;

4) Whether the benefit conferred upon the estate exceeds the costs sought to obtain that benefit; and

5) Whether the actions were duplicative of those being taken by other parties in the case, such as the debtor, a trustee or an official committee.[14]

The circuits are split on whether a creditor acting in its own self-interest may obtain an award under section 503(b)(3)(D).[15] Some circuits have held that a

---

[13] *Cellular 101*, 377 F.3d at 1097 (quoting *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir. 1986)).

[14] 4-503 Collier on Bankruptcy, ¶ 503.10[5][a] (14th ed. 2014).

[15] *Cellular 101*, 377 F.3d at 1097.

7

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 7 of 16

creditor's motives are not relevant; other circuits have held that expenses intended primarily to serve a creditor's interests are not compensable under 503(b)(3)(D). The Ninth Circuit has not decided this issue yet but has said that the extent of the benefits conferred on the estate can outweigh concerns about the claimant's self-interest.[16]

Even if the creditor's motive is irrelevant, the court should allow compensation only for those particular services which actually benefitted the estate and the creditors generally, and disallow compensation for other services that only benefitted the applicant, provided only minimal or incidental benefits to other creditors, or were duplicative of services rendered by others.[17]

Finally, courts construe section 503(b)(3) and (4) narrowly in order to hold administrative expenses to a minimum.[18] "[T]he integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to significant and tangible benefits to the creditors, debtor, or the

---

[16] *Id.*

[17] *See In re D.W.G.K. Restaurants, Inc.* 84 B.R. 684 (Bankr. S.D. Cal. 1988); *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 254 (Bankr. D. Colo. 1990); *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 946 (3d Cir. 1994) ("Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement. . . . 'substantial contribution'" should be applied in a manner that excludes reimbursement in connection with *activities of creditors and other interested parties* which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate [emphasis added].").

[18] *In re Sentinel Mgmt. Group, Inc.*, 404 B.R. 488, 494 (Bankr. N.D. Ill. 2009).

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 8 of 16

estate."[19]

## III. Discussion

No one denies that the Batiste creditors are "creditors" for purposes of section 503(b). The main dispute concerns whether they made a substantial contribution to the case.

In general, I find that the Batiste creditors substantially contributed to the case in two ways. First, they benefitted the unsecured creditors by roughly doubling the fund from which they would be paid. Second, they benefitted the estate by eliminating objections and paving the way to a confirmed plan. The Batiste creditors' contribution was substantial because it obviated further litigation and, perhaps, a denial of plan confirmation.

One could argue that the Batiste creditors' contribution was not "substantial" because, even with the enlarged fund, unsecured creditors may recover less than five percent of their claims.[20] The arithmetic behind this argument is correct, but the proportional increase in the distribution is more significant and persuasive in this case.

---

[19] *In re D.W.G.K. Rests., Inc.*, 84 B.R. 684, 690 (Bankr. S.D. Cal. 1988); *see also In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 250 (Bankr. D. Colo. 1990).

[20] If the unsecured creditors have claims of $33,700,000 and share pro rata in a fund of $1,550,000, each creditor would recover 4.6%. The percentage recovery would increase if creditor claims are disallowed (many objections have been filed), and would decrease to the extent that administrative expenses are paid out of the fund.

9

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed  10/02/14   Page 9 of 16

This leaves the question of amount: how much compensation and reimbursement is reasonable?

The debtors argue, and I agree, that the Batiste creditors' work should be analyzed in three time segments: the period before the first plan was filed on August 15, 2013 (which I will call the "pre-plan period"); the period from the filing of the first plan until SKFI offered to increase the unsecured creditors fund to $1,500,000 on November 11, 2013 (the "pre-offer period"); and the period after November 11, 2013 (the "post-offer period").

### A. The Pre-Plan Period

The debtors argue that the services rendered during the pre-plan period are not compensable because there was no plan on file and therefore there was nothing to which the Batiste creditors could have contributed. I agree with this objection, but only in part.

The timing of the services is not necessarily determinative. For example, in the right circumstances, prebankruptcy services are compensable. "It is the 'substantial contribution,' not the activity, that must occur 'in a case' under chapter 11 . . . ."[21] Some of the work of the Batiste creditors' counsel during the pre-plan period, such as general familiarization with the facts and legal issues of the case, were a necessary

---

[21] *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).

10

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 10 of 16

foundation for the work they did later. The happenstance of timing, standing alone, should not preclude compensation. If a particular task performed during the pre-offer period would have been compensable, it should also be compensable even though it was performed earlier, during the pre-plan period.

But some of the work done during the pre-plan period benefitted only the Batiste creditors. For example:

- Many of the time entries reflect counsel's consideration of "options for responding to bankruptcy filing."[22] Some of those options must have included the pursuit of the Batiste creditors' rights and claims regardless of, or at the expense of, other creditors.

- Counsel worked on motions for relief from the stay filed by other lot purchasers.[23] Counsel probably did this work at least in part to decide whether the Batiste creditors should follow the same approach. The Batiste creditors did not oppose the motions or take any other actions related to them that benefitted the estate or other creditors.

- Counsel apparently considered requesting the appointment of a trustee. Counsel never made a formal motion for such an appointment and there is no

---

[22] *See, e.g.*, the time entries by CDC on 3/11/13 and 3/14/13, among many others. Exhibit "A" to this decision is a copy of the Batiste creditors' billing statements on which I have struck out examples of noncompensable work.

[23] *See, e.g.*, the time entries by ABB and CDD on 4/18/13.

11

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 11 of 16

evidence that a trustee would have been advantageous to creditors.

- Counsel prepared and filed proofs of claim for the Batiste creditors. Filing a proof of claim benefits no one other than the filing creditor (except in rare circumstances not present here[24]).

Further, some of the general preparatory work would have been necessary even if the Batiste creditors never did anything that helped anyone other than themselves. For example, their counsel would have had to learn the facts and legal issues in order to file proofs of claim for the Batiste creditors. Therefore, only a portion of the services rendered during the pre-plan period are compensable.

Based on the billing records provided by the Batiste creditors, I cannot determine with precision what amount is compensable and what is not. Counsel performed multiple tasks on many days, some of which are compensable and some of which are not. The time records state the total amount billed by person per day, but do not allocate that time among the tasks.[25]

Another difficulty is that, in many cases, the billing records do not adequately

---

[24] For example, in a case filed by an individual, the debtor may benefit if creditors holding nondischargeable claims file proofs of claim, so the nondischargeable claims are paid to the extent possible out of estate assets and the remaining unpaid portion is minimized.

[25] This court's local rules require that professional billings itemize time entries by task, not just by day. LBR 2016-1(a)(3). The Batiste creditors' lead counsel are highly reputable and skilled, but they are not bankruptcy specialists, and may not have been aware of this rule. Further, they may not have expected, at least initially, that they would present their billing records to the court for approval. Therefore, I will not strictly enforce the local rule in this instance.

12

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 12 of 16

describe the work done. For example, many of the time entries reflect telephone calls or emails, but do not describe the subject of those communications. It is impossible to determine whether these tasks benefitted all creditors or solely benefitted the Batiste creditors.[26]

Based on the time records and my experience and personal observation, I find that $10,000 is a reasonable fee for the services rendered during the pre-plan period that were necessary to the substantial contribution made by the Batiste creditors. This amount is roughly one-third of the total amount sought for the pre-plan period. The Batiste creditors should also recover one-third of the reimbursable expenses incurred during that period.

### B. The Pre-Offer Period

The debtors argue that, at most, a portion of the services rendered during the pre-offer period made any positive contribution to the case and that even those services should not be compensated because the benefit to the estate was only incidental to the Batiste creditors' efforts to protect their own interest. I agree, but again only in part. Just as I concluded for the pre-plan period, a portion of the Batiste creditors' fees are compensable under section 503(b)(3)(D).

It is undisputed that the plan proponents agreed to double the unsecured

---

[26] Compounding the problem, many of the time entries are redacted. However, at the hearing on this motion, the Batiste creditors' attorney, Bernard Bays, represented that he was only claiming the amounts for the unredacted amounts.

13

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 13 of 16

creditors fund after they initially proposed the plan. I find that they would not have done so but for the Batiste creditors' efforts. Other creditors objected to the plan and disclosure statement, but those objections were either "me too" statements, following the Batiste creditors' lead, or based largely, if not entirely, on the plan's treatment of those creditors' particular claims. Only the Batiste creditors mounted a serious and sustained attack on SKFI's claims. That challenge induced SKFI to sweeten the pot for unsecured creditors.

Just as in the pre-plan period, however, some of the services rendered during the pre-offer period benefitted only the Batiste creditors. These services are a much smaller portion of the entirety than during the pre-plan period. Also, the timesheets lack the detail that would permit me to calculate the compensable services with precision.

Based on the time sheets and my experience and personal observation, I find that $45,000 is reasonable compensation for the services rendered during the pre-offer period that conferred a substantial benefit on the creditors and ultimately led to a confirmed plan. This amount is roughly 95% of the fees requested for that period.

### C. The Post-Offer Period

The debtors argue that none of the services rendered during the post-offer period are compensable. They claim that the only additional benefit that inured to creditors after the initial offer was a $50,000 increase in the unsecured creditors fund,

14

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 14 of 16

that this increase is not "substantial," and that the increase is dwarfed by the additional attorneys fees and expenses (over $130,000) which the debtors and the estate incurred to resist the Batiste creditors during the same period. The debtors argue that, during this period, virtually all of the Batiste creditors' efforts were devoted to an unsuccessful attempt to negotiate a separate benefit for themselves.

The Batiste creditors respond in several ways.

First, they emphasize that their efforts produced the improved recovery for unsecured creditors. This is true, but it overlooks the point that the court must scrutinize the work for which compensation is sought and grant administrative expense treatment only to those specific services which benefitted the estate generally.[27]

Second, they object to the debtors' use of settlement communications. Settlement offers, demands, and related communications are not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," but are admissible for other purposes.[28] I agree with the debtors that the settlement communications are not offered to

---

[27] *Hall Fin'l Group, Inc. v. DP Partners Ltd. P'ship (In re DP Partners Ltd. P'ship)*, 106 F.3d 667, 673 (5th Cir.), *cert. denied*, 522 U.S. 815 (1997) (Section 503(b)(3)(D) "requires the judge to distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection, the latter being noncompensable.").

[28] Fed. R. Evid. 408.

15

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 15 of 16

establish the validity or amount of the Batiste creditors' claims against anyone, but rather to show that their activities during the post-plan period did not make a substantial contribution to the estate or any other creditor. Indeed, settlement communications are the most important evidence, and may be the only evidence, showing whether a party made a substantial contribution to the settlement of a chapter 11 case.

Third, they claim that the debtors' statements about the settlement discussions are incomplete and inaccurate. The Batiste creditors, however, offer no evidence to rebut the declarations and exhibits offered by the debtors. The Batiste creditors' counsel believes that, if he did so, he would jeopardize his reputation for trustworthiness and discretion and impair his ability to settle other cases. This position is principled, but it leaves me with nothing to counter the detailed, corroborated, and persuasive evidence offered by the debtors.

Therefore, I find that the services rendered during the post-offer period did not make a substantial contribution to these chapter 11 cases.

## IV. Conclusion

In summary, I find that the Batiste creditors are entitled to an administrative expense claim of $55,000 under section 503(b).

**END OF DECISION**

U.S. Bankruptcy Court - Hawaii   #13-00353   Dkt # 1213   Filed 10/02/14   Page 16 of 16